# In the United States Court of Federal Claims

No. 11-804C

(Filed: November 8, 2012)

*******************************************  *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| SUFI NETWORK SERVICES, INC., | Non-Appropriated Funds Contract for Telephone Services on U.S. Air Force Bases in Germany; Wunderlich Act Review of Board of Contract Appeals Decision; Burden of Proof on Damages; Standards of Review for Legal and Fact Issues; Wilful Breach of Contract. |

SUFI NETWORK SERVICES, INC.,

           Plaintiff,

v.

THE UNITED STATES,

           Defendant.

*Non-Appropriated Funds Contract for Telephone Services on U.S. Air Force Bases in Germany; Wunderlich Act Review of Board of Contract Appeals Decision; Burden of Proof on Damages; Standards of Review for Legal and Fact Issues; Wilful Breach of Contract.*

*******************************************

*Frederick W. Claybrook, Jr.*, with whom was *Brian T. McLaughlin*, Crowell & Moring LLP, Washington, D.C., for Plaintiff.

*Douglas T. Hoffman*, with whom were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Harold D. Lester, Jr.*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for Defendant.

## OPINION AND ORDER

WHEELER, Judge.

      This case is before the Court for review of the decision of the Armed Services Board of Contract Appeals ("ASBCA" or "Board") in <u>SUFI Network Services, Inc.</u>, ASBCA No. 55306, 09-1 BCA ¶ 34,018 (Nov. 21, 2008) ("SUFI VIII").[1]   Our Court normally operates as a trial tribunal, but in this case, involving a non-appropriated fund instrumentality, the Court is performing an appellate function under the review standards of the Wunderlich Act, 41 U.S.C. §§ 321-22.  The Contract Disputes Act, 41 U.S.C. §

---

[1]  The ASBCA issued eleven decisions in the SUFI matter during a six-year period from April 22, 2004 through April 5, 2010.  The Board's lengthy decision on the merits in <u>SUFI VIII</u> is the main decision requiring review.

7101 et. seq., does not apply. Under the Wunderlich Act, our Court reviews issues of law de novo, but the ASBCA's fact findings are final unless they are arbitrary or capricious, or not supported by substantial evidence. See, e.g., Vista Scientific Corp. v. United States, 808 F.2d 50, 51 (Fed. Cir. 1986).

The disputes here stem from an April 26, 1996 contract between SUFI Network Services, Inc. ("SUFI") and the Air Force Non-Appropriated Funds Purchasing Office ("AFNAFPO") to provide telephone service in the guest lodging rooms on U.S. Air Force bases in Germany. Under the contract, SUFI agreed to provide the necessary telephone equipment and system operations at its own expense. In return, SUFI would share the telephone service revenues with the United States. The "financial purpose of the contract" was the sharing of revenues from outgoing long-distance calls by lodging guests. SUFI Network Servs., Inc., ASBCA No. 54503, 04-2 BCA ¶ 32,714 (Aug. 17, 2004) ("SUFI II") at 161,867-68. The parties understood that guests would use long-distance carriers selected by SUFI, and that other methods of long-distance calling would be blocked. Id. As amended, the contract would be in place for fifteen years.

The AFNAFPO added lodging facilities to the contract by means of delivery orders. At the time of award, three air bases were covered by the contract: Ramstein (602 guest rooms); Rhein Main (266 guest rooms); and Aviano (53 guest rooms). One month after award, the AFNAFPO added Landstuhl (275 guest rooms), and Vogelweh/ Kapaun (361 guest rooms). In July 1998, the AFNAFPO added Spangdahlem/Eifel West (180 guest rooms), and in August 1998, the AFNAFPO added Sembach Annex (563 guest rooms). SUFI VIII, at 168,218. Prior to SUFI's contract, with one exception, none of the guest rooms at these air bases had any telephone service.[2] The only guest facility telephones were located in the hallways and lobbies.

Many of the ensuing disputes resulted from Air Force actions that frustrated or undermined the use of SUFI's network, and thus prevented the generation of revenues in which SUFI would share. The ASBCA determined that the Air Force materially breached the contract when it directed SUFI in November 2003 to grant access from guest rooms to other long-distance providers. SUFI II, at 161,869. The Board concluded that the Air Force's material breach entitled SUFI to stop performance and cancel the contract. Id. On August 25, 2004, SUFI notified the contracting officer that it intended to stop performance. Through negotiations and a partial settlement agreement, SUFI stopped work on the contract on May 31, 2005, and the following day, the Air Force assumed ownership and operation of SUFI's telephone system at each base.

On July 1, 2005, SUFI submitted 28 monetary claims to the contracting officer totalling $130,308,071.53 in damages. On January 5, 2006, SUFI appealed to the ASBCA from the deemed denial of its claims, since the contracting officer had failed to

---

[2] Only the Prime Knight lodging rooms, discussed below, were equipped with telephone service.

issue a final decision.  On April 17, 2006, the contracting officer denied SUFI's claims in their entirety except for a small portion of one claim totalling $132,922.  See SUFI Network Servs., Inc., ASBCA No. 55306, 06-2 BCA ¶ 33,444 (Nov. 8, 2006) ("SUFI IV") at 165,772.  The Board held 23 days of hearing in Falls Church, Virginia and Ramstein Air Base, Germany from February 26, 2007 to May 10, 2007.  During the Board proceedings, SUFI amended its claim to more than $163,000,000.  In the decision on the merits, the Board granted SUFI partial relief on 21 of 28 claims, but awarded damages of only $3,790,496.65, plus interest.  SUFI VIII, at 168,291.  As a result of SUFI's three motions for reconsideration, the Board ultimately adjusted SUFI's award to $7,416,751.52.  See SUFI Network Servs., Inc., ASBCA No. 55306, 10-1 BCA ¶ 34,415 (Apr. 5, 2010) ("SUFI XI") at 169,887.

SUFI filed suit in this Court for review of the Board's decisions on November 30, 2011.  SUFI then filed a motion for judgment on the administrative record on January 21, 2012, and the Government filed its cross-motion for judgment on the administrative record on May 24, 2012.  The parties later filed reply briefs, and they have submitted an extensive appendix of the Board's proceedings.  The Court heard oral argument on September 11, 2012.[3]

The Court finds this case to be very odd.  The Air Force committed multiple breaches of contract that were mostly wilful, and the existence of damage to SUFI is clear and certain.  Yet, a wide gulf exists between the amount SUFI claimed ($163,000,000) and the amount the Board ultimately awarded ($7,416,751.52).  One might say that SUFI's claims must have been vastly inflated, but just as easily one could say that the Board harshly reduced SUFI's damages at every opportunity.  Indeed, the Board's SUFI VIII decision gives the impression that the Board ruled in every possible way to cut back SUFI's damages.  Virtually every Board judgment call went against SUFI and in favor of the Government.  In view of the wilfulness of the Air Force breaches, one would expect the outcomes to have been just the opposite, with judgment calls favoring SUFI.  Despite these general impressions, the Court must delve into the details of each claim to determine the proper outcome under the law.

The Court's total damages award to SUFI is $118,764,081.34.  This amount may seem generous, but after a full and careful review of the Board's record for each of the individual claims, the Court is persuaded that this contract was completely mismanaged

---

[3]  Given the lengthy history of this case, there are substantial documents comprising the record.  The Court has employed the following abbreviations and citations in this opinion: SUFI's Memorandum in Support of its Motion for Judgment on the Administrative Record ("Pl.'s Mem."); Defendant's Response to Plaintiff's Motion for Judgment Upon the Administrative Record and Defendant's Cross-Motion for Judgment Upon the Administrative Record ("Def.'s Resp."); September 11, 2012 Oral Argument ("Oral Arg. Tr."); Rule 4 File documents ("R4F, vol. __, tab __, at __"); Hearing exhibits ("Ex. __"); Hearing before the ASBCA ("Witness, Hr'g Tr. __/____").

by the Air Force, to the severe detriment of SUFI.  In view of the dramatically changing telecommunications environment that existed when the parties executed the contract, this agreement may not have made good business sense at the time.  With the advantage of perfect hindsight, there are other business alternatives that might have served the Air Force better.  Nevertheless, a contract is a contract, and SUFI relied to its detriment on the Air Force's promises that it would perform as required.  The damages award simply reflects the magnitude of the program envisioned by the parties and the disaster that it became following the Air Force's material breaches.  The Air Force has only itself to blame for a totally botched program of grand proportions.

Standard of Review

The Court's review in this case is governed by the Wunderlich Act, 41 U.S.C. § 321-22.  Although Congress repealed the Wunderlich Act as part of Public Law No. 111-350, 124 Stat. 3677, 3859 (Jan. 4, 2011), review under the statute is still appropriate because Congress excepted from the repeal "rights and duties that matured, penalties that were incurred, and proceedings that were begun before the date of enactment of this Act." Id. at 3855.  Since SUFI began these proceedings at the ASBCA long before the repeal of the Wunderlich Act, the Court must apply the Act's review standards here.

Under the Wunderlich Act, the Court's review is based upon the record developed before the Board and the Board's opinion.  See Hydromar Corp. of Del. & E. Seaboard Pile Driving, Inc. v. United States, 25 Cl. Ct. 555, 558 (1992); Titan Pac. Constr. Corp. v. United States, 17 Cl. Ct. 630, 634 (1989).  Plaintiff SUFI bears the burden of establishing any legal or factual errors by the Board.  See Titan, 17 Cl. Ct. at 634; Marley v. United States, 191 Ct. Cl. 205, 214, 423 F.2d 324, 329 (1970).  Wunderlich Act review employs the same standards used in the Administrative Procedures Act and other similar statutes. United States v. Carlo Bianchi & Co., 373 U.S. 709, 715-16 (1963).

The Court's review of Board decisions on questions of law is de novo.  Granite Constr. Co. v. United States, 962 F.2d 998, 1001 (Fed. Cir. 1992).  Issues of contract interpretation are questions of law, and thus the Court's review is unrestrained.  See Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1292 (Fed. Cir. 2002); George Hyman Constr. Co. v. United States, 215 Ct. Cl. 70, 80, 564 F.2d 939, 944 (1977).  When a mixed question of law and fact exists, if the law element "is predominant, essential, and in all respects crucial," such as an issue that is "fundamentally a decision interpreting the contract," the Court owes no deference either to the Board's decision or its rationale. Ray D. Bolander Co. v. United States, 186 Ct. Cl. 398, 415-16 (1968).

For fact issues, the Court must apply the "substantial evidence" and "arbitrary and capricious" standards.  See Monroe M. Tapper & Assocs. v. United States, 206 Ct. Cl. 446, 460-61, 514 F.2d 1003, 1009-10 (1975) (noting Supreme Court decisions holding that findings unsupported by substantial evidence are arbitrary and capricious).

Evidence is "substantial" if "a reasonable mind might accept [it] as adequate to support [the agency's] conclusion," and must be "more than a mere scintilla." <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938); <u>see</u> <u>Dickinson v. Zurko</u>, 527 U.S. 150, 162 (1999); <u>Statistica, Inc. v. Christopher</u>, 102 F.3d 1577, 1581 (Fed. Cir. 1996).

A "substantial evidence" review includes consideration of not only the body of evidence in support of the Board's view, but also "the body of evidence opposed to the Board's view." <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951); <u>see</u> <u>Farnsworth & Chambers Co. v. United States</u>, 171 Ct. Cl. 30, 37-38, 346 F.2d 577, 582 (1965). "The fact that there is evidence, considered of and by itself, to support the administrative decision is not sufficient where there is opposing evidence so substantial in character as to detract from its weight and render it less than substantial on the record as a whole." <u>Titan</u>, 17 Cl. Ct. at 634; <u>see</u> <u>Williams v. United States</u>, 130 Ct. Cl. 435, 440-41, 127 F. Supp. 617, 619 (1955).

In applying the "arbitrary and capricious" standard, the Court looks to whether an agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice[s] made.'" <u>Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983) (quoting <u>Burlington Truck Lines, Inc. v. United States</u>, 371 U.S. 156, 168 (1962)). The Court considers "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." <u>Id.</u> (quoting <u>Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.</u>, 419 U.S. 281, 285 (1974)).

An "arbitrary and capricious" finding occurs where a tribunal has "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view . . . ." <u>Id.</u>; <u>see also</u> <u>Morgan v. United States</u>, 298 U.S. 468, 480 (1936) ("Facts and circumstances which ought to be considered must not be excluded.").

Decisions have been found arbitrary and capricious in the following instances: (1) when record citations do not support the findings, <u>see</u> <u>Teledyne Lewisburg v. United States</u>, 699 F.2d 1336, 1354 n.58 (Fed. Cir. 1983); (2) when the findings misstate testimony, <u>see</u> <u>Ordnance Research, Inc. v. United States</u>, 221 Ct. Cl. 641, 664-66, 609 F.2d 462, 476-77 (1979); (3) when the findings give no explanation for a determination, <u>see</u> <u>Southern Co. Services, Inc. v. FERC</u>, 416 F.3d 39, 47 (D.C. Cir. 2005); (4) when the findings use irrational or unsupported assumptions, <u>see</u> <u>OMV Medical, Inc. v. United States</u>, 219 F.3d 1337, 1344 (Fed. Cir. 2000); (5) when the findings make miscalculations or utilize faulty methodologies, <u>see</u> <u>id.</u>; or (6) when the findings are inconsistent or otherwise illogical or unreasonable, <u>see</u> <u>Missouri Roofing Co. v. United States</u>, 357 F. Supp. 918, 922 (E.D. Mo. 1973).

On the other hand, if the Board has logically and rationally considered conflicting evidence, or resolved conflicting testimony through reasoned credibility determinations, the Board's factual findings generally should not be disturbed, since the Board is well suited to decide which evidence is more persuasive.  Blount Bros. Corp. v. United States, 872 F.2d 1003, 1005 (Fed. Cir. 1989); see also Statistica, 102 F.3d at 1583.

### Remand to the Board

The Court must address the question of whether there is a need for remand proceedings at the ASBCA.  As will become evident from the Court's review of the individual claims below, the Court in many instances reached a different outcome than the Board.  The issue is whether the Court must remand to the Board to make further findings, or whether the Court may make its own findings based upon the evidence of record.  The U.S. Court of Claims faced this very question in Maxwell Dynamometer Co. v. United States, 181 Ct. Cl. 607, 631, 386 F.2d 855, 870 (1967), where in reviewing an administrative decision of the ASBCA, the Court ruled:

> Where an administrative board has failed to make a relevant finding of fact as to which the evidence is undisputed, this court has made such finding rather than referring the matter to the board.  Likewise, where the evidence is disputed but it is of such a nature that as a matter of law the Board could have made only one finding of fact, it would seem that this court can make that finding without sending the matter back to the Board for determination of the factual issues; otherwise, litigation would be protracted and unnecessary delay and expense would result simply in order to have the Board formally decide a fact which legally can be decided in only one way.  Such an empty ritual has no place in a rational decision-making process.

(citations omitted); see also Sherwin v. United States, 193 Ct. Cl. 962, 979, 436 F.2d 992, 1002 (1971) (same); Koppers Co. v. United States, 186 Ct. Cl. 142, 150, 405 F.2d 554, 559 (1968) (same).  In this case, most of the Board's errors involve issues of law that the Court reviews de novo.  For the few fact questions, the Court can make the necessary corrections to the Board's decision without remanding the case for further findings or proceedings.  For some claims, the evidence is undisputed, and for other claims, only one finding could have been made from the record evidence.  Therefore, a remand to the Board is not required, and would only cause needless delay to already protracted proceedings that began in 2004.  The Court will comment upon this issue in the review of individual claims where applicable.

### Burden of Proof on Damages

A recurring problem in this case is to determine how best to apply the damages burden of proof rules to reach a just outcome for both parties. In many of the claims,[4] SUFI contractually was to receive revenue from all of the calls made by guests at a base lodging facility, but the Air Force repeatedly frustrated that objective in allowing guests to make calls by other means. The Air Force even encouraged guests to avoid using SUFI's telephone system and facilitated the practice. The Air Force breached the contract each time it allowed lodging guests to circumvent SUFI's network. SUFI's task in proving damages was to place a value on the calls made by other means that should have been made on SUFI's network. In some circumstances, SUFI has actual call records to calculate its claims, but in others, it had to estimate damages from a limited data base and make reasonable assumptions about telephone usage on non-SUFI telephones. The Air Force, while wilfully allowing these circumstances to occur, defends against SUFI's claims by arguing that not all of the calls made on non-SUFI telephones would have been made on the SUFI telephones. The Air Force's premise is that guests would not have used the more expensive SUFI network to the same extent as the less expensive or free calls they made through another carrier or system. The Air Force contends that SUFI has the burden of showing as part of its prima facie case what the guest calling patterns would have been absent the Air Force's breach. SUFI argues that it satisfied its burden by showing with reasonable certainty the amount of lost revenue for calls made on non-SUFI telephones, and that the Air Force has the burden to show any offset or reduction, which it failed to do.

The Board struggled with this issue in the decision on the merits (SUFI VIII), and in the three decisions on reconsideration (SUFI IX, X, and XI). Often, the Board used an alternative approach in calculating damages, resulting in a significantly reduced award to SUFI. The Board, however, did not explain the burden of proof rules it was applying.

In a breach of contract case, damages are recoverable where: "(1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." Ind. Mich. Power Co. v. United States, 422 F.3d 1369, 1373 (Fed. Cir. 2005) (citing Energy Capital Corp. v. United States, 302 F.3d 1314, 1320 (Fed. Cir. 2002)). "One way the law makes the non-breaching party whole is to give him the benefits he expected to receive had the breach not occurred." Bluebonnet Sav. Bank, FSB v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001) (quoting Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001)).

---

[4] A burden of proof issue exists in the calling card claim, the hallway and lobby DSN telephones claim, the Prime Knight lodging claim, the Delta Squadron claim, the early DSN abuse claim, and the other operator numbers patching claim.

Many courts have noted that "[t]he ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision." Bluebonnet, 266 F.3d at 1355 (citing Elec. & Missile Facilities, Inc. v. United States, 189 Ct. Cl. 237, 257, 416 F.2d 1345, 1358 (1969)).   Although absolute exactness is not required, "recovery for speculative damages is precluded." Ind. Mich., 422 F.3d at 1373 (citing San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997)).

In the context of expectancy damages, "any risk of uncertainty is assumed by the party whose wrongful conduct caused the damage." S. Cal. Edison Co. v. United States, 93 Fed. Cl. 337, 355 (2010) (citing Energy Capital, 302 F.3d at 1327).  As the Supreme Court observed long ago, in the context of a jury's award of damages:

> In such a case, even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork.  But the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly.  In such circumstances "juries are allowed to act on probable and inferential as well as (upon) direct and positive proof." Story Parchment Co. v. Paterson Parchment Paper Co., supra, 282 U.S. 561-564, 51 S. Ct. 250, 251, 75 L. Ed. 544; Eastman Kodak Co. v. Southern Photo Material Co., supra, 273 U.S. 377-379, 47 S. Ct. 404, 405, 71 L. Ed. 684.  Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim.  It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain.

Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264 (1946); see also Locke v. United States, 151 Ct. Cl. 262, 267, 283 F.2d 521, 524 (1960) ("The defendant who has wrongfully broken a contract should not be permitted to reap advantage from his own wrong by insisting on proof which by reason of his breach is unobtainable.").

The Restatement (Second) of Contracts, § 352, notes that a court may take wilfulness of the breach into account in assessing damages:

> Doubts are generally resolved against the party in breach.  A party who has, by his breach, forced the injured party to seek compensation in damages should not be allowed to profit from his breach where it is established that a significant loss

has occurred.   A court may take into account all the circumstances of the breach, including wilfulness, in deciding whether to require a lesser degree of certainty, giving greater discretion to the trier of the facts.

Restatement (Second) of Contracts, § 352 cmt. a (1981).

With regard to the parties' burdens of proof, "[w]hile plaintiff has the burden of proving its damages, the government has the burden of proving any setoffs, here the value of any benefits conferred on plaintiff." Caroline Hunt Trust Estate v. United States, 65 Fed. Cl. 271, 315 (2005), aff'd in part, rev'd in part and remanded, 470 F.3d 1044 (Fed. Cir. 2006); see also Lisbon Contractors, Inc. v. United States, 828 F.2d 759, 769 (Fed. Cir. 1987) ("The burden was on the government to prove the amount [of the claimed offset]."). "Any offset must be established with reasonable certainty." Caroline Hunt, 65 Fed. Cl. at 315 (citing Bausch & Lomb, Inc. v. Bressler, 977 F.2d 720, 729 (2d Cir. 1992); Restatement (Second) of Contracts § 349 (1979); Am. Capital Corp. v. United States, 59 Fed. Cl. 563, 584 (2004)).

Applying these damages principles to the case at hand, the Court does not agree with many of the damages determinations of the Board.  The Board only needed to assess whether SUFI proved its damages with "reasonable certainty."  Frequently, however, in assessing SUFI's lost revenue claims, the Board improperly rejected SUFI's calculations in favor of its own approach which resulted in a much lower damages award to SUFI. The Government's concerns that guests would not have used the more expensive SUFI network to the same extent as the less expensive or free calls they made through another carrier or system involves pure speculation.  The Government could have presented evidence to show the alleged effects of these damages reductions, but it did not.  The Court declines to eviscerate SUFI's damages claims as the Board did, just because of these speculative and unproven concerns.  See Tip Top Constr., Inc. v. United States, 695 F.3d 1276, 1284-85 (Fed. Cir. 2012) (Board engaged in impermissible speculation when embracing possible rebuttal points on which the Government had presented no evidence).

The rules of damages governing this case are issues of law, which the Court may apply de novo.  See Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538, 1544 (Fed. Cir. 1995) (explaining that whether lost profits "are legally compensable is a question of law" reviewed de novo); Trachtebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 109 (2d Cir. 2007) ("district court's decision to deny damages for breach of contract" is reviewed de novo).  The Court will address the specific deficiencies in the Board's approach under each claim below.

<u>Labor Rates for Extra Work</u>

Another recurring issue on some of SUFI's claims concerns the labor rate per hour that SUFI should receive for performing extra work required by the Air Force.[5]   In granting SUFI's claims for extra work, the Board constructed its own labor rates for SUFI's employees by dividing their base annual salary by 2,080 hours per year.   <u>SUFI VIII</u>, at 168,219, ¶ 11.   The Board did not add anything to these hourly rates to account for overhead or profit.   <u>Id.</u>   In taking this approach, the Board disregarded the fully loaded labor rates negotiated by the parties for changed work.   <u>Id.</u>   SUFI requested the Board to correct this error in its first motion for reconsideration, and the Air Force did not oppose SUFI's position.   <u>SUFI Network Servs., Inc.</u>, ASBCA No. 55306, 09-2 BCA ¶ 34,021 (Jul. 15, 2009) ("SUFI IX") at 169,094.   The Board did correct an error regarding the hourly rate for one employee (Ms. Cecilia Ansola), and acknowledged that, for extra work in changes claims, SUFI should be entitled to its actual costs plus overhead and profit.   <u>Id.</u>   However, despite the lack of any Air Force opposition, the Board declined to allow any overhead or profit on breach damages.   <u>Id.</u>

In making its ruling that "[w]e disallow profit on breach damages," <u>SUFI VIII</u>, at 168,256, the Board cited <u>H.H.O. Co. v. United States</u>, 12 Cl. Ct. 147, 154 n.1 (1987), and then on reconsideration quoted <u>Northern Helex Co. v. United States</u>, 225 Ct. Cl. 194, 203, 634 F.2d 557, 563 (1980), for the proposition that the innocent party is "not to make a profit from the breach."   <u>SUFI IX</u>, at 169,094.   The Court does not construe SUFI's breach claims to be seeking anything more than to be made whole for the labor hours incurred for extra work.   Breach damages for services should be awarded at their fair market value, not at some unburdened cost rate.   <u>See</u> <u>Acme Process Equip. Co. v. United States</u>, 171 Ct. Cl. 324, 359, 347 F.2d 509, 530 (1965) (the reasonable value of a non-breaching party's services is to be measured by "what he could have got[ten] for them in the market.") <u>rev'd on other grounds</u>, 385 U.S. 1032 (1967); <u>Hansen Bancorp, Inc. v. United States</u>, 367 F.3d 1297, 1314-15 (Fed. Cir. 2004) ("The non-breaching party is not limited to recovering the particular value of its services to the defendant; rather, it may recover in restitution the reasonable market value of those services, measured at the time of performance.").

Furthermore, the Court cannot see any logical reason to allow overhead and profit on labor hours incurred for a contract change, but to disallow overhead and profit on the same labor hours incurred because of a breach.   A failure to award overhead as part of damages does not make the non-breaching party whole; therefore reimbursement of salary alone is insufficient.   If the innocent party does not recover its allocable overhead,

---

[5]  A labor rate issue exists for extra work allowed by the Board for the hallway and lobby DSN telephones claim, the other operator number patching claim, the Delta Squadron claim, the calling cards claim, the SIMS/LTS interface claim, the change of Air Force switches claim, the early DSN abuse claim, the Prime Knight lodging claim, and the German troops housing claim.

it simply means that some other business activities of the contractor must absorb a disproportionately higher amount of overhead. See Carolina Power & Light Co. v. United States, 573 F.3d 1271, 1277 (Fed. Cir. 2009) (if contractor had not recovered overhead as part of a contract breach, "other activities would have assumed a disproportionate amount of the total overhead costs") The same is true for a reasonable profit element. All labor of a commercial enterprise is designed to earn a reasonable profit. The denial of profit on labor hours incurred because of a breach does not make the contractor whole. See Rumsfeld v. Applied Cos., Inc., 325 F.3d 1328, 1339 (Fed. Cir. 2003) (explaining where the Government breaches a contract and diverts business away from the contractor and does not use the contractor to satisfy a requirements contract, the contractor is entitled to recover lost profits damages); see also Fifth Third Bank v. United States, 518 F.3d 1368, 1374 (Fed. Cir. 2008) ("expectancy damages are intended to make a non-breaching party whole" and "expectancy damages include lost profits *but are not* limited to them.") (emphasis added).

The above reasoning also applies to SUFI's claims for out-of-pocket expenses, where SUFI is entitled to recover 25 percent for overhead and profit. The Board denied, or allowed only ten percent (depending on the claim), for overhead recovery on out-of-pocket expenses.

### Interest

On April 1, 2005, the parties entered into a Partial Settlement Agreement ("PSA"). Ex. B70. Section 4 of the PSA provides that "The Air Force will be liable to pay interest on any amounts paid or recovered by settlement or judgment from the earlier of (i) the [July 1, 2005] date of receipt of the claim or (ii) the date damages are actually incurred, until payment." Id.; SUFI XI, at 165,773. The applicable interest rate is the Federal Reserve Board's ("FRB's") monthly Prime Rate. SUFI VIII, at 168,225. It is undisputed that SUFI is entitled to interest payments. SUFI IV, at 165,777-78; Def.'s Resp. 18.

### Review of Claims

In addressing SUFI's contentions, the Court will first review the enforceability of an October 13, 2006 settlement agreement purporting to resolve ten of SUFI's 28 claims. Next, the Court will examine SUFI's claims for recovery of lost revenue and extra work costs, treating them in order from the largest claim to the smallest claim. Last, the Court will review SUFI's two claims for lost profits.

A.  Settlement Agreement

On October 12 and 13, 2006, the parties met at Ramstein Air Force Base, Germany to negotiate a settlement of ten of SUFI's 28 claims.[6]  Attorneys Rick Claybrook and Brian McLaughlin represented SUFI, while Air Force counsel Peter Gedraitis and Contracting Officer Max Browning represented the Government.  Mr. Gedraitis was the lead negotiator for the Government, but he was not a warranted contracting officer.  At the beginning of the discussions, Mr. Gedraitis stated that any negotiated agreement at the meeting would be finalized in a contract modification.  During the afternoon of October 13, 2006, Messrs. Gedraitis and Claybrook prepared a handwritten document of the matters agreed upon during the negotiations, and each of them signed the document.  The contracting officer, Mr. Browning, expressly stated that he would not sign the document.  The agreement stated as follows:

> Ramstein AB, Germany                    13 October 2006
>
> The parties in the Appeal of SUFI Network Services, Inc., ASBCA No. 55306 have agreed to resolve certain claims found in this Appeal.  In consideration of the following amounts listed to be paid by the AF NAFI, the Appellant, SUFI, Inc. will withdraw the respective claims from consideration by the ASBCA.
>
> | | |
> |---|---:|
> | Count I – Calling Card Claims | $625,000.00 |
> | Count II – Front Desk Patching | $180,000.00 |
> | Count IV – A&B Bed Switch | $400,000.00 |
> | Count XIII – Temporary Shutdowns | $300,000.00 |
> | Count XXIII – Security Inspection | $1,200.00 |
> | | $564.00 |
> | Count XXIV – Severance and Shutdown | $193,000.00 |
> | Count XXV – Office Lease | $1,083.00 |
> | Count XXVI – Extra Transition | $9,000.00 |
> | Count XXVII – Spare Parts | $105,000.00 |
> | Count XXVIII – Miscellaneous Shutdown | $4,200.00 |
> | Totaling | $1,819,047.00 |
>
> The parties have not agreed to the application of interest to any claims and will await a decision from the ASBCA regarding the application of interest to these claims.  If the ASBCA determines that interest is applicable to these claims, the NAFI will pay SUFI interest on these claims per the

---

[6]  The recited facts are taken from the Board's decision, SUFI VIII, at 168,219-21.

partial settlement agreement.   The rate of interest is in dispute.

This document represents the totality of the Parties' agreement on this Appeal; no other issues have been agreed upon by the parties in this settlement negotiation.   Attorney fees have not been resolved through this settlement.

s/Pete Gedraitis
Peter F. Gedraitis
For the NAFI

s/Rick Claybrook
Rick Claybrook
For SUFI

Ex. B83.

SUFI argued at the Board, and argues now before the Court, that the settlement agreement is legally binding and enforceable because: (1) the agreement was a completely integrated contract finalizing the settlement of the parties; (2) the Government intended to be bound by the agreement; (3) no contract modification was required to implement the agreement; (4) the government negotiator executed the agreement with full authority from the contracting officer; and (5) the contracting officer approved the agreement.   The Board disagreed with all of these contentions.   SUFI VIII, at 168,221.

It is well established that "anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority."   E.g., Flexfab, LLC v. United States, 424 F.3d 1254, 1260 (Fed. Cir. 2005) (quoting Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947)).   Settlement agreements are accomplished through contractual action.   Mil-Spec Contractors, Inc. v. United States, 835 F.2d 865, 868 (Fed. Cir. 1987).   The plaintiff bears the burden of proving a government agent's authority to enter into a binding contract on behalf of the Government.   See City of El Centro v. United States, 922 F.2d 816, 820 (Fed. Cir. 1990).

The fundamental problem with SUFI's position is that a warranted contracting officer did not sign the parties' agreement.   The Air Force lawyer who did sign the agreement did not possess a contracting officer's warrant.   While the contracting officer was present during the negotiations, his failure to sign the agreement is fatal to SUFI's position.   The contracting officer's reasons for not signing the agreement may include some or all of the factors noted in the Board decision.   Id.   It may have been that the contracting officer would wait to sign a bilateral contract modification formalizing the

parties' agreement.  Id.  It may have been that the contracting officer wanted to include missing terms such as the time of payment, or suitable release language.  Id.  Whatever the reasons, the agreement does not contain the signature of an authorized person.

Here, although Mr. Gedraitis signed the agreement "[f]or the NAFI," Ex. B83 at 1, Mr. Browning alone had "full authorization and approval power for a settlement," Pl.'s Mem. 27.  The contract stated that "[n]o agreement or understanding to modify this contract will be binding upon the NAFI unless made in writing and signed by a Contracting Officer."  R4F, vol. 1, tab 1, at I-4.  The mere fact that Mr. Browning did not voice a specific objection to the agreement does not render the agreement binding on the Government.  Pl.'s Mem. 28.  Rather, Mr. Browning's presence during the negotiations, coupled with his express refusal to sign the agreement, SUFI VIII, at 168,219-20, ¶¶ 13-15, underscores the non-binding nature of the purported settlement agreement for lack of authorization.  Under the contract, only a signature by Mr. Browning could render the agreement binding.  Thus, without his signature, the agreement is unenforceable.

### B.  Hallway & Lobby DSN Telephones

As noted, before the April 26, 1996 contract there were no telephones in the guest lodging rooms of the Air Force bases in Germany, but there were defense switched network ("DSN") telephones in the hallways and lobbies.[7]  These DSN telephones were to be used only for official business.  A caller wanting to use a DSN telephone would call a local base operator and demonstrate that the call was for official purposes.  The operator would issue a control number for the call, and the call would be placed to another DSN operator in the United States or internationally.

In the pre-award events preceding the SUFI contract, SUFI was concerned that it would lose significant call revenue if the hallway and lobby DSN telephones remained.  SUFI feared that a caller with a choice of using SUFI's in-room commercial network or the hallway DSN telephones might choose the hallway telephones as a way of circumventing long-distance charges.  For example, a caller wanting to connect with a relative in San Antonio, Texas might attempt to have a base operator in Germany connect with a base operator in San Antonio, who would then forward the call to a local San Antonio residence.  This call would be considered only a San Antonio local call, not an international long distance call from Germany to San Antonio.

To address this potential problem, in light of SUFI's desire to maximize call revenue under the contract, the parties agreed that the Air Force would remove all hallway and lobby DSN telephones when SUFI's telephones became operational.  Callers

---

[7]  The facts relating to this claim are taken from the Board's decision in SUFI VIII, at 168,235-41, and from the Board's decisions on reconsideration where the claim is further discussed, SUFI IX, SUFI Network Services, Inc., ASBCA No. 55306, 10-1 BCA ¶ 34,327 (Dec. 14, 2009) ("SUFI X"), and SUFI XI.

would then be required to use the SUFI guest room telephones for all calls.  The contract also provided, however, that SUFI would not receive revenue for local base level calling. To make an official business call, a caller would place a local call to the base operator in Germany, who would then place the call over the DSN network.  The Air Force agreed to monitor official business calls from the base, to be sure that this exception was not being abused.

After contract award in April 1996, the Air Force did not perform as required. Despite repeated demands from SUFI representatives, both orally and in writing, the Air Force refused to remove the hallway and lobby DSN telephones.  Although eventually some of the telephones were removed, the Air Force still left many hallway and lobby telephones in place.  The Air Force even added hallway and lobby telephones in some locations.  The existence of these DSN telephones presented a cheaper alternative for placing calls, and SUFI undeniably lost significant revenue because of the Air Force's refusal to remove the hallway and lobby telephones.

The Air Force's breach of contract in refusing to remove the hallway and lobby telephones can only be regarded as wilful.  In testimony explaining why the hallway and lobby telephones were not removed, Air Force witnesses candidly conceded that the hallway and lobby telephones afforded guests cheaper alternatives for making calls worldwide.  Wible, Hr'g Tr. 20/143-44; White, Hr'g Tr. 16/22-24, 130-31.  The Air Force actively assisted guests in circumventing the SUFI system, and seemingly wanted to enable guests to make free calls instead of using SUFI's telephones in the lodging rooms.  Notwithstanding the contract requirements with SUFI, the Air Force simply disregarded the need to remove hallway and lobby telephones.

The Board found that the Air Force had materially breached the contract by failing to remove hallway and lobby DSN telephones, but the Board encountered difficulty in analyzing the available data on damages.  The Board at first granted no relief to SUFI for this claim, holding that SUFI "has not sustained its burden of proving that the hallway/lobby DSN phones caused a reduction in its long distance revenues . . . ."  SUFI VIII, at 168,242.  After three decisions on reconsideration, however, the Board ultimately awarded SUFI $1,299,481.93 for this claim.  SUFI XI, at 169,887.

In the first decision on reconsideration, the Board applied a method of calculation that neither party had advocated, but one that the Board thought established "a reasonable amount for SUFI to recover for this breach."  SUFI IX, at 169,089.  The Board reviewed approximately 173,000 minutes of the 4,274,690 recorded minutes (slightly more than four percent) in calls for 28 hallway and lobby DSN telephones from September 1997 through December 2005.  Id.  The Board determined that thirteen percent of the reviewed minutes "were during other than normal duty hours at the locations called, and therefore more likely than not to have been non-official calls."  Id.  Using this method, the Board arrived at an award to SUFI of $1,159,756.37, incorporating lost revenues and extra

work.  Id.  In its final decision on reconsideration, the Board adjusted the lost revenue award to $1,296,723.50, which resulted in a total award of $1,299,481.93 for this claim. SUFI XI, at 169,887.

The Court agrees with the Board's liability determination that the Air Force materially breached the contract by failing to remove hallway and lobby DSN telephones. After careful consideration, however, the Court concludes that the Board erred in substituting its own calculation of damages.  SUFI presented a prima facie case of damages for this claim, and the Government failed to show any reduction or setoff, instead attempting to minimize the damages through mere speculation.

In establishing its prima facie case for lost revenue, SUFI showed that the "damages were reasonably foreseeable by the breaching party at the time of contracting." Ind. Mich., 422 F.3d at 1373.  The "financial purpose of the contract" between SUFI and the Air Force was the sharing of revenues from outgoing long-distance calls by lodging guests.  SUFI II, at 161,867-68.  SUFI was to select the long-distance carriers, and all other methods for such calls would be blocked.  Id.  Moreover, SUFI was concerned about the negative impact on revenue if the hallway and DSN telephones remained, an issue discussed by the parties and subsequently addressed in the contract.  SUFI VIII, at 168,241-42.  Thus, at the time of contracting, it was reasonably foreseeable that such a breach by the Air Force would result in significant revenue damages to SUFI.

Second, SUFI has shown that the Air Force's breach was a "substantial causal factor" in the revenue damages.  Ind. Mich., 422 F.3d at 1373.  The Air Force repeatedly refused to remove the hallway and lobby DSN telephones and actively installed such telephones in some locations.  SUFI VIII, at 168,236-37.  This wilful breach was the direct cause of SUFI's lost revenue, as the DSN telephones gave guests a cheaper, unauthorized method for placing calls, Def.'s Resp. 15.  If not for the presence of the unauthorized hallway and lobby DSN telephones, guests would have had no other option but to use the SUFI telephones for long-distance calls, thereby increasing SUFI's revenue.

Third, SUFI demonstrated the lost revenue damages caused by the hallway and lobby DSN telephones with "reasonable certainty."  Ind. Mich., 422 F.3d at 1373.  Under the contract, SUFI was to be the sole provider of any outgoing long-distance calls by lodging guests.  SUFI IX, at 169,088; Pl.'s Mem. 39.  It is undisputed that the hallway and lobby DSN telephones constituted a breach by the Air Force that negatively impacted SUFI's revenue.  Hoffman, Oral Arg. Tr. 89.  As such, SUFI merely needed to present sufficient evidence for the Court to make a "fair and reasonable approximation" of its damages.  Bluebonnet, 266 F.3d at 1355.

As SUFI itself points out, the best evidence for determining these damages would have been the Air Force's own DSN call records from its switches.  Pl.'s Mem. 42.  The

Government has lost these records, Oral Arg. Tr. 85, thereby precluding a precise calculation of damages.  SUFI provided alternative methods for determining a fair and reasonable approximation of damages.  Pl.'s Mem. 42-43.  In particular, SUFI proffered that the Landstuhl lobby telephone (x.4619) functioned in a similar capacity to the hallway and lobby DSN telephones, such that it served as a "surrogate" telephone.  SUFI VIII, at 168,242; Claybrook, Oral Arg. Tr. 76-80.

SUFI was unable to monitor the usage of the hallway and lobby DSN telephones, but it employed a methodology approved by the Defense Contract Audit Agency ("DCAA") to compute the lost revenues for this claim.  SUFI VIII, at 168,240, ¶ 112; Appellant's Post Hr'g Br. 200.  The basic method was to (1) identify a particular hallway or lobby DSN government telephone in the lodging facilities during some or all of SUFI's performance; (2) determine the date of use for that particular telephone; (3) apply a usage rate of that telephone over the dates of use; and (4) calculate lost revenues by applying the applicable annual long-distance revenue and cost rates to the total usage.  Appellant's Post Hr'g Br. 200.

SUFI elected to use the call records from its telephone in the Landstuhl guest lobby as a substitute for the actual call records from the unauthorized hallway DSN telephones.  Id. at 210.  The Landstuhl telephone did not have commercial access, but it had local and long-distance direct-dial DSN access, as well as access to the base operator.  Id.  Based on a twelve-month period, September 2003 through August 2004, SUFI computed an average monthly usage of 10,135 minutes.[8]  Id.; Ex. 205, tab 4A, at 122.  SUFI then used this figure, along with its weighted average long-distance rate and weighted cost average per minute, to compute lost revenue of $53,692,407.91 for both the known and unknown number telephones.  SUFI VIII, at 168,238-39; Ex. 205, tab 4A, at 122,211.

The Landstuhl telephone data allowed SUFI to calculate a reasonable and conservative estimate of damages in lieu of the Air Force's lost data.  Demonstrating the conservative nature of these damages, SUFI also presented data from two Delta Squad telephones as alternative surrogate records.  Pl.'s Mem. 42-43.  These records yielded a monthly usage of 12,176 minutes, twenty percent more than the Landstuhl data.  Ex. 205, tab 4A, at 212.  Moreover, calling card access was unblocked during the twelve-month period selected for the Landstuhl telephone.  Appellant's Post Hr'g Br. 211.  The calling card breach, discussed below, allowed guests to make calling card calls from their rooms instead of from the lobby, thereby depressing the average monthly usage figure from the Landstuhl data.  Id. at 212.  Although the Air Force clearly was in breach, SUFI exercised good faith in utilizing such conservative data.

---

[8] SUFI excluded all local calls and used only long-distance and operator calls in arriving at this average usage rate.  Appellant's Post Hr'g Br. 210.

The data from the comparable Landstuhl telephone records, although not an exact representation of the damages sustained from the hallway and lobby telephones, is relevant data that provides a reasonable estimate of the revenue damages. See Bigelow, 327 U.S. at 264. As the breaching party, the Government bears any risk of uncertainty in calculating damages incurred from the hallway and lobby DSN telephones. See S. Cal. Edison Co., 93 Fed. Cl. at 355.

Taking into account the wilful nature of the Air Force's breach, the unavailability of precise call records that only the Air Force possessed, and the conservative comparable data from the Landstuhl telephone, the Court finds that SUFI has adequately shown its damages with reasonable certainty. The burden then shifted to the Government to prove any reduction or setoff. Lisbon Contractors, 828 F.2d at 769. The Government maintains that SUFI's claimed damages are speculative, as guests would not have made the same amount of calls, or calls of the same duration, on the more expensive SUFI network. Def.'s Resp. 15. The Government argues: "The economic fact that people make more (and longer) telephone calls when paying lower rates made SUFI's damages calculation implausible, uncertain, and speculative." Id. at 12. The Board agreed, and correspondingly reduced SUFI's damages. See SUFI IX, at 169,089 ("Considering the personal cost to the caller of using the SUFI phones, we cannot conclude that all non-official calls placed ("free") over the hallway/lobby DSN phones would have been placed, in the absence of those phones, minute-for-minute over the SUFI phones at SUFI's commercial rates.").

The Government cited no authority and presented no evidence for this supposition. Absent any evidence, the Court has no basis to conclude that prospective callers would have used the hallway DSN telephones more than the SUFI telephones, or that calls on the DSN telephones would have been of longer duration than on the SUFI telephones. Counteracting these premises, there were fewer hallway telephones than guest room telephones, there were often waiting times to use the hallway telephones, and there was little privacy on the hallway telephones. Consequently, the Government's arguments, not SUFI's, amount to mere speculation. The Board's use of this unsubstantiated reduction in decreasing SUFI's damages was legal error. See Tip Top Constr., 695 F.3d at 1284-85 (Board made legal error by embracing speculation not supported by the record or any evidence by the Government). The Government failed to establish any offset or reduction of SUFI's damages claim with reasonable certainty. SUFI is also entitled to its extra work damages at the labor rates agreed upon by SUFI and the Air Force, combining overhead and profit, out-of-pocket costs, and claim preparation costs. Accordingly, the Court grants SUFI damages for the hallway and lobby DSN telephones in the amount of $53,700,352.41.

Pursuant to the PSA, SUFI is entitled to interest on these damages at the FRB monthly prime rate. Ex. B70 at 3. The Board used SUFI's proffered time period for accrual in its calculations. SUFI XI, at 169,887. SUFI now argues that the Board erred

in its interest computation when it used a chronological average date for the hallway and lobby DSN telephones as opposed to a weighted average date.  Pl.'s Mem. 45.  The Board rejected SUFI's proposed weighted midpoint as "inconsistent with the unweighted midpoints [it] used in . . . prior decisions."  SUFI XI, at 169,887.  Given that the unweighted midpoint of March 1, 2001 was indeed offered by SUFI as an alternative date for accrual, id., the Court declines to increase the interest accrual period.  Accordingly, the Court holds that SUFI is entitled to recover $53,700,352.41, plus interest thereon at the FRB monthly prime rate from March 1, 2001.

### C.  Other Operator Numbers Patching

Lodging guests at the Air Force bases where SUFI's system was installed looked for ways to make telephone calls from their rooms without incurring the cost of using SUFI's system.[9]  This issue first arose in connection with "morale calls," where troops on temporary duty of at least two weeks could make personal calls, usually to the United States, limited to fifteen minutes once every two weeks.  SUFI had not addressed the question of morale calls with the Air Force prior to contract award.  In October 1998, the Air Force established two DSN telephone numbers for morale calls, which SUFI monitored.  SUFI quickly learned that the morale call process was subject to rampant abuse, and although aware of such abuse, the Air Force made no effort to control it.  SUFI found morale calls on its records of up to three hours in duration.  From January through March 1999, SUFI submitted records showing calls exceeding morale call limits by 3,046.5 minutes, or 50 hours and 46 minutes.

Upon the Air Force's failure to monitor or control morale calls, SUFI blocked the ability to make these calls from guest rooms.  SUFI installed lobby telephones for morale calls that Government front desk personnel were expected to monitor, but apparently did not.  With SUFI blocking access to the original base operator numbers from guest rooms, Air Force front-desk personnel then actively assisted guests in circumventing SUFI's system.  First, Air Force front-desk personnel encouraged guests to use various "direct access" local DSN numbers that the Air Force set up to reach DSN operators directly, and who would then patch guests through to long-distance access.  Second, Air Force front-desk personnel also provided various indirect access local DSN numbers which guests could dial to be patched to the base operators and then to long-distance access directly.  Third, the Air Force made available an indirect access DSN number that reached a call-routing recording on which the Air Force added push-button access to the operators.  With the access to a host of local DSN numbers that could be used for patching, the usage levels of these numbers showed an explosive increase.  SUFI maintains that the only

---

[9]  The facts relating to this claim are taken from the Board's decision in SUFI VIII, at 168,250-53, and from the Board's decisions on reconsideration where the claim is further discussed, SUFI IX, SUFI X, and SUFI XI.

reason for these dramatic increases was to access the operators for long-distance calling and thereby to circumvent SUFI's network.

In total, there were five direct operator access numbers, 33 indirect operator access numbers, and one Air Mobility Command ("AMC") terminal number with push-button access to the base operator. SUFI prepared its damages claim by analyzing the call records of 33 DSN telephone numbers that guests could use either by direct or indirect access to operators, who would then patch the calls to a long-distance destination. These numbers should have been blocked completely from the guest rooms to require use of SUFI's network, but the Air Force did not honor this requirement. To be conservative in its claim calculation for the indirect access numbers, SUFI limited the damages to telephone lines that experienced at least 70 or more calls per year of ten minutes or more. By using this benchmark, SUFI presumed that calls greater than ten minutes most likely were personal calls, and therefore were long-distance. Any calls less than ten minutes in duration were excluded from SUFI's claim. The DCAA audited this claim, and approved of SUFI's methodology. SUFI VIII, at 168,253, ¶ 168.

The ASBCA found for SUFI on all liability aspects of this claim, but it denied damages to SUFI except for a small part of increased usage on a single access number. SUFI had claimed $1,586,863.81, plus interest, for Operator Numbers Patching, but the Board awarded only $3,004.15. The Board later adjusted this award to include corrected extra work damages and claim preparation costs, totaling $5,341.11. SUFI IX, at 169,094. The Board cited an "evidentiary lacuna"[10] in SUFI's proof, because SUFI was able to identify only the first call placed (to a local base operator), and not the next number to which the operator had patched the call for the caller. SUFI VIII, at 168,254. The Board granted only the minor claim amount for one number used for morale calls, but denied the remainder because SUFI could not show what portion of the patched calls were local calls. Id.

SUFI maintains that the Air Force breached the contract by providing guests with additional direct DSN operator numbers after SUFI had blocked operator numbers being abused by guests. With respect to indirect operator access numbers, SUFI showed that these numbers were given out by Air Force front-desk personnel to allow lodging guests to circumvent SUFI's long-distance system. Having used this reasonable and conservative method to calculate damages, approved by the DCAA, SUFI argues that it satisfied its burden of showing damages with reasonable certainty, and that the Government had the burden of showing the need for some reduction or offset in SUFI's claim.

---

[10] A "lacuna" is defined as a blank space or a missing part. Merriam-Webster's Collegiate Dictionary 696 (11th ed. 2003).

The Court concludes that the Board committed legal error in its application of damages burden of proof rules.  SUFI employed a reasonable method to calculate its damages, but the Board refused to allow any of it due to an inability to show which calls were patched to long-distance numbers by the operators.   As SUFI points out, the explosive call data for the numbers in question show that some atypical usage was occurring, and that the explosive call data was attributable to guests who were making calls to circumvent SUFI's system.   The Board was wrong to deny relief due to an absence of more detailed call data that could not be supplied by either party.

To deny SUFI all but $5,341.11 in damages, for lack of information that neither party could supply, works a miscarriage of justice and is not in accordance with law.  See e.g., Bluebonnet, 266 F.3d at 1355 ("[A]scertainment of damages is not an exact science, and where responsibility for damages is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision."); Locke, 151 Ct. Cl. at 267, 283 F.2d at 524 ("Nor does it exonerate the defendant that his misconduct, which has made necessary the inquiry into the question of harm, renders that inquiry difficult.") (citing Eastman Kodak Co. v. S. Photo Materials Co., 273 U.S. 359, 379 (1927)).

For the extra work portion of this claim, the Board denied all but a small portion of Ms. Ansola's time, even though the Board granted liability on the claim in all respects. SUFI VIII, at 168,254.   The Board provided no explanation for its denial of the extra work claim.   This too was legal error.   The total amount to be awarded SUFI for this claim is $1,586,863.81, plus interest.

D.  Delta Squadron

SUFI began providing telephone service at Sembach AFB, Germany in May 1999.[11]   The ground floor of Sembach lodging Building 210 housed the Delta Squadron's administrative, maintenance, and transportation personnel.   They worked in an area called the Day Room or lounge.   There were five or six DSN telephones in this area to which Delta Squadron personnel had complete access.[12]   SUFI requested Air Force personnel to remove these DSN telephones because they were within the confines of the lodging facility, and the contract required their removal.   The Air Force at first refused, but eventually removed all but two phones by the end of 1999.   In April 2000, SUFI

---

[11]  The facts relating to this claim are taken from the Board's decision in SUFI VIII, at 168,260-62, and from two of the Board's decisions on reconsideration where the claim is further discussed, SUFI IX and SUFI X.

[12]  In its memorandum for judgment on the administrative record, SUFI requests lost revenues for all government DSN telephones in the lounge.  Pl.'s Mem. 59.  SUFI reduced damages on this claim, however, in its post-hearing brief.  See Appellant's Post Hr'g Br. 265 ("SUFI's claim is conservative in that it only asks for lost revenue for two DSN phones from the day of its cutover until SUFI installed its two phones, instead of for the full five or six phones that were in place for much of the year.") (citations omitted).

substituted two of its own DSN telephones to monitor telephone usage from the lounge area.

The two telephones substituted by SUFI with DSN access were to be used mainly for troop morale calls. When SUFI complained that many of the calls were exceeding the fifteen minute limit for morale calls, SUFI threatened to remove its lounge area telephones. The Delta Squadron commander told SUFI that if the lounge area telephones were removed, "he would order his troops not to use SUFI's room phones." SUFI VIII, at 168,260, ¶ 203. SUFI maintained that the existence of the DSN telephones in the lounge area both before and after it substituted its own telephones was a breach of contract. The Board held, however, that the Air Force only had a duty to remove the government telephones it installed, and not the two SUFI telephones substituted by SUFI in place of the government telephones in order to monitor their usage. Id. at 168,262.

SUFI submitted a lost revenue and extra work claim of $1,836,063.41, but the Board at first granted just $108,488 in lost revenue damages, disallowing extra work and out-of-pocket costs. Id. at 168,262-63. On reconsideration, the Board adjusted its calculation upward and granted recovery for some of the extra work, out-of-pocket, and claim preparation costs, eventually totalling $184,314.54. SUFI IX, at 169,090-91, 94.

The Board limited SUFI's recovery to the period prior to April 2000, when SUFI substituted two of its own DSN telephones in the Delta Squadron lounge. The Board reasoned that the Air Force was not required to remove the telephones installed by SUFI, and therefore no damages were incurred by SUFI after April 2000. For the period prior to the removal of the government telephones, however, the Board employed its own lower rate, and disallowed most of the extra work claim. SUFI VIII, at 168,262-63.

In calculating the lost revenue damages for the pre-April 2000 period, the Board looked to records from the telephones subsequently installed by SUFI. It then "derive[d] the approximate call minutes multiplier by adjusting and extrapolating the minutes claimed for the two phones x.6998 and x.6999 to the two phones DSN 1 and DSN 2." SUFI VIII, at 168,263. The Board used this temporally proximate partial year data instead of SUFI's proposed multi-year average of the available call data from June 2000 through December 2004, finding that the partial year data "more accurately reflected the lost revenues." SUFI IX, at 169,091. In adopting this methodology, the Board examined the relevant data and articulated its rationale. Accordingly, the Court finds the Board's damages calculation for the government telephones supported by substantial evidence, and therefore not arbitrary and capricious.

The Board previously held that the contract required the Air Force "to remove government-installed DSN phones in Building No. 210's Day Room outside of the administrative area . . . on cutover in May 1999." SUFI VIII, at 168,262. Despite repeated requests by SUFI that they be removed, two government telephones remained,

and in April 2000 SUFI received permission to substitute these telephones with SUFI telephones.  Pl.'s Mem. 53.  Ms. Ansola testified that the purpose of this substitution was to enable SUFI to "monitor the phones and be able to show what kind of abuse was happening on those two phones."  Ansola, Hr'g Tr. 4/178-79.[13]  After the installation, SUFI continued to request removal of DSN telephones from the Delta Squad lounge. SUFI IX, at 169,090; Ansola, Hr'g Tr. 4/176-77.

It would be manifestly unfair to preclude SUFI from recovering damages after the April 13, 2000 substitution.  The contract required the removal of the government's DSN telephones, and the Government refused to remove two telephones which continually were abused.  In deciding many of the claims in this case, the Board denied SUFI recovery, citing insufficient proof of damages.  Here, SUFI took steps to ensure that its revenue damages were indisputably documented, substituting its own telephones for monitoring purposes.  The Board, however, found that this nuance of "SUFI-installed phones," as opposed to "government-installed phones" eviscerated the Air Force's "duty" to remove unauthorized telephones from the lounge.  SUFI VIII, at 168,262.  The Court finds this determination to be inconsistent and illogical, and therefore reverses the Board's decision as arbitrary and capricious.  Accordingly, SUFI is entitled to lost revenue damages from April 2000 through May 2005, as well as extra work hours, out-of-pocket costs, and claim preparation costs.  The correct award for SUFI's Delta Squadron claim is $1,534,192.40, plus interest.

E.  Calling Cards

On November 5, 2003, well after the beginning of the contract, the contracting officer directed SUFI to allow toll-free calls to lodging guests, which could include the use of calling cards of other long-distance carriers.[14]  SUFI II, at 161,865-66.  SUFI objected to this directive, but to no avail.  The Board held that the contracting officer's

---

[13]  The Government confirmed this series of events and rationale behind the substitution in its post-hearing brief:

> 326.  On 13 April 2000, SUFI installed two DSN phones with worldwide access in the Delta Squadron orderly room to replace two Government DSN phones.  These SUFI phones had the extensions 6998 and 6999.  (Ex. B205, tab 8A)

> 327.  The two SUFI DSN phones were connected to the SUFI telephone switch.  SUFI replaced the two Government DSN phones with SUFI phones for the purpose of allowing SUFI to monitor the use of these phones for alleged abuse.  (Tr. 4/179; R4, vol. 8, tab 84B at SCL002661)

See Resp't Post Hr'g Br. 89.

[14]  The facts relating to this claim are taken from the Board's decisions in SUFI I, SUFI II, and SUFI VIII, at 168,275-76.

directive constituted a material breach of contract, permitting SUFI to stop performance. Id. at 161,869.

For its damages claim, SUFI presented the actual call records over the unblocked calling card numbers of other carriers.  This evidence resulted in a claim for lost revenues of $947,752.29.[15]   Adding amounts for extra work and out-of-pocket costs, SUFI's calling card claim totalled $986,369.13, plus interest.  SUFI VIII, at 168,275-76.  The Board, however, rejected the evidence of SUFI's actual call records, and instead performed a comparison of (1) SUFI's monthly revenue for all bases from February 2003 through January 2004, before the unblocking of guest room phones took effect, and (2) SUFI's revenues for all bases from mid-February 2004 through August 2004.  The Board undertook a similar comparison for September through December 2004, but used the per month average from the pre-breach period as the baseline.  Id. at 168,276.  Using this method, the Board calculated a $24,466.85 difference that it applied for the first six and one half months, and a $7,400.82 difference that it applied for the last four months.  Id. at ¶ 275.  SUFI's total lost revenues under the Board's method was $188,637.80.  After adding a small allowance for extra work and out-of-pocket costs, the Board awarded $194,472.98 in calling card damages to SUFI.  Id. at 168,276.  The Board gave no explanation for its rejection of the actual call record evidence furnished by SUFI.  The Board later adjusted the extra work award and added claim preparation costs, allowing a total recovery of $205,147.47 for this claim.  SUFI IX, at 169,094.

As SUFI points out, the method adopted by the Board is far less precise than the actual records of calls placed with other carriers.  The Board's method assumes that the only breach SUFI was experiencing in 2004 was the calling card breach, and thus it could be isolated by comparing the total revenues for the months in question with other months.  However, the facts are otherwise.  SUFI was experiencing a multitude of other breaches simultaneously, such as the hallway and lobby DSN telephones breach, the other operator numbers patching breach, and several other breaches that ebbed and flowed in their severity.  Because of these other breaches, it is impossible to isolate the calling card breach using the Board's methodology.  The actual call records provided by SUFI would have been the best evidence of SUFI's calling card damages.

The Government argues that the Board's method was proper because SUFI had failed to account for the fact that guests likely would not have made calls of the same number and duration using the SUFI system as they did using the calling cards.  Def.'s Resp. 38.  According to the Government, "[t]he economic fact that people make more (and longer) telephone calls when paying lower rates made SUFI's damages calculation implausible, uncertain, and speculative."  Id.  The Government, however, failed to present any evidence to support its theory.  When there is no record evidence from the

---

[15]   SUFI's lost revenue estimate for the months of September through December 2004, amounting to $35,448.62 in lost revenues, is included in the total lost revenue claim.  SUFI VIII, at 168,275-76, ¶ 274.

extensive Board proceedings, the Court cannot engage in speculation as to what callers might or might not have done when using calling cards instead of SUFI's system.  As the Board observed in one of its earlier decisions, "once calls . . . were diverted to other carriers and no revenues are generated for SUFI, such revenues were lost."  SUFI II, at 161,869; see also Ace-Fed. Reporters, Inc. v. Barram, 226 F.3d 1329, 1332-33 (Fed. Cir. 2000) ("[E]ach time an agency . . . arranged for services covered under the contract from a non-contract source, the government . . . breached the contract.").

The Board committed legal error when it rejected the best evidence of SUFI's damages, the actual call records, and instead developed a monthly revenue comparison lacking any precision whatsoever.  This claim offers an excellent example of where the Board strained to develop a calculation that eviscerated nearly 80 percent of SUFI's legitimate claim.  The Board's method and result were improper, particularly in circumstances of a wilful breach where the Government's actions created the very difficulty of proving damages of which the Government now complains.  See e.g., Locke, 151 Ct. Cl. at 267, 283 F.2d at 524; Restatement (Second) of Contracts, § 352 cmt. a.

For SUFI's extra work claim, the Board awarded all of the extra work hours, but it used its own, recalculated hourly rates based upon each person's salary.  SUFI VIII, at 168,276, 168,291.  For the reasons explained under the "Labor Rates for Extra Work" section above, this was legal error, as it did not make SUFI whole for the extra work incurred.  The Board should have adopted the hourly rates that included an appropriate mark-up for overhead and profit.  Similarly, the Board should have allowed a mark-up on out-of-pocket costs and granted the amount that SUFI claimed.  The correct award for SUFI's calling card claim is $986,369.13, plus interest.

F.  SIMS/LTS Interfaces

This item relates to SUFI's claim for extra work and extra out-of-pocket costs due to defects in the Air Force's guest registration system called "SIMS" (Services Information Management System), and SUFI's later need to interface with another guest registration system called "LTS" (Lodging Touch System), which replaced SIMS.  SUFI claimed $560,001.85 in damages, plus interest, of which the Board granted $151,614.00, plus interest.[16]  The contract called for SUFI to collect data on call account and room status records so that all telephone charges could be included on a guest's bill upon check out.

In SUFI VIII, the Board found that SUFI's proposal, included in the contract, required SUFI to:

---

[16] The facts relating to this claim are taken from the Board's decision in SUFI VIII, at 168,228-33, and the first reconsideration decision, SUFI IX.

> [I]nstall a complete turn-key communications system which
> [would] interface with existing and planned Government
> equipment at each facility designated in the RFP (4.1) and
> SUFI's billing system [would] be fully interactive with the
> Government SIMS system (4.1.8) whose interface was a Type
> RS-232 GFE Computer Serial Port (<u>SUFI I</u>, ex. A1 at C-35,
> C-43).

168,228, ¶ 51.  Both SUFI and Contracting Officer Technical Representative ("COTR")
Wayne Sellers believed that under the contract, SUFI was obligated to provide the means
for the Air Force to print a single guest folio that included the telephone charges.  Pl.'s
Resp. 51; Sellers, Hr'g Tr. 3/233 ("Well, the way I read the contract, the one bill was the
contractual requirement.").

Initially, SUFI encountered difficulties interfacing with SIMS, first employing
GC-DOS computers as a "work around" and eventually replacing those computers with
the Tiger billing system in order to meet the Air Force's needs.  SUFI also had to train
Air Force attendants in using the new system.  Disagreements arose concerning the origin
of the defects that caused the interface problems.  The Air Force maintained that SUFI
had to employ the Tiger billing system to correct its own deficiencies, but SUFI
contended that the problems were with the SIMS guest registration system.  The Board
determined that the SIMS registration system was the source of the defects, but it denied
relief to SUFI for its failure to provide notice of extra-contractual work under the
contract.  <u>SUFI VIII</u>, at 168,232.  The second aspect of this claim, the interaction with the
Air Force's new LTS registration system, is acknowledged to be a valid extra work claim.
Still, there are damages issues in controversy, as the Board awarded only $154,781.27 in
extra work, out-of-pocket costs, and claim preparation costs.  <u>Id.</u>, at 168,233, 168,291;
<u>SUFI IX</u>, at 169,094.

With regard to the "notice" issue, there is record evidence of SUFI notifying the
contract specialist, Ms. Charlotte Guilmenot, that it regarded the installation of the Tiger
billing system as extra work.  The Board at first made a finding of this notice, <u>SUFI VIII</u>,
at 168,230, ¶ 63, but on reconsideration, the Board "corrected" finding 63 to read "[t]he
record contains no proof that SUFI told Ms. Guilmenot about installing the Tiger
system."  <u>SUFI IX</u>, at 169,093.  Regardless of whether the Board properly credited the
testimony of notice, the Court does not see what purpose a "notice" would have served in
this instance in the first place.  Both parties were aware of the need for the work, and
COTR Sellers was authorized to ensure that SUFI performed in accordance with the
contract terms and conditions.  <u>SUFI IX</u>, at 169,093.  Mr. Sellers' direction that SUFI
should employ the Tiger billing system to accomplish the "one bill contractual
requirement," Sellers, Hr'g Tr. 3/233, was therefore within his authorization, and did not
constitute an action necessitating notice.

The deficiencies in the Air Force's SIMS system caused SUFI to perform the extra work of installing the GC-DOS computers and Tiger billing system.  When extra work is performed, the contractor does not necessarily need to provide written notice to the contracting officer where the government had actual or constructive notice of the conditions.  See Dawco Constr., Inc. v. United States, 18 Cl. Ct. 682, 693 (1989), aff'd in part, rev'd in part, 930 F.2d 872 (1991).  Once notice is given about one type of differing site conditions, the contractor does not need to provide additional notice every time a "new rock [is] discovered."  Allied Contractors, Inc. v. United States, 149 Ct. Cl. 671, 675, 277 F.2d 464, 466 (1960); Blue Cross & Blue Shield United v. United States, 71 Fed. Cl. 641, 660-61 (2006) (imputing knowledge to supervisor where the senior employee was the primary point of contact with plaintiff).

The plaintiff may also recover damages if the defendant is not prejudiced by the lack of notice.  Dawco, 18 Cl. Ct. at 693.  It is the defendant's burden to show prejudice from the plaintiff's failure to give notice.  Id. (citing G.M. Shupe Inc. v. United States, 5 Cl. Ct. 662, 727 (1984)).  Prejudice is demonstrated by illustrating how the plaintiff could have mitigated the costs of performing the extra work if it had provided the contracting officer with notice.  See Dawco, 18 Cl. Ct. at 693 (citing Schnip Bldg. Co. v. United States, 227 Ct. Cl. 148, 163-65, 645 F.2d 950, 959–60 (1981)).

SUFI had to perform this work so that the interface with the SIMS guest registration system would function properly.  Neither party argued that a "notice" issue existed, and the Court does not see one.  It was legal error for the Board to deny SUFI's extra work claim on this basis.  With a breach of contract action, the key is to put the contractor in as good a position as he would have been in if not for the defendant's wrongful action.  Bennett v. United States, 178 Ct. Cl. 61, 70, 371 F.2d 859, 864 (1967).  By denying SUFI's extra work claim, that objective would not be achieved.  See id.  Moreover, the Government was not prejudiced by the lack of notice because the contracting officer already knew the work needed to be performed and the Government did not show how notice would have mitigated the costs of installing the Tiger billing system.  See Dawco, 18 Cl. Ct. at 693.

SUFI also contends that the Board erred when it failed to rely upon the best evidence of the cost of GC-DOS computers.  The Board used a unit cost of $20,000 for the six computers, based upon a SUFI internal memorandum from September 21, 1998 stating that the computers cost "$20,000 each."  SUFI VIII, at 168,232, ¶ 74.  However, SUFI's witness testified that the correct cost was $22,000 each, from a February 1998 email prepared when he was actually looking at the invoices.  Stephens, Tr. 2/77; Ex. A36, B17.  Finally, SUFI questions the Board's failure to award SUFI any of its subcontractor costs due to its finding that "SUFI identified no subcontractor work by name or date."  SUFI VIII, at 168,232, ¶ 74.

In the Court's view, the proper outcome here is to grant SUFI's damages, except for the $51,500 subcontractor work and the $2,000 increase for each of the six GC-DOS computers. SUFI presented insufficient evidence of invoices or payment records to support these claim items. With the use of fully loaded labor rates and as adjusted by the parties, SUFI's total damages award for SIMS/LTS interfaces is $480,626.85, plus interest.

G. Kapaun Line Charge

SUFI claims a $1.00 per day per phone line charge for wiring the Kapaun and Sembach air bases with a SUFI telephone system. For the Sembach base, the contracting officer issued a delivery order authorizing the $1.00 per day line charge, and SUFI recovered $758,463.00 for that claim. SUFI VIII, at 168,259. The Board, however, denied the Kapaun line charge because it was never included in a delivery order or contract modification.[17] SUFI contends that it has a valid equitable estoppel claim against the Air Force to recover the Kapaun line charge.

According to SUFI, it reached an agreement with the Air Force for payment of a $1.00 line charge per day per phone for SUFI's wiring of the Kapaun air base. However, after SUFI performed the work on the promise that the Air Force would modify the delivery order to incorporate the line charge, the Air Force reneged on its promise. SUFI's claim is for $544,476. The Board denied SUFI's claim, because it had not made a case for equitable estoppel. The Board found that the COTR who allegedly made the promise lacked the authority to modify the delivery order to include the charge, that SUFI knew the COTR lacked contracting authority, and that SUFI did not rely detrimentally on the COTR's conduct because it knew there was an existing delivery order covering the Kapaun base. Id.

A claim for equitable estoppel requires: "(1) misleading conduct, which may include not only statements and actions but silence and inaction, leading another to reasonably infer that rights will not be asserted against it; (2) reliance upon this conduct; and (3) due to this reliance, material prejudice if the delayed assertion of such rights is permitted." Mabus v. Gen. Dynamics C4 Sys., Inc., 633 F.3d 1356, 1359 (Fed. Cir. 2011) (citing Lincoln Logs Ltd. v. Lincoln Pre-Cut Log Homes, Inc., 971 F.2d 732, 734 (Fed. Cir. 1992)). A party invoking the doctrine of equitable estoppel against the government "bears a heavy burden," Connor Brothers Construction Co., Inc. v. United States, 65 Fed. Cl. 657, 692 (2005) (citing Heckler v. Community Health Services of Crawford County, Inc., 467 U.S. 51, 61 (1984)), as a contractor must prove an additional element of "affirmative misconduct," Zacharin v. United States, 213 F.3d 1366, 1371 (Fed. Cir. 2000). Prior to finding estoppel against the government, the threshold issue of

---

[17] The facts relating to this claim are taken from the Board's decision in SUFI VIII, at 168,257-60.

authority must be satisfied: "it is essential to a holding of estoppel against the United States that the course of conduct or representations be made by officers or agents of the United States who are acting within the scope of their authority." Emeco Indus., Inc. v. United States, 202 Ct. Cl. 1006, 1015, 485 F.2d 652, 657 (1973).

Here, this threshold requirement is not met. In early March 1998, SUFI's Mr. Carl Stephens met with COTR Sellers, Mr. John Fortuna, Mr. Perry Kosmatka, and a Non-Commissioned Officers Academy representative. SUFI VIII, at 168,257. At this meeting, SUFI proposed the condition of the $1.00 per day per room line fee for the Kapaun and Sembach buildings, to which the attendees agreed, and asked Mr. Stephens to submit proposals. Id. There was no contracting officer present at this meeting. Id. As discussed above in the "Settlement Agreement" section, SUFI bore the risk of ensuring that the government agents stayed within the bounds of their authority. See Flexfab, 424 F.3d at 1260. The contract required all modifications to be made in writing and signed by a contracting officer. R4F, vol. 1, tab 1, at I-4. Under the contract and Delivery Order No. 4, SUFI was required to provide service at Kapaun without a line fee. SUFI VIII, at 168,257-58. SUFI's argument that this requirement was withdrawn fails because there was never any written modification by the contracting officer to this effect. Id. at 168,259; Ex. A1 § G.3 ("The CO is responsible for issuing any amendment to the Request for Proposal and any modification to the contract(s)."). Thus, SUFI remained contractually obligated to install telephones at Kapaun without a line fee, and COTR Sellers did not have the authority to authorize the $1.00 per day per phone charge.

SUFI contends that the Kapaun line charge agreement had the "Contracting Office's approval, encouragement, and knowledge." Pl.'s Mem. 74. Mr. Stephens testified that Ms. Guilmenot, the contracting specialist, informed him that she would approve whatever was agreed to by U.S. Air Force Europe. SUFI VIII, at 168,257; Stephens, Hr'g Tr. 1/231-32. SUFI submitted a proposal to the Contracting Office, but no formal modification was ever issued. SUFI VIII, at 168,257-58. According to SUFI, at the March 12, 1998 meeting, COTR Sellers urged SUFI to begin installation of the Kapaun LFTS services, thereby confirming the pending modification of the line charge. Pl.'s Mem. 79. In support of its argument that the Government is estopped from denying these charges, SUFI cites persuasive language from American Electronic Laboratories:

> The statements of the Technical Representative cannot be completely disavowed and repudiated on the ground that he was without the authority to speak for the contracting officer. When an official of the contracting agency is not the contracting officer, but has been sent by the contracting officer for the express purpose of giving guidance in connection with the contract, the contractor is justified in relying upon his representations.

Am. Elec. Labs., Inc. v. United States, 774 F.2d 1110, 1115-16 (Fed. Cir. 1985) (quoting Max Drill, Inc. v. United States, 192 Ct. Cl. 608, 625, 427 F.2d 1233, 1243 (1970)).  The facts of that case, however, are markedly different from the case at bar.  In American Electronic Laboratories, the court held that the Government was estopped from relying on a Limitation of Funds clause in the contract to the extent of $900,000 because the contracting officer had "determined that the proposed modification would be in the best interests of the government and signed a document authorizing the modification."  Id. at 1112, 1115-16.  Here, regardless of the alleged inducements of Ms. Guilmenot and COTR Sellers, Contracting Officer Janice Jones never signed any document authorizing a Kapaun line charge.  SUFI VIII, at 168,258.  A signed document was required for a delivery order or contract modification, a practice followed by the contracting officer when she issued a delivery order authorizing the line charge for the Sembach base.  SUFI VIII, at 168,258.  Accordingly, the Court agrees with the Board that SUFI has not made a case for equitable estoppel, and denies damages with respect to the Kapaun line charge.

## H.  Change of Air Force Switches

In April 2000, the Air Force replaced existing Siemens DSN switches at Ramstein and other air base lodgings with a Nortel DSN switch.[18]  SUFI's already installed system was compatible with the Siemens DSN switches, and as a result of the replacement, SUFI had to implement the interface of its equipment with these new switches.  Under the contract, SUFI was required to install a system that would "interface with existing and planned Government equipment."  R4F, vol. 1, tab 1, at C-35.  There is no evidence that the Air Force "planned" this equipment replacement.  Moreover, Contracting Officer Cedric Henson explained to COTR Claudette "Sam" Adams that SUFI was only responsible for the initial interface:  "the clarification was made so that SUFI was responsible for interfacing with w/the [sic] [Property Management System ("PMS")] at the time of each install; however, [it] was not meant to cover developing subsequent interfaces due to Air Force migration to a new PMS."  Ex. B34 at 2 (Adams e-mail, quoting CO Henson).  Accordingly, SUFI is entitled to recover damages for interfacing with the replacement Air Force switches.

After the change to the Nortel switch at Ramstein, SUFI experienced a "call queuing" problem with the Reservations Center telephone system which SUFI serviced.  The Ramstein Reservation Center call queuing system could accommodate up to twenty calls.  The incoming calls went through the SUFI switch and then to the automatic call distribution ("ACD") center system.  The ACD system put the calls in a queue in order of receipt, telling the caller his or her place in the queue, and then releasing the calls in the order received to the available operator.  With the new Nortel switch, if a caller decided to hang up after being put in the queue, the call would not release from the queue.  When this call reached the head of the line, the call would not release to the operator either,

---

[18]  The facts relating to this claim are taken from the Board's decision in SUFI VIII, at 168,263-65.

effectively blocking the system. This problem had not existed with the prior Siemens switch.

SUFI's employees investigated this problem extensively, and finally resolved the problem. SUFI purchased and installed a new ACD system, and upgraded the Ramstein switch to work with the new ACD system. SUFI did not encounter this problem at other air bases where the Air Force replaced the Siemens switch with the Nortel switch.

The Board denied SUFI's claim, finding that SUFI "did not carry its burden of proof that respondent's new Nortel DSN switch caused the malfunction in SUFI's system and hence SUFI's extra work and purchased equipment." SUFI VIII, at 168,265. The Court finds this ruling to be arbitrary, capricious, and not supported by substantial evidence. SUFI presented compelling testimony explaining that the new Nortel switch did not provide a satisfactory "hang up" tone to SUFI's equipment. As a result, when callers hung up the telephone after being placed in the queue, SUFI's equipment did not know to hang up the line. Congalton, Hr'g Tr. 12/64-67, 88-93; Smith, Hr'g Tr. 13/52-53; R4F, vol. 11, tab 95A, at 3133 (Broyles 4/14/00 entry); R4F, vol. 13, tab 99A, at 4,298-313.

The Board essentially made the above findings, SUFI VIII, at 168,264, ¶¶ 215-16, but apparently rejected SUFI's claim because a similar problem had not been encountered at any of the other bases where the switches had been changed. Any inference from this fact is overcome by the strong temporal relationship between the Nortel switch change and the occurrence of the call queuing problem. The Air Force offered no evidence to rebut SUFI's analysis of the problem, and indeed there is nothing in the record to establish any alternate cause. The Air Force did not contest the amount of SUFI's damages for this claim, and accordingly, the Court will grant SUFI's claim in full, $213,191.13 plus interest, for the change in Air Force switches, incorporating damages both for interfacing with the replacement Air Force switches and the call queuing problem.

I.  Early DSN Abuse

On May 23, 1997, early in contract performance, SUFI added DSN call service to the Ramstein guest rooms, limited to the local area.[19] Almost immediately, SUFI noticed a significant reduction in long distance call revenues and an increased pattern of calls to the DSN information operator. SUFI suspected that the DSN operators were patching long distance calls to circumvent the cost of using the SUFI network, and promptly notified the contracting officer. After the Air Force refused to monitor the calls to DSN operators, SUFI blocked access to three DSN operator numbers (0, 112, and 113) and SUFI's long distance revenues returned to the previous levels. If a guest encountered a

---

[19]  The facts relating to this claim are taken from the Board's decision in SUFI VIII, at 168,233-35.

blocked DSN operator number, the front desk staff provided a different DSN number to circumvent SUFI's commercial network.  SUFI again notified the contracting officer, and blocked access from the guest rooms to these additional DSN numbers.

SUFI claimed damages of $75,000 for lost revenue from May through July 1997, plus extra work, out-of-pockets costs, and interest.  The Board found that SUFI's factual assertions were true, but did not award any damages because SUFI's monthly revenues for the months in question did not show a decline as SUFI alleged.  The Board determined through averaging monthly revenues that SUFI received $37,377 per month from May through July 1997, which was $6,372 higher than the average for January through May 1997 ($31,005 per month).  SUFI VIII, at 168,234, ¶ 84.  The Board did not address the extra work or out-of-pocket cost claims.

SUFI asserted through its witness, Mr. Stephens, that the $75,000 claim is conservative because it includes only DSN calls of 30 minutes or more.  SUFI presented evidence of one to four hour calls or more on the DSN lines.  SUFI VIII, at 168,233, ¶ 77.  Indeed, one guest room had logged five-hour telephone calls for ten consecutive days.  Id. at 168,234, ¶ 83.  The call records from 1997 no longer exist, but Mr. Stephens referred to those records when he prepared the $75,000 claim for lost revenues.  Stephens, Hr'g Tr. 1/170-71; Ex. A36 ¶ 5.

The Board is correct that the 1997 Ramstein monthly averages of revenues do not support a finding of significant revenue loss due to DSN abuse.  Once again, however, the use of monthly averages in this case does not tell a complete or reliable story.  There were multiple other breach factors affecting SUFI's monthly revenues, and it is incorrect to rely upon the monthly averages as if this breach were the only one in play.  In contradiction of the Board's conclusion, the fact of damage to SUFI is clear, and the Air Force's breach was wilful.  The Board erred in relying on suspect monthly revenue averages to the exclusion of other compelling evidence.  The Court has a duty to award reasonable damages when a wilful breach has occurred.  See Bluebonnet, 266 F.3d at 1357-58 (using "jury verdict" method to compute reasonable damages when there was clear proof of injury); Locke, 151 Ct. Cl. at 267, 283 F.2d at 524 (approximate amounts may be used "if a reasonable basis of computation is afforded" because the breaching party "should not be permitted to reap advantage" from lack of proof which his breach made unobtainable).

The Court owes no deference to the Board's decision on issues of law.  The application of the proper rule of damages is a question of law, or to the extent it might be regarded as a mixed question of fact and law, the legal portion of the issue predominates.  Ray D. Bolander Co., 186 Ct. Cl. at 415-16.  With the discretion to decide this claim de novo, the Court will grant SUFI its damages in full for the early DSN abuse, $122,942.50, plus interest.

J.  Prime Knight Lodging

The Prime Knight lodging facilities at Ramstein air base Building Nos. 538 and 540-42 were intended for air crews transitioning on flight status.[20]  Their overnight stays were relatively brief.  During a pre-award survey held in February 1996, SUFI's Mr. Stephens observed DSN telephones in each of the Prime Knight guest rooms he entered. The Prime Knight Lodging Manager, Mr. Fred Roberts, falsely stated that these were intercom telephones allowing the front desk clerk to call the rooms with flight information and changes.  In fact, these DSN telephones provided Class A worldwide service.  These were the only guest quarters that had in-room telephones prior to SUFI's contract.

There is no dispute that the contract required the Air Force to remove these DSN telephones from the Prime Knight guest rooms as of the date of cutover to SUFI's system.  Yet Mr. Roberts, and others within the Air Force, refused to remove the DSN telephones throughout 1997.  While the contracting officer knew that the Prime Knight DSN telephones had to be removed, the Air Force brass in Germany stubbornly thought these flight crew personnel should have free telephone service.  Pearson, Hr'g Tr. 3/13-14.  The Air Force finally removed the DSN telephones shortly after September 30, 1998. The Government concedes that it committed a breach of contract in failing to remove the DSN telephones from January 1997 through September 1998.

SUFI claimed $208,547.45 in lost revenue, extra work, and out-of-pocket costs for this item, but the Board awarded only $128,942.83.  One of the differences is in the calculation of lost revenue.  SUFI's Mr. Stephens estimated a loss of approximately $18,000 in revenue per month, causing a total net loss of $188,260.20 for December 1996 through September 1998.  Oral Arg. Tr. 108-09.  SUFI no longer possesses the call records on which the lost revenue estimate was based.  The Board, however, awarded $121,542.08, or approximately $70,000 less, based upon a comparison of Prime Knight revenues per room for the breach period ($667.05), and the revenues received per room from other Ramstein lodging facilities ($1,357.63).  This difference, $690.58, times the 176 Prime Knight rooms, yields a total of $121,542.08.

The revenues received per room from other Ramstein lodging facilities were themselves repressed.  All of them were subject to the existence of hallway and lobby DSN telephones that were also impacting SUFI's revenue.  The allowance of SUFI's lost revenue claim, $188,260.20, yields a per room lost revenue of $1,069.60, only $379.02 higher than the Board's calculation of lost revenue per room ($1,069.60 less $690.58). Because of the Board's failure to consider the effects of the hallway and lobby DSN telephones on the other Ramstein lodging rooms, the Court finds that the higher award is more reasonable.  Again, the Court gives weight to the wilful breach of contract, more so

---

[20]  The facts relating to this claim are taken from the Board's decision in SUFI VIII, at 168,242-45.

here than for any other claim, in reaching this result.  The extra work and out-of-pocket costs for this claim also are granted, and claim preparation costs adjusted accordingly. Since the application of the proper damages rule is a question of law, which the Court reviews de novo, the Court has the necessary discretion to reach its own result. Accordingly, the Court grants SUFI's claim in full, $208,547.45, plus interest, for the Prime Knight Lodgings.

K.  German Troops Housing

At the Sembach air base, the Air Force through Lodging Manager David White decided to house a group of German troops at Building 212, using this building as a barracks rather than for transient lodging.[21]  These troops were assigned to guard Air Force bases in Germany.  They were long-term guests who stayed at Sembach Building 212 for six to eight week periods.  The commander of the German troops requested Building 212 front desk personnel not to issue PIN numbers to the German troops.  The use of PIN numbers would have been necessary to access the SUFI telephones, so without PIN numbers, the German troops could not use SUFI's system, and thus SUFI received no revenue.  From March 2003 through May 2005, a few PIN numbers were issued, and occasionally, someone other than German troop personnel would stay in a room.  The Board found that the housing of German troops at Sembach Building 212 was a change in the description of services to be performed under the contract's Changes clause.  SUFI VIII, at 168,270.

SUFI claimed damages of $49,909.02 for lost revenue, plus extra work and interest.  The Board awarded only $1,042.88 for some of the extra work, and did not grant SUFI any lost revenue.  SUFI IX, 169,094-95.  With claim preparation costs, the total award from the Board was $1,696.20.  Id.  However, the Board did not address or explain the reasons for denying the lost revenue claim.  The Board's failure to address the lost revenue claim in any respect was clear error.

SUFI calculated its lost revenue claim by comparing the amounts received during the months of occupancy by the German troops against the prior average monthly revenue received for lodging in Building 212.  Smith, Hr'g Tr. 13/31; Myers, Hr'g Tr. 14/91-92; Ex. B205, tab 12A, at 385, 387-89.  The DCAA took "no exception" to the lost revenue computation and "verified the contractor's methodology."  R4F, vol. 9, tab 88A, at 2820, 2822-24; R4 Supp., vol. 1, tab 108, at 14; Ex. B205, tab 12A, at 385.  The Air Force did not contest the amount calculated.

The Court grants SUFI the full amount of this claim, $54,780.52, plus interest.

---

[21]  The facts relating to this claim are taken from the Board's decision in SUFI VIII, at 168,269-71.

L.  Lost Profits

SUFI submitted a lost profits claim to recover the expected revenue, less estimated costs of performance, that SUFI would have received if the contract had continued to completion.  SUFI's lost profits claim totalled $65,980,144.35, of which the Board allowed $636,497 in its original decision.  SUFI VIII, at 168,284 (claim), 168,287 (decision).  After three motions for reconsideration, the Board adjusted SUFI's lost profits award to $2,646,116.  SUFI XI, at 169,887.  There are two significant issues that must be addressed in considering SUFI's lost profits claim:  (1) the length of the contract; and (2) whether SUFI's telephone service would have been used at new lodging facilities to be opened at the bases assigned to SUFI's contract.

1.  Length of the Contract

The parties dispute whether SUFI's contract, as amended, was to last for fifteen years from the date of contract award, or for fifteen years after the acceptance of a functioning telephone system at each air base.  The Board sua sponte measured the fifteen year period from the date of award, but SUFI relies on its analysis of pertinent contract provisions to argue otherwise.  Contract interpretation questions are issues of law, which the Court may decide de novo.  Seaboard Lumber, 308 F.3d at 1292; George Hyman Constr., 215 Ct. Cl. at 80, 564 F.2d at 944.

The "Performance Period" clause, found at section H.29 of the contract, states as follows:

> The performance period *for each site* will commence upon *actual completion of installation, inspection and acceptance* by the ordering NAFI for the system ordered for that particular site and shall not exceed a period of 10 years from that date.

R4F, vol. 1, tab 1, § H.29 at H-5 (emphasis added).  Modification 8 ("Mod 8") of the contract, dated March 24, 2000, changed the "10" year period to "15" years, but left all other language unchanged.  R4F, vol. 1, tab 11.  The Board relied on section F.4 of the contract, entitled "Term of Contract," which states that "The term of this contract will be for 120 months (ten years).  All percentages shall remain firm and fixed for this period." R4F, vol. 1, tab 1, § F.4 at F-4.  Modification 8 also changed section F.4 to read "180 months (15 years)."  Id.  In its first reconsideration decision, the Board explained that it used April 25, 2011 as the end date for the unperformed years "because Mod 8 so specified for the expiration of the 15-year *contract term*."  SUFI IX, at 169,092 (emphasis in original).  The Board reasoned that this interpretation was consistent with section H.29, which states that the performance period for each site "shall not exceed a period of 15 years."  Id.

SUFI also relies upon the "Option to Buy Equipment" clause, section H.27 of the contract, as amended by Mod 8, which states as follows:

> *Upon completion of the performance period of each site (15 years),* and prior to removal of any contractor owned equipment, the Government shall have the option to buy existing equipment at fair market value . . . .

R4F, vol. 1, tab 11 (Mod. 8), § H.27 at H-5 (emphasis added).

Considering each of the cited contract clauses, SUFI's interpretation is the most reasonable, and the one that gives meaning to all of the provisions. SUFI maintains that section F.4, "Term of Contract," sets the period under which new delivery orders could be placed adding bases and lodging facilities to the scope of work. If section F.4 were controlling in setting a firm limit on the fifteen-year term, such an interpretation would render sections H.27 and H.29 meaningless and superfluous. Under the Board's interpretation giving preference to section F.4, there would be no reason to have other provisions addressing a performance period *for each site*. The only way to give meaning to all of the provisions is to hold that sections H.27 and H.29 establish fifteen-year terms on a site-by-site basis, measured from the date of "actual completion of installation, inspection and acceptance" of the telephone system at each site. Interpreted in this way, there is no ambiguity in the contract, and all clauses are given effect. See Arizona v. United States, 216 Ct. Cl. 221, 235-36, 575 F.2d 855, 863 (1978) ("[A]n interpretation which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result.")

Moreover, as SUFI points out, the contract procedure for adding lodging at new bases was for the Government to issue delivery orders. The parties expected that some bases would be added well after the initial contract award date, such as occurred for Spangdahlem (August 31, 1998), and Sembach (November 30, 1998). R4F, vol. 1, tabs 19, 20. If the Performance Period clause did not provide for a new start date for each base, there would be little or no incentive to add bases as the contract end date neared. The Performance Period clause also reflects the sound business principle that SUFI could not earn any revenue on its investment at a base until the telephone system was up and running.

Accordingly, SUFI's lost profits claim should extend for fifteen years from the date of actual completion of installation, inspection, and acceptance of the telephone system at each site.

2.   Whether New Guest Lodging Facilities Are Within SUFI's Contract

SUFI included in its lost profits claim revenues that it would have received if new guest lodging facilities at Ramstein and Spangdahlem had been brought on line after SUFI's performance ended in May 2005.   SUFI included the room counts for these facilities in the lost revenues, 104 rooms for Spangdahlem (to be opened in April 2007), and 355 rooms for Ramstein (to be opened in September 2007).  SUFI VIII, at 168,283, ¶ 322.  SUFI contends that the parties' agreement operated like a requirements contract for bases where SUFI already had received a delivery order.  If, for example, SUFI had received a delivery order for Ramstein in 1996, as it did, SUFI asserts that the Government was required to award the telephone services work to SUFI for all other new lodging facilities opened at Ramstein.  The Government disagrees with SUFI's position, maintaining that the Air Force had the right, but not the duty, to order telephone services from SUFI for new lodging facilities.   SUFI also argues that if not for the Air Force's material breach, SUFI would have serviced the new hotel at Spangdahlem, pointing to the Air Force's use of SUFI equipment to service the hotel.

Central to the analysis of this issue is the "Expanded Service" clause of the contract.  The "Statement of Work" in the AFNAFPO's solicitation stated:

> The contractor shall provide expanded services after cut over in accordance with the terms of the contract as requested by the government.   Expanded services are those services necessary to satisfy additional requirements over and above those provided at cut over.

Ex. A2 § 3.11 at C-27.   SUFI requested clarification of this provision in its initial proposal.  The Air Force explained that the expanded service requirement related only to lodging facilities for which SUFI would receive additional revenues.  Ex. A2 § 3.11 at C-27; Ex. A4 at sec. II, pg. 8; Ex. A6 at 2 (Q&A 7).

In its final proposal, SUFI rewrote the "Expanded Service" provision to conform to the Air Force's clarification.  The "Expanded Services" clause, as incorporated in the contract, stated as follows:

> [SUFI] is fully committed to providing the best Customer Service available.   Our goal is to develop a mutually rewarding long term relationship through our commitment to your satisfaction.  Expanded service is defined as additional services or features required to support the lodging mission (i.e. addition of new buildings, rooms, and lodging offices).

Ex. A1 at A-2, § 3.11 at C-29.

The Board ruled in <u>SUFI II</u> that the Air Force was not required to allow SUFI to service new or replacement lodging facilities on bases where SUFI already had received a delivery order.  <u>SUFI II</u>, at 161,868.  The Board noted that the contract is an indefinite quantity type of contract, and that AFNAFPO had the duty to order only "minimum" quantity of services "designated in the schedule."  <u>Id.</u>  The AFNAFPO complied with this requirement by ordering "one system per base" for Aviano, Rhein Main, and Ramstein air bases.  <u>Id.</u>  SUFI moved for reconsideration, but the Board reaffirmed its ruling.  <u>SUFI Network Servs. Inc.</u>, ASBCA No. 54503, 04-2 BCA ¶ 32,788 (Nov. 1, 2004) ("SUFI III") at 162,194-95.

Following these rulings, the Air Force moved for partial summary judgment on SUFI's request that the rooms for the new Ramstein and Spangdahlem lodgings be included in the lost profits computation.  The Board denied this motion, finding that whether the Air Force "would have ordered telephone services at new facilities at Ramstein and Spangdahlem but for the CO's material breach of the contract" was in factual dispute.  <u>SUFI IV</u>, at 165,780.  In <u>SUFI VIII</u>, after considering the evidence presented at the hearing, the Board found that the chance of Air Force officials ordering SUFI's services at those new facilities "was essentially zero."  <u>SUFI VIII</u>, at 168,285.

SUFI relies upon a variety of hearing testimony to show the parties' understanding both before and during the contract performance period.  However, the Court's resort to parol evidence would only be helpful if there existed some contract ambiguity requiring interpretation.  <u>See</u> <u>Barron Bancshares, Inc. v. United States</u>, 366 F.3d 1360, 1375-76 (Fed. Cir. 2004) (discussing that the parol evidence rule prohibits external evidence to interpret unambiguous contract terms) (citations omitted).  The Court does not see any ambiguity in the "Expanded Services" provisions or in any other pertinent contract clause.  The fact remains that this contract was not a requirements contract, and there was no clause giving SUFI any entitlement to telephone services at new lodging facilities.  The Government had the right, but not the obligation, to place this work with SUFI.  The mere fact that the Air Force used SUFI equipment (which it then owned) to service the Spangdahlem hotel after SUFI stopped performance is not sufficient evidence to show that SUFI would have serviced the hotel if not for the Air Force's breach.

The Court agrees with the Board's ruling to exclude new lodging facilities from SUFI's lost profits calculation.

###  3.  <u>Other Lost Profit Matters</u>

The parties agree that the lost profits calculation is dependent upon the outcome of the other SUFI claims.  After considering the Court's additional damages awarded to SUFI, the lost profits claim is increased to $59,876,215.14.  In making this adjustment, the Court has used the January 2002 through May 2005 revenue averaging period

proposed by SUFI.  Neither the DCAA nor the Air Force challenged the use of this averaging period.  The only effect of the Board's use of a different period, beginning in July 2000 (SUFI VIII, at 168,285, ¶ A), is to reduce arbitrarily the amount of SUFI's recovery.  The Board offered no reason for this change to the averaging period.

M. General Lack of Cooperation

SUFI sets forth a "General Lack of Cooperation" claim to provide an alternative measure of relief for lost profits.  Pl.'s Mem. 109-10.  As the Court has accepted much of SUFI's lost profits methodology, the issue of whether SUFI should recover under an alternative method of calculation is moot.

N.  Summary of Damages

The following chart summarizes the damages awards allowed by the Court and by the Board regarding SUFI's claims appealed to the Court, excluding interest:

| Claim Description | Court Award | ASBCA Award |
|---|---|---|
| Hallway & Lobby DSN Telephones | $53,700,352.41 | $1,299,481.93 |
| Other Operator Numbers Patching | $1,586,863.81 | $5,341.11 |
| Delta Squadron | $1,534,192.40 | $184,314.54 |
| Calling Cards | $986,369.13 | $205,147.47 |
| SIMS/LTS Interface | $480,626.85 | $154,781.27 |
| Kapaun Line Charge | $0.00 | $0.00 |
| Change of Air Force Switches | $213,191.13 | $0.00 |
| Early DSN Abuse | $122,942.50 | $0.00 |
| Prime Knight Lodging | $208,547.45 | $128,942.83 |
| German Troops Housing | $54,780.52 | $1,696.20 |
| Lost Profits | $59,876,215.14 | $2,646,116.00 |
| **TOTAL** | **$118,764,081.34** | **$4,625,821.35** |

Conclusion

Based upon the foregoing review of SUFI's claims, the Court concludes that SUFI should recover $118,764,081.34 in damages.  The total amount awarded by the Board for the same claims is $4,625,821.35.  Thus, the total net award by the Court is

$114,138,259.99, plus interest.  The Court directs the Clerk to enter judgment for SUFI in that amount.  This result leaves undisturbed SUFI's claims that were not appealed to the Court, for which SUFI has received $2,790,930.17.  Pursuant to Rule 54(d), the Court awards reasonable costs to SUFI.

     IT IS SO ORDERED.

<u>s/Thomas C. Wheeler</u>
THOMAS C. WHEELER
Judge