IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SUFI NETWORK SERVICES, INC., Plaintiff, | ) | No. 11-804C |
| v. | ) | (Wheeler, J.) |
| UNITED STATES, Defendant. | ) | |

SUFI'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES

Frederick W. Claybrook, Jr.
Brian Tully McLaughlin

Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
(202) 624-2500

Attorneys for SUFI Network Services, Inc.

June 17, 2016

Table of Contents

Page

I. SUFI Is Due Its Litigation Hours Incurred at *All* Forums ..... 1

A. SUFI's Hours Incurred in This Court Must Be Included in the Award ..... 1

B. All SUFI's Hours Incurred in ASBCA Litigation Must Be Included in the Award ..... 1

1. The Initial Board Proceedings Are Included ..... 2

2. The Board Proceedings on Remand Are Included ..... 7

C. SUFI's Hours for the Federal Circuit Appeals Must Be Included in the Award ..... 7

D. SUFI's Hours for Preparing and Defending This Fee Application Must Be Included in the Award ..... 8

II. SUFI Is Due All Its Claimed Hours ..... 8

III. SUFI Is Entitled to an Award at Full, Current Rates Under § 2412(b) ..... 11

A. SUFI Is Due Full Rates Under § 2412(b) Because the Air Force Denied SUFI Relief Clearly Due ..... 13

1. The Air Force Willfully Hampered the Litigation ..... 14

2. SUFI Is Due Full Rates Under § 2412(b) Because the ASBCA, in Its Function as the Agency, Acted Unreasonably and Required Litigation ..... 19

3. DOJ Litigated Vexatiously with Respect to the Remand Proceedings ..... 23

B. Crowell & Moring's Standard Rates Should Be Used ..... 27

C. The Rate Under § 2412(b) Should Be Adjusted to Account for Delay ..... 28

IV. In the Alternative, SUFI Is Entitled to Recover As a Small Business Under § 2412(d) ..... 31

A. The Air Force's Position Was Not Substantially Justified ..... 33

B. SUFI Should Receive Full Rates in a § 2412(d) Recovery ..... 38

1. SUFI Should Receive an Enhanced Rate Due to the Exceptional Results Obtained ........ 38

2. SUFI Should Receive an Enhanced Rate Under § 2412(d) Because of Special Tasks Performed ........ 40

3. SUFI Should Receive an Enhanced Rate Under § 2412(d) Because of Extraordinary Delay ........ 41

4. SUFI Should Receive an Enhanced Rate Under § 2412(d) Because of the "Limited Availability of Qualified Attorneys" ........ 42

C. At a Minimum, the Capped Rate Under § 2412(d) Must Be Adjusted for the Increase in the Cost of Living ........ 46

V. SUFI's Expenses Are Fully Supported and Are Not "Fractionable" ........ 47

VI. SUFI's Requested Damages Are Appropriately Supported ........ 48

VII. Under the Partial Settlement Agreement, SUFI Is Entitled to Interest from the Date of This Petition Until Payment ........ 49

Conclusion ........ 50

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*360Training.com, Inc. v. United States*,
111 Fed. Cl. 356 (2013) ....................47

*Adolph Coors Co. v. Truck Ins. Exchange*,
383 F. Supp. 2d 93 (D.D.C. 2005) ....................27

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*,
421 U.S. 240 (1975) ....................11, 27

*Am. Hosp. Ass'n v. Sullivan*,
938 F.2d 216 (D.C. Cir. 1991) ....................12, 13, 14

*Applegate v. United States*,
52 Fed. Cl. 751 (2002) ....................8

*Armstrong v. Davis*,
318 F.3d 965 (9th Cir. 2003) ....................2

*Barnes v. Cincinnati*,
401 F.3d 729 (6th Cir. 2005) ....................39

*Barry v. Bowen*,
825 F.2d 1324 (9th Cir. 1987) ....................11

*BCPeabody Constr. Servs., Inc. v. United States*,
117 Fed. Cl. 408 (2014) ....................45, 47

*Beta Sys., Inc. v. United States*,
866 F.2d 1404 (Fed. Cir. 1989) ....................8

*Biery v. United States*,
818 F.3d 704 (Fed. Cir. 2016) ....................30

*Brotherton v. Cleveland*,
141 F. Supp. 2d 907 (S.D. Ohio 2001) ....................39

*Brown v. Sullivan*,
724 F. Supp. 76 (W.D.N.Y. 1989) ....................12

*Brown v. Sullivan*,
916 F.2d 492 (9th Cir. 1990) ....................12, 21

*Burlington v. Dague*,
505 U.S. 557 (1992)....................32

*Centex Corp. v. United States*,
486 F.3d 1369 (Fed. Cir. 2007)....................11, 13, 32, 33

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991)....................11, 12, 48

*Christianburg Garment Co. v. EEOC*,
434 U.S. 412 (1978)....................12

*Cmty. Health Servs. v. Califano*,
563 F. Supp. 1368 (W.D. Pa. 1983)....................33

*Comm'r, INS v. Jean*,
496 U.S. 154 (1990)....................3, 7, 8

*Copeland v. Marshall*,
641 F.2d 880 (D.C. Cir. 1980) (en banc)....................8, 9, 29, 41

*Dalles Irrigation Dist. v. United States*,
91 Fed. Cl. 689 (2010)....................48

*DGR Assocs., Inc. v. United States*,
97 Fed. Cl. 214 (2011), *rev'd on other grounds*, 690 F.3d 1335 (Fed. Cir. 2012)....................43, 45, 46, 47

*Doty v. United States*,
71 F.3d 384 (Fed. Cir. 1995)....................32

*EEOC v. Peoplemark, Inc.*,
732 F.3d 584 (6th Cir. 2013)....................12

*Esprit Corp. v. United States*,
15 Cl. Ct. 491 (1988)....................43

*F.D. Rich Co. v. United States ex rel. Indus. Lumber Co.*,
417 U.S. 116 (1974)....................21, 27

*Fala Corp. v. United States*,
2003 U.S. App. LEXIS 8330 (Fed. Cir. Apr. 29, 2003)....................11

*Fidelity Constr. Co. v. United States*,
700 F.2d 1379 (Fed. Cir. 1983)....................4, 5, 7

*Fischbach & Moore Int'l Corp. v. United States*,
617 F.2d 223 (Ct. Cl. 1980)....................23, 24

*Former Emps. of Motorola Ceramic Prods. v. United States*,
336 F.3d 1360 (Fed. Cir. 2003)....................7

*Fritz v. Principi*,
264 F.3d 1372 (Fed. Cir. 2001)....................8

*Gen. Dynamics Corp. v. United States*,
206 Ct. Cl. 821 (1975)....................23

*Geo-Seis Helicopters, Inc. v. United States*,
79 Fed. Cl. 74 (2007)....................32

*Hall v. Cole*,
412 U.S. 1 (1973)....................11

*Hensley v. Eckerhart*,
461 U.S. 424 (1983).................... *passim*

*Hirschey v. FERC*,
777 F.2d 1 (D.C. Cir. 1985)....................41

*Hoel-Steffen Constr. Co. v. United States*,
684 F.2d 843 (Ct. Cl. 1982)....................20, 21, 33

*Hollowell v. Gravett*,
723 F. Supp. 107 (E.D. Ark. 1989)....................39

*Hopi Tribe v. United States*,
55 Fed. Cl. 81 (2002)....................47

*Hubbard v. United States*,
480 F.3d 1327 (Fed. Cir. 2007).................... *passim*

*Hubbard v. United States*,
52 Fed. Cl. 192 (2002), *aff'd in part and rev'd in part*, 480 F.3d 1327 (Fed. Cir. 2007)....................34

*Impresa Construzioni Geom. Domenico Garufi v. United States*,
100 Fed. Cl. 750 (2011)....................43

*Info. Scis. Corp. v. United States*,
88 Fed. Cl. 626 (2009)....................8

*Jazz Photo Corp. v. United States*,
597 F. Supp. 2d 1364 (Ct. Int'l Trade 2008)....................44

*K-Con Bldg. Sys., Inc. v. United States*,
106 Fed. Cl. 652 (2012)....................18

*Kattan by Thomas v. D.C.*,
995 F.2d 274 (D.C. Cir. 1993) ....................27

*Kulkarni v. Alexander*,
662 F.2d 758 (D.C. Cir. 1978) ....................3, 4

*Laffey v. Nw. Airlines, Inc.*,
746 F.2d 4, 24 (D.C. Cir. 1984) ....................28

*Lamphere v. Brown Univ.*,
610 F.2d 46 (1st Cir. 1979) ....................9

*League of Wilderness Defenders v. Smith*,
491 F. Supp. 2d 980 (D. Ore. 2007) ....................44

*Leon v. IDX Sys. Corp.*,
464 F.3d 951 (9th Cir. 2006) ....................18

*Libas, Ltd. v. United States*,
314 F.3d 1362 (Fed. Cir. 2003) ....................11

*Library of Congress v. Shaw*,
478 U.S. 310 (1986) ....................28, 29, 30, 42

*Loudner v. United States*,
379 F. Supp. 2d 1048 (D.S.D. 2005) ....................44

*Love v. Reilly*,
924 F.2d 1492 (9th Cir. 1991) ....................43

*Lumen View Tech. LLC v. Findthebest.com, Inc.*,
811 F.3d 479 (Fed. Cir. 2016) ....................40, 42

*Maritime Mgmt., Inc. v. United States*,
242 F.3d 1326 (11th Cir. 2001) ....................11, 12

*Masonry Masters, Inc. v. Nelson*,
105 F.3d 708 (D.C. Cir. 1997) ....................30

*McDonald v. Armontrout*,
860 F.2d 1456 (8th Cir. 1988) ....................3

*Estate of McIntyre v. United States*,
739 F. Supp. 2d 70 (D. Mass. 2010) ....................16, 18

*Melknoyan v. Sullivan*,
501 U.S. 89 (1991) ....................7

*Mendenhall v. Nat'l Transp. Safety Bd.*,
92 F.3d 871 (9th Cir. 1996) ....................12, 13, 34

*Micron Tech., Inc. v. Rambus Inc.*,
645 F.3d 1311 (Fed. Cir. 2011)....................16, 17, 18, 19

*Miller v. Holzmann*,
575 F. Supp. 2d 2 (D.D.C. 2008) ....................3, 8

*Missouri v. Jenkins*,
491 U.S. 274 (1989).................... *passim*

*Moreland Corp. v. United States*,
76 Fed. Cl. 268 (2007) ....................34

*Murray v. Weinberger*,
741 F.2d 1423 (D.C. Cir. 1984) ....................29

*N. Star Alaska Hous. Corp. v. United States*,
85 Fed. Cl. 241 (2009) ....................11, 13

*N.Y. Gaslight Club, Inc. v. Carey*,
447 U.S. 54 (1980)....................2, 4

*Nadarajah v. Holder*,
569 F.3d 906 (9th Cir. 2009) ....................43, 45

*Naporano Iron & Metal Co. v. United States*,
825 F.2d 403 (Fed. Cir. 1987)....................8

*Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*,
675 F.2d 1319 (D.C. Cir. 1982) ....................8

*Nat'l Res. Def. Council, Inc. v. EPA*,
703 F.2d 700 (3d Cir. 1983)....................3

*Native Village of Quinhagak v. United States*,
307 F.3d 1075 (9th Cir. 2002) ....................3

*Okla. Aeronautics, Inc. v. United States*,
943 F.2d 1344 (D.C. Cir. 1991) ....................41

*Pa. v. Del. Valley Citizens Council*,
478 U.S. 546 (1996)....................3

*Padgett v. Loventhal*,
706 F.3d 1205 (9th Cir. 2013) ....................9, 10

*Pennsylvania v. Del. Valley Citizens Council*,
483 U.S. 711 (1987).....29, 42

*Perdue v. Kenny A. ex rel. Winn*,
559 U.S. 542 (2010).....39, 42

*Perkins v. Cross*,
728 F.2d 1099 (8th Cir. 1984).....3

*Pierce v. Underwood*,
487 U.S. 552 (1988).....*passim*

*Pirus v. Bowen*,
869 F.2d 536 (9th Cir. 1989).....43

*Prowest Diversified, Inc. v. United States*,
40 Fed. Cl. 879 (1998).....43

*Ramcor Servs. Grp., Inc. v. United States*,
185 F.3d 1286 (Fed. Cir. 1999).....31, 32

*Rogerson Hiller Corp. v. Port of Port Angeles*,
982 P.2d 131 (Wash. Ct. App. 1999).....12

*Roscoe-Ajax Constr. Co. v. United States*,
499 F.2d 639 (Ct. Cl. 1974).....23

*S&E Contractors, Inc. v. United States*,
406 U.S. 1 (1972).....*passim*

*Save Our Cumberland Mountains, Inc. v. Hodel*,
857 F.2d 1516 (D.C. Cir. 1988) (en banc).....28

*Scarborough v. Principi*,
541 U.S. 401 (2004).....11, 31

*Shakman v. Democratic Org.*,
677 F. Supp. 933 (N.D. Ill. 1987).....39

*Silvestri v. Gen'l Motors Corp.*,
271 F.3d 583 (4th Cir. 2001).....17

*Slattery v. United States*,
635 F.3d 1298 (Fed. Cir. 2011) (en banc).....39

*Smith v. Robinson*,
468 U.S. 992 (1984).....2

*Stevenson v. Union Pac. R.R.*,
354 F.3d 739 (8th Cir. 2004) ....................18

*Sullivan v. Hudson*,
490 U.S. 877 (1989)....................2, 3, 4, 5

*In re Tom Carter Enters., Inc.*,
159 B.R. 557 (Bankr. C.D. Cal. 1993)....................44

*Tsombanidis v. W. Haven Fire Dept.*,
352 F.3d 565 (2d Cir. 2003)....................3

*Ulysses Inc. v. United States*,
117 Fed. Cl. 772 (2014) ....................10, 47

*United Med. Supply Co. v. United States*,
77 Fed. Cl. 257 (Fed. Cl. 2007) ....................16, 17

*United Partition Sys., Inc. v. United States*,
95 Fed. Cl. 42 (2010) ....................9, 10, 46, 48

*United States v. Bachner*,
877 F. Supp. 625 (S.D. Fla. 1995) ....................12

*United States ex rel. Koch v. Koch Indus., Inc.*,
197 F.R.D. 488 (N.D. Okla. 1999)....................16

*United States v. Wunderlich*,
342 U.S. 98 (1951)....................20, 21

*Vaughan v. Atkinson*,
369 U.S. 527 (1962)....................11, 13, 14, 27

*Webb v. Dyer Cty. Bd. of Educ.*,
471 U.S. 234 (1985)....................2, 4

*West v. Goodyear Tire & Rubber Co.*,
167 F.3d 776 (2d Cir. 1999)....................16

*West v. Potter*,
717 F.3d 1030 (D.C. Cir. 2013) ....................30

*Wilkett v. ICC*,
844 F.2d 867 (D.C. Cir. 1988) ....................41

*Zubulake v. UBS Warburg LLC*,
220 F.R.D. 212 (S.D.N.Y. 2003) ....................17

*Zubulake v. UBS Warburg LLC*,
229 F.R.D. 422 (S.D.N.Y. 2004) .....17

**Statutes**

5 U.S.C. § 504, 94 Stat. 2325 § 202(a) (1980) .....6

5 U.S.C. § 504(b)(1)(C) (2012) .....5

16 U.S.C. § 3117(a) .....3

28 U.S.C. § 2412(b) (2012) ..... *passim*

28 U.S.C. §§ 2412(d)(1)(A) .....31

28 U.S.C. § 2412(d)(2)(A) ..... *passim*

28 U.S.C. § 2412(d)(2)(A)(i) .....48

28 U.S.C. § 2412(d)(2)(B) .....32

28 U.S.C. § 2412(d)(2)(D) .....32, 33

28 U.S.C. § 2516(a) .....28, 30

35 U.S.C. § 285 .....40, 42

41 U.S.C. § 321 (2006) .....20, 21

41 U.S.C. § 7107(b)(2)(B) (2012) .....33

42 U.S.C. § 1988 .....29, 39, 42

42 U.S.C. § 2000-16(d) (2012) .....28

42 U.S.C. § 4654(c) .....30

**Other Authorities**

*Delaware Valley*, § 2412(b) .....30

The Court should award SUFI its attorneys' fees and expenses in this action and the related Board and Federal Circuit proceedings. The United States is liable for such fees and expenses provided by the Equal Access to Justice Act under subsection (b) of § 2412 due to "bad faith," vexatious litigation. 28 U.S.C. § 2412(b) (2012). In the alternative, SUFI is entitled to fees and expenses under EAJA's provisions under subsection (d) for awards to small businesses. *Id.* (d). Under either provision, SUFI should be awarded fees at full market rates.[1]

## I. SUFI Is Due Its Litigation Hours Incurred at *All* Forums

The lodestar calculation of hours times rate is the foundation of awards for both bad faith and small business fee awards under EAJA. Under both § 2412(b) and § 2412(d), SUFI is entitled to recover its hours worked at each litigation forum – the ASBCA, this Court, and the Federal Circuit.

### A. SUFI's Hours Incurred in This Court Must Be Included in the Award

The hours SUFI incurred in this Court, both in the initial proceedings and after remand from the Federal Circuit, must be included in the award. The hours incurred in those two proceedings are separately itemized below.

### B. All SUFI's Hours Incurred in ASBCA Litigation Must Be Included in the Award

The proceedings have now involved two sessions before the ASBCA, the first before SUFI initiated litigation in the CFC and the second on remand from the Federal Circuit and the CFC. *See SUFI CAFC I*, 755 F.3d 1305 (Fed. Cir. 2014). Both sessions of proceedings before

---

1 SUFI in this motion will adhere to the Court's naming conventions for the CFC and ASBCA published decisions. *See SUFI Network Servs., Inc. v. United States*, 105 Fed. Cl. 184, 188 n.1 (2012).

the Board are included for EAJA purposes under controlling Supreme Court and Federal Circuit precedent.

1. The Initial Board Proceedings Are Included

The Supreme Court when construing analogous statutory fee-shifting provisions has identified two situations in which time spent in related agency proceedings must be included in the fee award. First, if the agency proceedings are required as a predicate to the court action, they must be considered. *Compare N.Y. Gaslight Club, Inc. v. Carey*, 447 U.S. 54 (1980) (holding that work in required state administrative proceedings be included), *with Webb v. Dyer Cty. Bd. of Educ.*, 471 U.S. 234 (1985) (holding that voluntary proceedings are not automatically included), *and Smith v. Robinson*, 468 U.S. 992 (1984) (same). Second, even if prior agency proceedings were discretionary, the work there should be included to the extent "the work product . . . was both useful and of a type ordinarily necessary to advance the . . . litigation . . . ." *Webb*, 471 U.S. at 243. Or, as Justice Brennan put it in his *Webb* concurrence, it should be reimbursed if it "obviated the need for comparable work in the federal action" and "contributed directly to the successful outcome in federal court." *Id.* at 249-50; *see also Armstrong v. Davis*, 318 F.3d 965 (9th Cir. 2003) (reimbursing work in related action).

While the first prong of this analysis arguably does not apply because the EAJA does not track the language of the Civil Rights Act statutes construed in *Carey* and *Webb* (which allowed for fees in "any action or proceeding under this title"), the second prong always applies and has often been applied to EAJA and other fee-shifting statutes. For example, in *Sullivan v. Hudson*, 490 U.S. 877, 888 (1989), the Supreme Court ruled that fees for administrative proceedings must be awarded against the government under EAJA when those proceedings "are intimately tied to the resolution of the judicial action and necessary to the attainment of the results Congress

sought to promote by providing for fees." *Id*. at 888. The Court identified the results Congress sought to promote in the EAJA as to encourage small companies to challenge adverse agency action when the costs of the legal fees might otherwise foreclose their meritorious complaints. *Id.* at 883-84, citing 94 Stat. 2325 (1980). In such situations, the administrative proceedings for EAJA purposes "should be considered part and parcel of the action for which fees may be awarded" under the EAJA. 490 U.S. at 888; *see also Comm'r, INS v. Jean,* 496 U.S. 154, 161-62 (1990) (applying rule in EAJA case and noting that the EAJA "favors treating a case as an inclusive whole, rather than as atomized line-items," citing *Hudson*, 490 U.S. at 888); *Pa. v. Del. Valley Citizens Council*, 478 U.S. 546, 557-61 (1996) (awarding fees for administrative proceedings under Clean Air Act action); *Native Village of Quinhagak v. United States*, 307 F.3d 1075, 1081-84 (9th Cir. 2002) (granting fees for mandatory administrative proceedings recoverable in court application under 16 U.S.C. § 3117(a), which allows fees for an "action"); *Tsombanidis v. W. Haven Fire Dept.,* 352 F.3d 565, 581 (2d Cir. 2003) (same under Fair Housing Amendments Act); *McDonald v. Armontrout*, 860 F.2d 1456, 1462 (8th Cir. 1988) (applying rule to prior habeas proceeding that aided the plaintiff in its Civil Rights Act suit); *Perkins v. Cross*, 728 F.2d 1099, 1100 (8th Cir. 1984) (holding that time spent on research and investigation pursuing a local proceeding was compensable in Civil Rights Act case if it was "directly relevant" to the court action); *Nat'l Res. Def. Council, Inc. v. EPA*, 703 F.2d 700, 713 (3d Cir. 1983) (permitting recovery under EAJA of fees incurred in obtaining information under FOIA that assisted in the court action); *Kulkarni v. Alexander*, 662 F.2d 758, 766 (D.C. Cir. 1978) (awarding fees spent in prior administrative action in Civil Rights Act case); *Miller v. Holzmann*, 575 F. Supp. 2d 2, 22-24 (D.D.C. 2008) (awarding fees to relator in civil False Claims Act action for work done in related criminal action).

This law mandates award to SUFI of its attorneys' work and expenses in the Board litigations here. SUFI was required to exhaust its ASBCA remedy before coming to this Court, and the record made at the ASBCA was not duplicated, but formed the basis for this Court's decisions. It is hard to imagine a situation that fits more precisely into the rule that work in a prior proceeding should be awarded if it is "useful" and "of a type ordinarily necessary to advance the . . . litigation." *Webb*, 471 U.S. at 243. The D.C. Circuit's reasoning in an analogous situation when sending a case back to the district court for an award of fees incurred in a collateral administrative proceeding and a related court suit is directly relevant here: "The holding of the first suit – in which the appellant clearly prevailed in a significant way – is a necessary predicate for a large part of his claim in the present action and . . . furnishes a very important reason why he prevails now." *Kulkarni*, 662 F.2d at 766. Similarly, SUFI's work in the ASBCA proceedings furnished a "very important" – indeed, an indispensable – "reason why" SUFI prevailed. Thus, SUFI's attorneys' fees for the predicate Board litigations must be included in this award.

This result is also required by the Federal Circuit's decision in *Fidelity Construction Co. v. United States*, 700 F.2d 1379 (Fed. Cir. 1983). Before Congress made explicit in the 1985 EAJA amendments that fees for CDA cases at the boards were covered, the Federal Circuit in *Fidelity* held that the EAJA did not "allow[ ] a board of contract appeals independently to award attorney fees . . . ." *Id.* at 1387. At the same time, however, the Federal Circuit held that, if a contractor had prevailed on appeal from a board decision, the contractor could have recovered fees for both the court and underlying administrative proceedings, tracking the Supreme Court's guidance in *Carey*, *Webb*, and *Hudson* that the board proceedings were a necessary predicate to the court proceedings: "Under this [EAJA] section, the court may award fees for service before

a board only when it also awards fees for service before itself." *Id.* at 1386. The situation is no different here. The CFC has served in basically an appellate function under the Wunderlich Act, *SUFI CFC III*, 108 Fed. Cl. 287, 294 (Fed. Cl. 2012), *aff'd in relevant part*, *SUFI CAFC I*, 755 F.3d 1305, 1311-12 (Fed. Cir. 2014), and the ASBCA proceedings were not repeated in, but were a necessary predicate to, this Court's review action. Thus, under *Fidelity*, SUFI's attorneys fees incurred at the ASBCA are recoverable under the EAJA as "part and parcel" of the court proceedings. *See Hudson*, 490 U.S. at 888.

Finally, this result is also consistent with, not contrary to, the public policy Congress adopted in the EAJA. Congress expressly expanded the EAJA's applicability to boards of appeals proceedings in 1985, amending the EAJA's title 5 provisions to include BCA actions brought under the Contract Disputes Act. Pub. L. No. 99-80, 99 Stat. 183 (1985), *codified at* 5 U.S.C. § 504(b)(1)(C) (2012). This did not reflect a conscious decision on Congress' part to exclude non-CDA, NAFI cases at the boards – there is no mention of such sentiment in the legislative history. Instead, the legislative history reflects a desire for the amended act to cover all board cases, while overlooking the few and unusual NAFI cases and improperly thinking all board cases were, by 1985, CDA cases. Indeed, the conference report expressly stated that the intent of the 1985 expansion was to "cover[] all cases commenced before the Boards of Contract Appeals on or after October 1, 1984." H.R. Rep. No. 99-120, at 7, *reprinted in* 1985 U.S.C.C.A.N. 132, 136 (emphasis added).

Congress' original, statutory findings in support of the EAJA apply with full force to this case:

> The Congress finds that certain individuals, partnerships, corporations, and labor and other organizations may be deterred from seeking review of, or defending against, unreasonable governmental action because of the

> expense involved in securing the vindication of their rights in civil actions and in administrative proceedings.

Congressional Findings and Purposes, note following 5 U.S.C. § 504, 94 Stat. 2325 § 202(a) (1980). The House Report for the original EAJA enactment explained as follows:

> [T]he Government with its greater resources and expertise can in effect coerce compliance with its position. . . . In fact, there is evidence that small businesses are the target of agency action precisely because they do not have the resources to fully litigate the issue. This kind of truncated justice undermines the integrity of the decision-making process.
>
> The exception created by [the EAJA] focuses primarily on those individuals for whom cost may be a deterrent to vindicating their rights. The bill rests on the premise that a party who chooses to litigate an issue against the Government is not only representing his or her own vested interest but is also refining and formulating public policy.

H.R. Rep. No. 96-1418, at 10 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4984, 4988.

Congress by means of the EAJA expressly desired to "curb[] . . . the unreasonable exercise of Government authority." *Id.* at 12. There could hardly be a more appropriate case in which to apply these principles upon which the EAJA was founded. *See also* S. Rep. No. 96-253, at 7 (1979) ("Providing an award of fees to a prevailing party represents one way to improve citizen access to courts and administrative proceedings."). Thus, finding that the ASBCA proceedings here were necessary to, and encompassed by, the court proceedings under EAJA furthers Congress' purposes.

The initial Board proceedings were a necessary predicate to this Court's proceedings and Board proceedings were not replicated at the Court. Under both Supreme Court and Federal Circuit precedent, the fees and costs of the initial Board proceedings are recoverable.

### 2. The Board Proceedings on Remand Are Included

SUFI also incurred substantial fees and expenses in the Board proceedings required by remand from the Federal Circuit and this Court. These fees and expenses, too, are covered by EAJA, largely for the reasons recited above related to the initial Board proceedings.

The Supreme Court directly addressed this situation in *Melknoyan v. Sullivan*, 501 U.S. 89 (1991): "in those cases where the district court retains jurisdiction of the civil action and contemplates entering a final judgment following the completion of administrative proceedings, a claimant may collect EAJA fees for work done at the administrative level." *Id*. at 97, citing *Hudson*, 490 U.S. at 892; *accord Former Emps. of Motorola Ceramic Prods. v. United States*, 336 F.3d 1360, 1366 (Fed. Cir. 2003). Here, this Court retained jurisdiction during the remand proceedings before entering judgment, and so the remand proceedings before the Board are also recoverable.

## C. SUFI's Hours for the Federal Circuit Appeals Must Be Included in the Award

SUFI successfully defended its CFC judgment on appeal in *SUFI CAFC I* and also prevailed on two of its four cross-appeals. Thus, the hours spent in that work must also be included. "Congress intended the EAJA to cover the cost of all phases of successful civil litigation addressed by the statute." *Jean*, 496 U.S. at 166 (emphasis added); *see also Fidelity*, 700 F.2d at 1386 (finding EAJA covers appeals from board decisions).

In *SUFI CAFC III*, 817 F.3d 773 (2016), SUFI also successfully defended its favorable judgment in *SUFI CFC V*, in which this Court dismissed the attempts by DOJ to challenge the Board's decisions on remand. This effort is separately itemized.

D. SUFI's Hours for Preparing and Defending This Fee Application Must Be Included in the Award

Hours incurred in preparing and defending a fee petition under the EAJA are also compensable. *See Jean*, 496 U.S. at 159, 166; *Fritz v. Principi*, 264 F.3d 1372, 1377 (Fed. Cir. 2001); *Info. Scis. Corp. v. United States*, 88 Fed. Cl. 626, 634 (2009). SUFI has segregated those hours and has included those hours to date in its supporting material. SUFI reserves the right to supplement with its full hours once application proceedings have concluded.

II. SUFI Is Due All Its Claimed Hours

SUFI bases its fee request on the timekeeping entries of Crowell & Moring timekeepers, as set out in the attached affidavit of Frederick W. Claybrook, Jr. (Attachment C). This satisfies SUFI's burden of proof. A plaintiff's *prima facie* case is met when hours are established by typical billing records showing time and charges and a description of the work done and by whom. *Beta Sys., Inc. v. United States*, 866 F.2d 1404, 1406-07 (Fed. Cir. 1989); *Naporano Iron & Metal Co. v. United States*, 825 F.2d 403, 404 (Fed. Cir. 1987); *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1327 (D.C. Cir. 1982). This Court, likewise, has accepted billed hours because there was no showing that they "were frivolous or otherwise undertaken in bad faith." *Applegate v. United States*, 52 Fed. Cl. 751, 768 (2002). In addition to more than satisfying these standards, SUFI's requested fees are also conservative by other measures particular to this case and should be granted in full.

SUFI has succeeded on almost all of its claims, including on all its largest claims. The hours spent on the single claim on which SUFI was wholly unsuccessful, the Kapaun Line Charge, is not readily segregable. SUFI's litigation work is not easily "fractionable," as other courts have put it. *E.g.*, *Copeland v. Marshall*, 641 F.2d 880, 892 n.18 (D.C. Cir. 1980) (en banc) (quoting *Lamphere v. Brown Univ.*, 610 F.2d 46, 47 (1st Cir. 1979)); *Miller v. Holtzmann*,

575 F. Supp. 2d 2, 32-33 (D.D.C. 2008). At the Board, SUFI prevailed on 22 of 27 claims initially, and this Court, affirmed by the Federal Circuit, granted SUFI success on two additional ones (Early Abuse and Change of AF Switches). The Federal Circuit, while finding the lost revenue awards of the Board supportable for the Calling Cards, Early Abuse, and Prime Knight claims, found for SUFI on each of those three claims for extra work and out-of-pocket costs.

The three remaining unsuccessful claims at the Board which SUFI did not challenge (AT&T Trailer, New Hotel Assistance, and Coordinated Message) were each, and in sum, small in amount, totaling approximately $60,000 out of about $130,000,000 initially claimed (less than one-half of one percent). (Ex. B205 at 1 (tabs 15, 18, and 22).) In the overall scope of the litigation, the hours spent on them was negligible. Thus, no discounting for unsuccessful claims is appropriate.[2]

This Court in *United Partition Systems, Inc. v. United States*, 95 Fed. Cl. 42 (2010), explained the required analysis set out by the Supreme Court in *Hensley v. Eckerhart*, 461 U.S. 424 (1983). When hours can be easily segregated <u>between</u> successful and unsuccessful claims, that should be done, but when the hours support <u>both</u> successful and unsuccessful claims, if the plaintiff "has obtained excellent results, his attorney should recover a fully compensatory fee . . . [that] should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." *Id.* at 57 (quoting *Hensley*, 461 U.S. at 435); *accord Copeland*, 641 F.2d at 891-92 & n.18; *Lamphere*, 610 F.2d at 47. The Ninth Circuit in *Padgett v. Loventhal*, 706 F.3d 1205 (9th Cir. 2013), set out the applicable principles in this way:

> Failure on a claim does not automatically reduce the fee award. *See Hensley v. Eckerhart*, 461 U.S, 424, 436 (1983). Often,

[2] SUFI also recovered for Sembach lodgings on its Sembach/Kapaun Line Charge claim, but not for Kapaun lodgings. The Sembach recovery was two-thirds of that claim. (Claybrook Aff't (Attach. C) ¶ 14.)

> attorney work will bear on multiple claims, only some of which are successful. Fees for work which relates *only* to unsuccessful claims should not be awarded. *See id.* But where attorney work proves beneficial to a successful claim, district courts should generally award these fees in full, even if the work is also useful to an unsuccessful claim. In other words, the district court must award fees for the work that contributed to a successful result as if the successful claims were the only ones litigated.

*Id.* at 1209 (italics in original).

No reduction for the three unsuccessful claims would be appropriate here. SUFI obtained excellent results, and so its hours should be granted in full, for both the ASBCA and CFC litigations. *See Hensley*, 461 U.S. at 435; *United Partition Sys.*, 95 Fed. Cl. at 57.[3] In *Ulysses Inc. v. United States*, 117 Fed. Cl. 772 (2014), this Court declined to allocate between successful and unsuccessful parts of the litigation when the plaintiff won one of two counts, recouped just less than half requested, and successfully defended against four counterclaims. *Id.* at 785. Obviously, this case presents a much stronger case for full recovery of fees at the ASBCA and this Court.

The initial Federal Circuit proceedings (Nos. 2013-5039, -40) principally involved the government's claim that the Board's initial awards—that SUFI had challenged successfully in the CFC—should be upheld. While the government succeeded in its secondary argument of having the matter remanded to the Board for additional fact-finding to revise the awards, SUFI largely prevailed in defending against the government's appeal and also prevailed on two of its four cross-appeal issues. Thus, SUFI's hours should not be discounted. (Claybrook Aff't (Attach. C) ¶ 23.) *See Hensley*, 461 U.S. at 435; *United Partition Sys.*, 95 Fed. Cl. at 57;

---

[3] If the government contests this, SUFI reserves the right to propose an appropriate method or methods to identify "unsuccessful" work.

*Ulysses*, 117 Fed. Cl. at 785. SUFI fully prevailed in the second Federal Circuit proceeding (No. 15-5151).

III. SUFI Is Entitled to an Award at Full, Current Rates Under § 2412(b)

Congress in the EAJA made the United States liable for litigation fees and expenses "to the same extent that any other party would be liable under the common law . . . ." 28 U.S.C. § 2412(b); *see Scarborough v. Principi*, 541 U.S. 401, 406 (2004). As an exception to the American Rule, such an award is appropriate when the losing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258-59 (1975) (quoting *F.D. Rich Co. v. United States ex rel. Indus. Lumber Co.*, 417 U.S. 116, 129 (1974). Bad-faith fee awards serve compensatory, punitive, and deterrent functions. *See Hall v. Cole*, 412 U.S. 1, 5, 15 (1973); *Barry v. Bowen*, 825 F.2d 1324, 1333 (9th Cir. 1987). A trial court's award is reviewed for abuse of discretion. *Pierce v. Underwood*, 487 U.S. 552, 557-63 (1988); *Libas, Ltd. v. United States*, 314 F.3d 1362, 1364 (Fed. Cir. 2003).[4]

The focus for such awards is generally not on the underlying agency action subject to the complaint (also called the "primary conduct"), but on the litigation conduct. *See Centex Corp. v. United States*, 486 F.3d 1369, 1371-72 (Fed. Cir. 2007); *Hubbard v. United States*, 480 F.3d 1327, 1332 (Fed. Cir. 2007). However, the rule covers the "full range of litigation abuses." *N. Star Alaska Hous. Corp. v. United States*, 85 Fed. Cl. 241, 244 (2009) (citing *Chambers,* 501 U.S. at 45-46, 53), *aff'd*, 356 F. App'x 415 (Fed. Cir. 2009). Pre-litigation conduct can be

---

[4] Alternatively, SUFI requests an award pursuant to the Court's inherent authority. *See Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) (federal courts possess inherent authority to sanction bad faith conduct); *Fala Corp. v. United States*, 2003 U.S. App. LEXIS 8330 at *4-*5 (Fed. Cir. Apr. 29, 2003) (CFC has inherent authority to sanction).

considered if there is a direct effect on the court proceedings, *id.* at 246-48; *Hall*, 412 U.S. at 15, for example, when the government denies relief clearly due and forces the plaintiff to go to court to vindicate its rights. *See*, *e.g.*, *Vaughan v. Atkinson*, 369 U.S. 527, 530-31 (1962); *Maritime Mgmt., Inc. v. United States*, 242 F.3d 1326, 1333 (11th Cir. 2001) ("The bad faith exception . . . also encompasses bad faith acts preceding . . . litigation."); *Mendenhall v. Nat'l Transp. Safety Bd.*, 92 F.3d 871, 875-77 (9th Cir. 1996); *Am. Hosp. Ass'n v. Sullivan*, 938 F.2d 216, 220-21 (D.C. Cir. 1991); *United States v. Bachner*, 877 F. Supp. 625 (S.D. Fla. 1995); *Rogerson Hiller Corp. v. Port of Port Angeles*, 982 P.2d 131 (Wash. Ct. App. 1999); *see also Chambers*, 501 U.S. at 57 (a "party may be sanctioned for abuses of process occurring beyond the courtroom"). Bad faith in even a single particular removes the case from the capped rate restrictions of § 2412(d) and allows full market rates under § 2412(b). *See Maritime Mgmt.*, 242 F.3d at 1333-35 (11th Cir. 2001) (upholding full fee award under § 2412(b) due to government's bad faith in not timely providing administrative record documents); *Brown v. Sullivan*, 916 F.2d 492, 496-97 (9th Cir. 1990); *Brown v. Sullivan*, 724 F. Supp. 76, 80 (W.D.N.Y. 1989).[5]

SUFI is due full rates as an exception to the American Rule under § 2412(b) because the agency's pre-litigation conduct directly affected the court proceedings. The Air Force denied

---

5 The Supreme Court basically adopted the common-law test for prevailing defendants in civil rights cases in *Christianburg Garment Co. v. EEOC*, 434 U.S. 412 (1978):

> [A] district court may in its discretion award attorney's fees to a prevailing defendant in a Title VII case upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith. . . . [N]eedless to say, if a plaintiff is found to have brought or continued [a frivolous] claim in bad faith, there will be an even stronger basis for charging him with the attorney's fees incurred by the defense.

*Id.* at 421-22; *see also EEOC v. Peoplemark, Inc.*, 732 F.3d 584, 590-95 (6th Cir. 2013) (applying *Christianburg* standard to assess attorney and expert fees and expenses against EEOC for unnecessarily continuing the litigation when it knew or should have known its allegation was unfounded).

SUFI relief that was clearly due, forcing it to vindicate its rights in this Court, and the Air Force took multiple actions with an eye to the litigation that injured SUFI's and the Court's ability to quantify the appropriate relief, which likely cost SUFI significant actual damages. Moreover, multiple examples of litigation conduct support the finding of vexatiousness and unnecessary recalcitrance and delay. Both pre- and post-litigation conduct by the government independently require recovery under § 2412(b) of full fees.

### A. SUFI Is Due Full Rates Under § 2412(b) Because the Air Force Denied SUFI Relief Clearly Due

The Air Force's pre-litigation conduct directly affected the judicial process in many ways and in many particulars. *See N. Star*, 85 Fed. Cl. at 246-48. As an initial matter, as recounted in the ASBCA decisions and SUFI's briefs both at the ASBCA and in this Court, the Air Force repeatedly and willfully stonewalled SUFI and refused to give it relief, even when the CO's and COTR's knew full well that they were allowing SUFI's contractual rights to be violated. If they had acted properly and promptly, almost all of SUFI's claims would have been forestalled or quickly settled. *See Vaughn*, 369 U.S. at 530-31; *Mendenhall*, 92 F.3d at 875-77; *Am. Hosp. Ass'n*, 938 F.2d at 220-21; *cf. Centex*, 486 F.3d at 1372-73 & n.1 (noting but not ruling on availability of fees when relief clearly due is denied, resulting in court activity).

Some examples of this conduct will be summarized below on a claim-by-claim basis. This conduct culminated, however, in the CO denying all of SUFI's monetary claims (except for offering a small amount on the Calling Card claim, which the Board had already found meritorious). The CO did this despite having no defense, either factual or legal, to almost all of the claims. The CO did not even admit to liability for the "shutdown" claims that flowed directly from the Board's rulings that the Air Force was in material breach and SUFI could cancel the Contract. SUFI canceled the Contract a week after the Board's ruling, while agreeing to work on

a smooth transition to the Air Force. The Air Force, for its part, delayed entering into the Partial Settlement Agreement with SUFI to accomplish the transition for seven months and, then, promptly filed a motion with the Board arguing that the cancellation was ineffective because SUFI had accommodated the transition and that the Partial Settlement Agreement was unenforceable in part. The Board made short work of such arguments in *SUFI ASBCA IV*. *See* 06-2 BCA ¶ 33,444 (2006).

The Air Force's "willful and persistent" bad faith treatment of SUFI's claims after they accrued is of the same cloth as the conduct the Supreme Court upbraided in *Vaughan v. Atkinson*, in which a sailor was forced to hire counsel when his employer ignored his valid claims. 369 U.S. at 530-31. It justifies an attorneys' fee award under the exceptions to the American Rule because the Air Force unjustifiably forced SUFI to vindicate its rights, first at the ASBCA and, then, in this Court and in the Federal Circuit. *See Am. Hosp. Ass'n*, 938 F.2d at 220 (finding fees justified when the government denied relief clearly due at the administrative level and forced the plaintiff to go to court).

1. The Air Force Willfully Hampered the Litigation

Moving beyond the stonewalling of SUFI's relief on clearly meritorious claims, the Air Force acted with conscious or callous indifference to hamstring the litigation itself and SUFI's presentation of its damages. It did so in the following principal ways.

First, the Air Force destroyed and/or neglected to retain the call records from its switches on the bases, records that accurately recorded the extent of use of the government's DSN phones that the Air Force refused to remove from the lodging hallways and lobbies (and the extent of use of those it added after SUFI began performance). SUFI literally screamed about this breach from the outset of performance, and yet the Air Force did nothing to preserve the records.

SUFI's counsel wrote to Air Force counsel on October 1, 2004, and reminded the Air Force of its obligations to preserve such records (and others) (Ex. B51), but even the switch records for the period after SUFI sent its letter were woefully incomplete. *SUFI ASBCA VIII*, 09-1 BCA ¶ 34,018 at 168,238 (¶ 109(b)), 168,242 (2008); Castanon at 18/88-90, 18/159-62; *compare* Ex. B98 (listing base switch call records produced and those missing) *with* R4F Supp. vol. 1, tab 107, file 07c-1, at 2 (12/19/05 Castanon e-mail listing call records then available, many of which were not produced in the litigation). The Air Force custodian of the call records on the KMC bases, Mr. Castanon, when questioned, "Were you ever asked to make sure not to lose any of your call record data, to retain all of it for purposes of litigation," responded, "No." (Castanon at 18/159.) During litigation, then, the only records of actual calls made from illicit government phones were a few months of incomplete base switch records and the more extensive copies of such records kept by DISA. But those DISA records were full of gaps and never included all of the relevant types of calls. *SUFI ASBCA VIII*, 09-1 BCA at 168,238 (¶ 109(b)). An analysis of the DISA data showed a significant number of gaps in the data, gaps that tended to increase as the data became older. (Ex. B208 (gaps matrix).) No DISA data was available at all prior to August 1997. The DISA data showed repeated instances of no data or only data for one phone on all of Ramstein and/or other bases for particular days, which Ms. Ansola, based on her eyewitness experience, stated was "inconceivable" as a practical matter. (Ansola at 23/144-47, 23/151-52, 23/189-90.) Moreover, various statistical analyses of the DISA data demonstrated that there were likely gaps in the data even on days for which there was some "admittedly incomplete" DISA data. (Broyles at 6/82 (saw guests on phones "constantly"); Johnson at 17/241 (may be gaps even in days with some recorded data), 20/129-30 (suggests programmer error for gaps in DISA data); King at 22/298-300 (gap analysis matrix description), 22/306-09 (lower usage for

days before and after gaps), 22/324-27 (correlation between gap days and average usage recorded), 22/340-55 (correlation between average usage and continuity of records); Ex. B208; Ex. B218; Ex. B219; Ex. B220; Ex. B221.) The ASBCA appropriately found the remaining DISA data to be incompetent. *SUFI ASBCA VIII*, 09-1 BCA at 168,238 (¶ 109(b)).

Second, the Air Force willfully withheld or destroyed internal correspondence within and among various Air Force offices in Germany and the United States during the litigation. Despite SUFI's multiple requests for full production of the COTR and CO files, it was discovered upon examination of CO Browning during the hearing in No. 55306 that the Air Force had not produced literally hundreds of documents which he had collected from AFNAFPO personnel and from USAFE HQ (where the COTR's were based) after litigation had begun in No. 54503 (the declaratory judgment action). (Browning at 15/48-50, 15/102-04.) But the Air Force produced only scattered pages from CO Browning's collection, mainly in the page "700" series. (R4F Supp., vol. 4, tabs 297 through 325.) A review of the selections the Air Force decided to produce shows that numbers from this consecutively numbered collection ranged from at least "38" to "2016," meaning that the Air Force withheld well over a thousand pages of internal correspondence. (*Compare* (54503) R4F 99 *with* (54503) R4F 193.) *See Estate of McIntyre v. United States*, 739 F. Supp. 2d 70, 74-75 (D. Mass. 2010) (granting full fees for entire case when agency made interrogatory response in bad faith, prolonging litigation).

Both of these two incidents involve spoliation of relevant documents and require the sanction of full fees and expenses. "Spoliation includes the intentional or negligent destruction or loss of tangible and relevant evidence which impairs a party's ability to prove or defend a claim. Sanctions for spoliation serve three distinct remedial purposes: punishment, accuracy, and compensation." *United States ex rel. Koch v. Koch Indus., Inc.*, 197 F.R.D. 488, 490 (N.D.

Okla. 1999); *accord Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1330 (Fed. Cir. 2011); *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999); *United Med. Supply Co. v. United States*, 77 Fed. Cl. 257, 263-64 (Fed. Cl. 2007). As this Court has held, "[a]side perhaps from perjury, no act serves to threaten the integrity of the judicial process more than the spoliation of evidence. . . . [W]hen critical documents go missing, judges and litigants alike descend into a world of *ad hocery* and half measures − and our civil justice system suffers." *Id.* at 258-59.

The general rule is that, "[o]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place 'a litigation hold' to ensure the preservation of relevant documents." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003). This duty "arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Silvestri v. Gen'l Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001); *accord Micron Tech.*, 645 F.3d at 1320-21.

"A party's discovery obligations do not end with the implementation of a 'litigation hold' – to the contrary, that's only the beginning." *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004). Counsel must become familiar with the client's document retention policies, which involves speaking with information technology personnel and learning about backup procedures. *Id.* "It will also involve communicating with the 'key players' in the litigation, in order to understand how they stored information." *Id.* "In short, it is *not* sufficient to notify all employees of a litigation hold and expect that the party will then retain and produce all relevant information." *Id.* (emphasis in original). "Counsel must take affirmative steps to

monitor compliance so that all sources of discoverable information are identified and searched." *Id.* Counsel is under a continuing duty to ensure preservation. *Id.*

This Court has emphasized the same: "it remained incumbent on trial counsel to ensure that the documents – wherever they were located – were preserved for plaintiff's inspection." *K-Con Bldg. Sys., Inc. v. United States*, 106 Fed. Cl. 652, 665 n.20 (2012). In *K-Con*, the Court found culpable trial counsel's failure to police agency officials which led to the agency's destruction of relevant information, labeling it, "at a bare minimum, willful and grossly reckless conduct" requiring sanctions. *Id.* at 667.

The Air Force and its counsel obviously fell woefully short of these duties to preserve and produce relevant evidence. These failures, individually and together, require full fees under § 2412(b), as well as under this Court's inherent authority. For example, in *Leon v. IDX Systems Corp.*, 464 F.3d 951 (9th Cir. 2006), the court appropriately dismissed the action and awarded fees when the plaintiff deleted files from his computer after litigation had begun and he had been put on notice not to do so. *Id.* at 956-61 (applying inherent authority). Similarly here, Air Force files "vanished" after litigation had begun and the Air Force had been put on notice by SUFI counsel to preserve evidence. *See also Stevenson v. Union Pac. R.R.*, 354 F.3d 739, 751 (8th Cir. 2004) (fee award appropriate under inherent authority for prelitigation destruction of evidence). In *Estate of McIntyre* the Court awarded full fees under § 2412(b) when the agency made a single interrogatory response in bad faith, albeit on a subject that pervaded the litigation. 739 F. Supp. 2d at 74-75. Here, the discovery failures were more extensive and just as pervasive. They easily meet the test for "bad faith" conduct with regard to spoliating parties, *i.e.*, that they "intended to impair the ability" of the other party to defend itself. *Micron Tech.*, 645 F.3d at 1326. While there was analogous data on which SUFI was able to rely when the Air Force

destroyed and/or failed to retain data of actual call minutes on illicit government phones, records of the actual calls may well have provided SUFI much greater relief, as SUFI was awarded damages using the most conservative, analogous data available. *See SUFI CFC III*, 108 Fed. Cl. at 304-05. As to the withheld or destroyed internal correspondence, it must be assumed that it would have supported SUFI's claims across the board. *Micron Tech.*, 645 F.3d at 1328.

2. SUFI Is Due Full Rates Under § 2412(b) Because the ASBCA, in Its Function as the Agency, Acted Unreasonably and Required Litigation

The special function of the Board in this non-CDA case cannot be ignored and reinforces that the agency is liable for fees under § 2412(b). The ASBCA was the Secretary's delegate to provide the final agency decision on SUFI's claims and to provide a fair recovery in accordance with law and fact. *See S&E Contractors, Inc. v. United States*, 406 U.S. 1, 10-14 (1972). The type of clause involved here "is intended . . . to provide a quick and efficient administrative remedy and to avoid 'vexatious and expensive and, to the contractor oftentimes, ruinous litigation.'" *Id.* at 8 (quoting *Kihlberg v. United States*, 97 U.S. 398, 401 (1878)).

The Board was deficient in its duties in unparalleled ways. After receiving the Board's initial decision on the monetary claims in *SUFI ASBCA VIII*, SUFI judiciously selected only about 20 of the decision's errors about which to complain on reconsideration; by contrast, the Air Force raised no issues on reconsideration. In *SUFI ASBCA IX*, the Board confessed error in about half of the instances SUFI cited and, in *SUFI ASBCA X* and *SUFI ASBCA XI*, the Board confessed further errors (but rejected or sidestepped most of those pointed out in SUFI's reconsideration petitions). Never before has the Board granted in part three reconsideration decisions in the same case.

This Court's decision puts the inadequacy of the ASBCA's treatment of SUFI's claims on full display. The Board did not faithfully fulfill its duties as the final decision maker for the agency. It consistently ignored important record evidence when denying SUFI relief, and it repeatedly came up with ways *sua sponte* to reduce SUFI's proven damages, even when they were unchallenged by the Air Force and DCAA. It sliced SUFI's extra work hours in many claims without explanation, despite no objection by the Air Force in its posthearing submissions and despite crediting exactly the same type of evidence in other claims. The obvious inference from this conduct of the Board was that it was reducing SUFI's proven damages solely to lower the agency's tab for its willful breaches. This was confirmed by the Board's studied avoidance of labeling the Air Force's actions in breach as willful and its never once holding that the Air Force breached its implied duties of good faith and cooperation and to facilitate, not frustrate, SUFI attaining the benefits of the bargain.

While SUFI certainly does not assert that the ASBCA acted with malicious intent to harm SUFI, it is also clear that the Board repeatedly tilted its initial decisions on the claims to protect the Air Force from paying the full damages due, thus denying SUFI a decision maker that was impartial. The Board's constant tilt to only one side generated the type of "grossly erroneous" results that necessarily imply "bad faith" as defined by the Wunderlich Act. *See* 41 U.S.C. § 321 (2006); *Hoel-Steffen Constr. Co. v. United States*, 684 F.2d 843, 850-52 (Ct. Cl. 1982). The act, Pub. L. No. 83-356, 68 Stat. 81, was passed to reverse the Supreme Court's determination that agency determinations of disputes could only be overturned if there were fraud by the agency decision maker, which the Court defined as "conscious wrongdoing, an intention to cheat or be dishonest." *United States v. Wunderlich*, 342 U.S. 98, 100 (1951); *see* H. Rep. No. 83-1380, *reprinted in* 1954 U.S.C.C.A.N. 2191. Congress adopted the dissenting rationale of Justices

Jackson and Douglas instead. *Id*. at 2193-94. Justice Jackson explained that the standard of "so grossly erroneous as to necessarily imply bad faith" does not require a showing of conscious, intentional wrongdoing, but can be satisfied by a demonstration of "overzeal for the department." *Id*. (quoting 342 U.S. at 103 (Jackson, J., dissenting)). The House Report in support of the Wunderlich Act adopted Justice Jackson's explanation that the agency's decision maker "is not at liberty . . . to shield his department from consequences of its own blunders at the expense of contractors." *Id.* (quoting 342 U.S. at 103 (Jackson, J., dissenting)). The Court of Claims in *Hoel-Steffen* explained the circumstances of the passage of the Wunderlich Act, Congress's adoption of dissenters' views, and that bad faith under the act can be shown indirectly and does not require subjective malice. 384 F.2d at 350-52.

The Board's gross tilt in favor of the agency in its decisions below is the same type of "bad faith" conduct that is contemplated by EAJA that is "vexatious," in that it necessitated this court action. *See F.D. Rich Co.*, 417 U.S. at 129; *see also S&E*, 406 U.S. at 8. Thus, it qualifies as an exception to the American Rule under § 2412(b). In *Brown v. Sullivan*, 916 F.2d 492 (9th Cir. 1990), the Ninth Circuit awarded full fees simply because the administrative board failed to transcribe proceedings and so affected the court review process, justifying a bad faith attorneys' fees award under § 2412(b). That pales in comparison to the agency's vexatious misconduct here.

It may on first blush seem anomalous that SUFI presents this argument when the ASBCA, with the same lead judge, on remand from the Federal Circuit and this Court granted SUFI significantly increased damages on the same record made before it initially. It is not. Instead, the Board's decisions on remand, which follow the lead of this Court and the Federal Circuit in requiring a proper application of the law to the record, were a welcome, albeit overdue,

admission that its earlier decisions reflected a unconscious bias "so grossly erroneous as necessarily to imply bad faith," 41 U.S.C. § 321 (2006), and were a prime example of what Justice Jackson called "overzeal for the department." *Wunderlich*, 342 U.S. at 103 (Jackson, J., dissenting). A notable incidence of this was the "official calls" issue. The Board in its initial decisions, citing no contractual basis, zeroed out SUFI's damages on the Hallway Phones claim (and then on reconsideration gave only a paltry sum) on the basis that SUFI was not entitled to receive revenue for official calls over its system. This contention was so flimsy that the CFC in *SUFI CFC III* did not even deign it worthy of discussion. 108 Fed. Cl. at 303-06. For its part, the Federal Circuit in *SUFI CAFC I*, in an exercise of tactful understatement, labeled the Board's "official calls" position "not entirely explicit or clear in its foundation," 755 F.3d at 1315, and identified the Board's computation of paltry damages based on that theory as "so far from self-evident" that it required reversal on that ground alone. *Id*. at 1315-16. It remanded for the Board to "more squarely review the legal and evidentiary basis of its apparent premise about 'official' long-distance DSN calls than it has yet done." *Id*. at 1316. To the Board's credit, when it did so on remand, it candidly admitted that its previous "official calls" rationale was in error. But it offered no excuse for its prior reliance on it and instead held that "the contract did not expressly or by implication require SUFI to exclude 'official' long distance calls from its revenue base." *SUFI ASBCA XII*, 15-1 BCA ¶ 35,878 at 175,396 (2015). While this was a welcome and necessary correction, it was too late to remedy the protracted court and administrative proceedings it in material part engendered.

Of course, this Court has already noted the Board's apparent bias in its initial decisions *SUFI CFC III*:

> Indeed, the Board's *SUFI VIII* decision gives the impression that the Board ruled in every possible way to cut back SUFI's damages.

> Virtually every Board judgment call went against SUFI and in favor of the Government. In view of the willfulness of the Air Force breaches, one would expect the outcomes to have been just the opposite, with judgment calls favoring SUFI.

108 Fed. Cl. at 295. The Board's actions were those of the agency and trigger the "bad faith" exception to the American Rule, as decisions so grossly erroneous as to imply bad faith (as the Wunderlich Act put it) reflecting an obvious "overzeal for the department" (as Justice Jackson put it).

3. DOJ Litigated Vexatiously with Respect to the Remand Proceedings

While DOJ capably defended the Air Force's interests during the initial phase of proceedings in this Court and at the Federal Circuit, the same cannot be said for its litigation posture when the ASBCA issued its decisions after remand. At that juncture, the law was pellucid that the ASBCA spoke for the Air Force and that its determination was "final and conclusive" for the United States. The law was pellucid that DOJ was then to enforce the ASBCA's determination. The law was pellucid that only a contractor could bring an action under the Tucker Act to complain of an alleged breach of the discretion given to the ASBCA under the disputes clause to make "final and conclusive" awards. These principles had been repeatedly elucidated and reinforced in binding precedent in *S&E*; *Fischbach & Moore International Corp. v. United States*, 617 F.2d 223 (Ct. Cl. 1980); *General Dynamics Corp. v. United States*, 206 Ct. Cl. 821 (1975); and *Roscoe-Ajax Construction Co. v. United States*, 499 F.2d 639 (Ct. Cl. 1974), among other cases. Yet, with nary a supporting precedent, instead of following the admonition of the Supreme Court in *S&E* that DOJ was to enforce, rather than challenge, a board determination, DOJ filed a "notice of dissatisfaction" with the agency's final decision on remand and sought to challenge it independently. That necessitated briefing by

SUFI in response and a decision by this Court rejecting DOJ's challenge. *SUFI CFC V*, 122 Fed. Cl. 257 (2015). In its decision and judgment, this Court expressed its "expectation that the Department of Justice will instruct the AFNAFPO to pay the Board's award of damages with interest." *Id.* at 263.

DOJ did not follow this Court's instruction. Instead, it filed an appeal in the Federal Circuit, necessitating additional briefing and generating further delay. The Federal Circuit affirmed, relying largely on the reasoning of this Court. *SUFI CAFC III*, 817 F.3d 773 (Fed. Cir. 2016). Several portions of the Federal Circuit's decision demonstrate that DOJ had no serious legal position, but pursued the appeal solely to delay satisfying the judgment. For example,

- The Federal Circuit did not grant DOJ oral argument, but granted SUFI summary affirmance. *Id.* at 777.
- The Federal Circuit recited this Court's rationale in *SUFI CFC V* relying on *S&E* and related Court of Claims decisions and concluded, "Here, the Board's new decision is not the first Board decision in the case. But we have been offered no good reason why that fact provides a basis for a different conclusion under the *S & E* line of authority." *Id.* at 776-78.
- It continued, "Holding the United States to its Board-determined position is a straightforward application of the long-established *S & E* line of authority and of the Wunderlich Act policy it implements: 'respect for the parties' rights to contract and to provide for their own remedies.'" *Id.* at 778 (quoting *United States v. Anthony Grace & Sons, Inc.*, 384 U.S. 424, 429, 430 (1966)).
- The Federal Circuit next rejected DOJ's argument based on the repeal of the guiding statute, the Wunderlich Act:

> But neither the repeal of the Act nor the distinct provisions of a different statute that is inapplicable here (and that co-existed with the Wunderlich Act for three decades, starting before *Fischbach & Moore* was decided) provides any basis for rejecting a straightforward application of the precedents under the Wunderlich Act.

*Id.*

- The Federal Circuit then disposed of DOJ's assertion that a "violation of the mandate" exception existed to the rule of *S&E*:

> We see no sound basis for that contention.
>
> The United States cites no authorities that are on point. It cites only decisions from quite different settings that make familiar, general points about mandate compliance. None of those decisions were rendered in cases that arose under the Wunderlich Act or involved a contract disputes clause like the one here. And none address a mandate-compliance argument in circumstances like the ones in this case . . . .
>
> The argument for a "mandate compliance" exception to the clear and long-settled Wunderlich Act doctrine not only lacks support in precedent. The argument also is contrary to the simple, established basis of that doctrine.

*Id.* at 778-79 (footnote omitted).

- Continuing *arguendo*, the Federal Circuit ruled that none of the "mandate violations" alleged by DOJ had any semblance of merit:

> In any event, even if we were to find a "mandate compliance" exception to the Wunderlich Act doctrine, we would not find any violation of this court's 2014 mandate by the 2015 Board decision in this case. . . .
>
> . . . To permit the United States to challenge the 2015 Board decision would require that the United States be relieved of the obligation to respect its own Board's decision in these circumstances. This court did not grant the United States any such relief. . . .
>
> . . . .

> . . . More generally, all of this court's remand directives came in the context of explanations that the Board had not given SUFI's arguments and evidence their due.

*Id.* at 779-80.

- Turning to specific allegations of DOJ, the Federal Circuit summarized before disposing of them,

> Even if we were to read some of this court's explanations of Board deficiencies as mandates to the Board favoring the United States, we would not find that the Board in 2015 committed a mandate violation. . . .
>
> . . . We have to generalize those passages beyond their terms to treat them as mandates running in the United States' favor, but even if we do so, we see no mandate violation.

*Id.* at 780-81.

- Concluding on the "mandate violation" point, the Federal Circuit stressed that DOJ's allegations had no colorable basis in fact or law: "The United States' mandate-violation contention now rests ultimately on a criticism of the Board for not sufficiently *discussing* each of the United States' specific evidentiary arguments. But there is no such requirement in this court's 2014 mandate . . . ." *Id.* at 781.

- Finally, the Federal Circuit noted that DOJ's arguments about alleged violations were so weak that they likely would not pass muster even if standard review had been available:

> Given how exhaustively the competing inferences from evidence were contested and examined in the numerous rounds of this dispute-resolution process, there may not be grounds for disturbing the Board decision here even under the standards of review applicable outside the mandate-compliance context.

*Id.* at 782.

All this leads to the conclusion that DOJ had no legitimate basis for appeal.

DOJ's additional litigation to block SUFI's right to collect its damages as determined by the Board on remand was vexatious, calculated to delay payment of the award despite clear law foreclosing its attempted challenge. As such, it requires the Court to award SUFI's full fees under § 2412(b). Such fees are appropriate when the opposing party has acted "vexatiously, wantonly, or for oppressive reasons," *Alyeska Pipeline*, 421 U.S. at 258-59; *F.D. Rich Co.*, 417 U.S. at 129, and they are more than appropriate here. *See also Vaughan*, 369 U.S. at 530-31 (awarding fees for denying relief clearly due and forcing litigation).

B. Crowell & Moring's Standard Rates Should Be Used

The Court in awarding pursuant to a lodestar methodology should use Crowell & Moring's standard rates, as specified in the supporting materials. (Claybrook Aff't (Attach. C) ¶¶ 39-42 & Ex. 24.) This Court affirmed the appropriateness of Crowell & Moring's rates in *SUFI CFC IV*, 113 Fed. Cl. at 147, and the Federal Circuit affirmed that ruling in *SUFI CAFC II*, 785 F.3d 585, 593-94 (Fed. Cir. 2015). This is supported here as well, not just by the evidence of the same nature as found sufficient in *SUFI CFC IV*, but by applicable precedent.

An "attorney's usual billing rate is presumptively the reasonable rate, provided that this rate is 'in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Kattan by Thomas v. D.C.*, 995 F.2d 274, 278 (D.C. Cir. 1993) (quoting *Blum v. Stenson*, 465 U.S. 886, 895 (1984)); *accord Adolph Coors Co. v. Truck Ins. Exchange*, 383 F. Supp. 2d 93, 98 (D.D.C. 2005) ("the most fundamental economic analysis indicates that, all things considered, the rate that [a firm] charges its clients is the market rate"). As the D.C. Circuit put it almost 30 years ago,

> [W]hen fixed market rates already exist, there is no good reason to tolerate the substantial costs of turning every attorneys fee case into a major ratemaking proceeding. *In almost every case, the firms' established billing rates will provide fair compensation.*

*Laffey v. Nw. Airlines, Inc.*, 746 F.2d 4, 24 (D.C. Cir. 1984) (emphasis in original), *overruled on other grounds by Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516 (D.C. Cir. 1988) (en banc). This rule applies in full measure here.

C. The Rate Under § 2412(b) Should Be Adjusted to Account for Delay

The Supreme Court has expressly sanctioned enhancing historic rates to compensate for delay between when the work was done and when the fees are paid. That is appropriate here because of the long delay in payment and because SUFI's actual fees, based on its contingent fee agreement, greatly exceed the lodestar amount requested.

The government will undoubtedly argue that the Supreme Court's decision in *Library of Congress v. Shaw*, 478 U.S. 310 (1986), forecloses this "enhanced" relief, but it does not. In *Shaw*, a 6-3 majority, in interpreting a Civil Rights Act fee-shifting statute, held that enhancement for delay was the functional equivalent of interest, despite recognizing distinctions in economics theory, and held that the "no-interest" rule that applied to the federal government, codified at 28 U.S.C. § 2516(a), was not overcome by a fee-shifting statute that made the federal government liable to the same extent as a private party would be. The dissent disagreed, believing Congress in this language expressly intended to provide for the payment of interest if a private party would be liable for it.

*Shaw* does not foreclose application of interest here because, first, the majority's decision has been fully undermined. Congress, whose language the Supreme Court was interpreting, disagreed with the majority's reading of the statute and promptly amended the statute to

repudiate the decision, expressly providing that interest could be awarded. *See* 42 U.S.C. § 2000-16(d) (2012). The legislative history instead lauds the Supreme Court's later ruling in *Missouri v. Jenkins*, 491 U.S. 274 (1989). *See* H.R. No. 102-40(I), 102d Cong., 1st Sess., at 86-87, *reprinted in* 1991 U.S.C.C.A.N. 549, 624-25.

*Jenkins* was a § 1988 fee-shifting case in which the district court awarded current market rates against the state to account for delay in payment of fees. The Supreme Court, now with the *Shaw* dissenters in the majority, held that a trial court may make "an appropriate adjustment for delay in payment − whether by the application of current rather than historic hourly rates or otherwise . . . ." 491 U.S. at 284. It noted that this result was foreshadowed by the Court in *Pennsylvania v. Delaware Valley Citizens Council*, 483 U.S. 711 (1987), also decided shortly after *Shaw*, in which the Court distinguished between augmentation due to risk of loss and due to delay:

> First is the matter of delay. When plaintiffs' entitlement to attorney's fees depends on success, their lawyers are not paid until a favorable decision finally eventuates, which may be years later . . . . Meanwhile, their expenses of doing business continue and must be met. In setting fees for prevailing counsel, the courts have regularly recognized the delay factor, either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value. Although delay and the risk of nonpayment are often mentioned in the same breath, adjusting for the former is a distinct issue . . . . We do not suggest . . . . that adjustments for delay are inconsistent with the typical fee-shifting statute.

*Id.* at 716 (quoted in *Jenkins*, 491 U.S. at 282-83 (citations omitted)); *see also Murray v. Weinberger*, 741 F.2d 1423, 1433 (D.C. Cir. 1984) ("Current market rates have been used in numerous cases to calculate the lodestar figure when the legal services were provided over a multiple-year period and when use of the current rates does not result in a windfall for the attorneys."); *Copeland*, 641 F.2d at 893 n.23 (noting that lodestar may be "based on present

hourly rates, rather than the lesser rates applicable to the time period in which the services were rendered," to reduce or eliminate "harm resulting from delay in payment"). While lower courts have continued to uphold the vitality of *Shaw* in cases against the federal government in some settings, *see*, *e.g.*, *Biery v. United States*, 818 F.3d 704 (Fed. Cir. 2016) (takings claim under 42 U.S.C. § 4654(c)); *Hubbard*, 480 F.3d at 1334 (EAJA § 2412(d) case); *Masonry Masters, Inc. v. Nelson*, 105 F.3d 708, 711-12 (D.C. Cir. 1997) (same), its underpinnings have been eroded, and no decision found analyzes the issue of whether interest can be awarded against the government under § 2412(b).

Even if an enhancement for extraordinary delay is equated with "interest," contra the teaching of *Jenkins* and *Delaware Valley*, § 2412(b) expressly avoids the result in *Shaw*. Section 2412(b) provides that the "United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award." 28 U.S.C. § 2412(b) (emphasis added). The State of Missouri was such an "any other party" against which an enhancement for delay was awarded in *Jenkins*; similarly, the Commonwealth of Pennsylvania was "any other party" in *Delaware Valley*. Moreover, by amending the statute Congress considered misconstrued by the *Shaw* majority, it expressly made interest available against the federal government in § 2412(b), because the amended statute became one of the set of "any statute which specifically provides for such an award." *Id.* (emphasis added); *see West v. Potter*, 717 F.3d 1030, 1034 (D.C. Cir. 2013). Thus, the United States is also liable for interest under § 2412(b).

A second reason that the no-interest rule does not apply here is because the Air Force agreed by contract to pay interest, an express exception under § 2516(a). The Partial Settlement Agreement executed by SUFI and the Air Force provides in relevant part as follows:

> The Air Force agrees to the following concerning any claims filed by SUFI with the AF concerning the Contract and this Agreement:
>
> (a) The Air Force will be liable to pay interest on any amounts paid or recovered by settlement or judgement from the earlier of (i) the date of receipt of the claim or (ii) the date damages are actually incurred, until payment.

(Ex. B70 ¶ 4.) This claim is "concerning the Contract," and SUFI files it "with the AF" through its counsel in this litigation, the Department of Justice. The interest runs from "the date damages are actually incurred, until payment," on "any amounts paid or recovered by settlement or judgment . . . ." The interest rate is established as the monthly Federal Reserve Board prime rate. *SUFI CFC III*, 108 Fed. Cl. at 301.

Enhancement for delay in payment should be applied here. The litigation hours were incurred beginning in 2004, with the initial Board work concluding in 2009; the CFC and Federal Circuit work began in 2011. There would be no windfall to SUFI, only a windfall to the government if it were allowed to avoid paying a just compensation, which will occur if the extensive delay between when payment is made and when SUFI incurred the fees goes unaccounted for. The Court, therefore, should either use current rates or, in the alternative, enhance the historic rates with Federal Reserve rate interest, as provided in the parties' Partial Settlement Agreement. (Claybrook Aff't (Attach. C) ¶ 47 & Ex. 27.)

Bad faith awards under § 2412(b) are not subject to the limitations imposed under § 2412(d). The amount requested is fully supportable as an exercise of the Court's discretion to sanction bad faith conduct, both under § 2412(b) and the Court's inherent authority.

## IV. <u>In the Alternative, SUFI Is Entitled to Recover As a Small Business Under § 2412(d)</u>

Congress in the EAJA also mandated that prevailing parties of limited size and means such as SUFI are to recover legal fees when the agency's conduct was not substantially justified.

28 U.S.C. §§ 2412(d)(1)(A), (d)(2). The burden to prove that the agency's conduct was substantially justified rests on the government. *See Scarborough*, 541 U.S. at 414-16; *Ramcor Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1288 (Fed. Cir. 1999). To satisfy this obligation, the government must show that its position had a "reasonable basis both in law and fact." *Pierce*, 487 U.S. at 565; *see Ramcor*, 185 F.3d at 1290; *Geo-Seis Helicopters, Inc. v. United States*, 79 Fed. Cl. 74, 77-79 (2007). Moreover, unlike with exceptions to the American Rule, the "primary" conduct that gave rise to the litigation, as well as the litigation conduct, is to be considered. 28 U.S.C. § 2412(d)(2)(D); *see Centex Corp.*, 486 F.3d at 1374-75; *Doty v. United States*, 71 F.3d 384, 386 (Fed. Cir. 1995).

Under the "small business" award provisions of § 2412(d), fees as a general rule are calculated by the "lodestar" method (reasonable hours times reasonable rates), subject to a cap of $125 per hour as adjusted for the "cost of living or a special factor." 28 U.S.C. § 2412(d)(2)(A); *see Burlington v. Dague*, 505 U.S. 557, 562 (1992). While a cost of living adjustment ("COLA") increase is to be provided as a matter of course (and is requested here), *see DGR Assocs., Inc. v. United States*, 97 Fed. Cl. 214, 220-21 (2011) (collecting cases), *rev'd on other grounds*, 690 F.3d 1335 (Fed. Cir. 2012), a "special factor" is, of necessity, a fact-specific inquiry. The Supreme Court has noted, however, that an enhanced award may be justified due to a party obtaining exceptional success. *See Hensley*, 461 U.S. at 432. To be eligible for fee awards as a small business, the plaintiff, at the time it filed the complaint, must have had fewer than 500 employees and a net worth of less than $7,000,000. 28 U.S.C. § 2412(d)(2)(B). As set out in the Declaration of James Pearson (attached as Attachment A), SUFI's Chief Executive Officer, SUFI satisfies these criteria.

A. The Air Force's Position Was Not Substantially Justified

This Court and the Federal Circuit overwhelmingly upheld SUFI's claims in this action. *Pierce*, 487 U.S. at 569 (noting that "a string of losses can be indicative; and even more so a string of successes" with respect to whether government position in litigation was substantially justified). The Air Force's position was not substantially justified, as the court decisions and SUFI's prior pleadings establish. In instance after instance, the Air Force, and the ASBCA as the agency's final decision maker, acted contrary to law and inconsistently with the record, as even the ASBCA's decisions on remand show.

Beyond this, the Court must look to the "primary conduct" of the agency when assessing whether the agency's position was "substantially justified." 28 U.S.C. § 2412(d)(2)(D); *see Centex*, 486 F.3d at 1374-75. The Federal Circuit in *Hubbard*, dealing with a similar case in which the agency had breached its implied, good faith duties by undercutting the contractor's ability to obtain the expected return on a shared revenues arrangement that was essentially a partnership, held that the trial court's determination that the agency had acted in bad faith toward the contractor proved that the agency's position was not substantially justified as a matter of law. 480 F.3d at 1332; *accord Cmty. Health Servs. v. Califano*, 563 F. Supp. 1368 (W.D. Pa. 1983) (finding of affirmative misconduct by agency establishes "not substantially justified"); *see also* 41 U.S.C. § 7107(b)(2)(B) (2012) (articulating "so grossly erroneous as to necessarily imply bad faith" standard); *Hoel-Steffen Constr.*, 684 F.2d at 850-52 (explaining that that standard does not require subjective bad faith or animus).

As recounted more fully in SUFI's merits briefs in this action, from "Day 1" of this Contract – and even before – the Air Force breached its good faith duties. Air Force personnel lied, misled, refused to honor express commitments, recaptured benefits foreclosed by the Contract, and facilitated evasions of the purpose of the bargain. They continued this behavior

throughout SUFI's Contract performance; they would not stop even after the Board had found the Air Force in material breach. As this Court found, the Air Force's multiple breaches were "mostly willful." *SUFI CFC III*, 108 Fed. Cl. at 295. SUFI provides only a summary by claim below.

With respect to the Calling Cards claim (*id.* at 309-10):

- Col. Hanson and Mr. Wible manifested a concerted intent to force SUFI to open up calling card access for guests by misreading Mod 5 and the rest of the Contract, contrary CO interpretations be damned ((54503) Hanson at 4/397-98; (54503) Wible at 4/489-90; Hanson at 9/99, 9/117; Ex. A103):

  - Col. Hanson insisted that the Contracting Office leverage SUFI by directing it to unblock calling card access immediately to "bring them to the table faster" by reducing SUFI's revenues. ((54503) Hanson at 4/414-20; Ex. A151 ¶ 6.) *See Mendenhall v. NTSB*, 92 F.3d 871, 876-77 (9th Cir. 1996) (leveraging by requesting party to give up a valid right is prime example of bad faith); *Moreland Corp. v. United States*, 76 Fed. Cl. 268, 291-93 (2007) (same).

  - At the same time as he and Mr. Wible were expecting SUFI to suffer a substantial drop in revenues if it reduced its rates (as he told his supervisor, Lt. Gen. Lichte, would happen), Col. Hanson told Mr. Pearson that he expected SUFI's revenues to go up if it lowered its rates. ((54503) Hanson at 4/411-12; Hanson at 9/127-29; Ex. A162.)

  - When he got resistance from CO Henson, Col. Hanson complained to his superiors about his being soft on SUFI. ((54503) Henson at 4/401-04; Hanson at 9/122; Ex. A128.)

  - During his testimony, Col. Hanson repeatedly stated that he had not directed the COs to open up calling card access, when the events and the documentary evidence demonstrate exactly the opposite. ((54503) Hanson at 4/432-33; Hanson at 9/124; Ex. A162 at 2.)

  - Mr. Wible had a marked bias against SUFI and in favor of running his "own" telephone system. ((54503) Adams at 4/20-21; (54503) Wible at 4/296-97 (refused to meet with Ms. Ansola); Wible at 21/8 (denying he thought it better for the Air Force to manage its own telephone system), 21/10 (admitting he wrote exactly that); (54503) R4F 227 (Wible's goal "is getting rid of us"); Ex. A63 (suggesting to COTR in 2001 that SUFI be terminated); Ex. A114 ("SUFI's days are numbered"); Ex. B84 § 5.) *See Hubbard v. United States*, 52 Fed. Cl. 192, 194-98 (2002), *aff'd in part and rev'd in part*, 480 F.3d 1327 (Fed. Cir. 2007) (finding it bad faith for

naval facility commander to undercut contractor because he wanted military personnel to take over the contracted function).

With respect to the Hallway and Lobby DSN Phones claim (*SUFI CFC III*, 108 Fed. Cl. at 303) ("The Air Force's breach of contract in refusing to remove the hallway and lobby telephones can only be regarded as willful.")):

- USAFE officials willfully refused to remove all hallway and lobby government phones, despite knowing they were required to do so. *SUFI ASBCA VIII*, 09-1 BCA at 168,236 (¶ 93), 168,241 (Air Force's contemporaneous understanding of Contract was not different from SUFI's).

- Within months after SUFI had begun its performance, the Air Force increased the access on the hallway and lobby phones from local to worldwide. *Id.* at 168,236 (¶ 91).

- USAFE officials added many hallway and lobby phones after SUFI had begun its performance. *Id.* at 168,237 (¶ 99); Stephens at 10/66-68; Ansola at 4/74-75; B25 at 4.

- The KMC Lodging management reneged on its promise to remove all hallway and lobby phones if SUFI agreed to provide service to Kapaun. (Stephens at 1/120-25; Branham at 12/248-49; White at 16/18-24; R4F, vol. 2, tab 25.)

- Contracting Office personnel refused to issue a "clarifying" modification to the Contract to assist in the removal of government phones, despite repeated requests that they do so by SUFI and COTR Adams. (Adams at 7/68-72; Browning at 15/63-66, 15/70, 15/107-19; Myers at 14/56-57; Ex. B27 at 1; Ex. B29 at 1-2; Ex. B30.)

With respect to the Prime Knight Lodgings claim (*SUFI CFC III*, 108 Fed. Cl. at 316):

- Lodging Manager Fred Roberts lied to Mr. Stephens about the access of in-room phones during the pre-bid site survey. *SUFI ASBCA VIII*, 09-1 BCA at 168,242 (¶¶ 121, 123); (54503) Stephens at 1/204-05; Stephens at 1/172-77, 1/189-90; Ex. A15; *SUFI CFC III*, 108 Fed. Cl. at 316.

- For almost two years, the Air Force, including the CO and the Air Force brass on the base, refused to remove the government phones from the rooms unless SUFI provided worldwide DSN access, despite open acknowledgement that the Contract required in-room phones to be removed. *SUFI ASBCA VIII*, 09-1 BCA at 168,242 (¶¶ 122, 126); *SUFI CFC III*, 103 Fed. Cl. at 316.

With respect to the Delta Squad claim (*id.* at 308):

- The CO, COTR, and Lodging management refused to have the phones removed or to let SUFI remove them (but allowed SUFI to replace them with its own phones), despite SUFI showing widespread abuse of the phones. *SUFI ASBCA VIII*, 09-1 BCA at 168,260 (¶¶ 202-03); Ansola at 4/173-83; Ex. A136 at S00359-60; FF 498, 501-03.

- The CO's refused to issue a "clarifying" mod to direct removal of the phones, even though COTR Adams recommended it. *SUFI ASBCA VIII*, 09-1 BCA at 168,260 (¶ 203); Myers at 14/204; Adams at 7/69-70; Ex. B23; R4F, vol. 6, tab 80A, at 1731; Ex. B27.

With respect to the Early DSN Abuse claim (*SUFI CFC III*, 108 Fed. Cl. at 315):

- After SUFI blocked access to the original base operator numbers due to widespread and extensive abuse, USAFE personnel established and communicated to guests other operator direct dial numbers to help them circumvent SUFI's system and make free, off-base calls. *SUFI ASBCA VIII*, 09-1 BCA at 168,233-34 (¶ 80).

- The Air Force, from the outset through the end of SUFI's performance, refused to inform the base operators not to patch calls from the lodgings to off-base numbers. (Sakuda at 17/163, 17/152-55; Ansola at 4/62-64; R4F, vol. 6, at 1732.)

With respect to the Other Operator Numbers Patching claim (*SUFI CFC III*, 108 Fed. Cl. at 306-07):

- "Air Force front-desk personnel encouraged guests to use various 'direct access' local DSN numbers that the Air Force set up to reach DSN operators directly, and who would then patch guests through to long-distance access." *Id.* at 307.

- The Air Force refused to act on SUFI's multiple requests to control direct and indirect operator access, despite knowing that assisting guests to circumvent SUFI's system was in violation of the Contract. Instead, "Air Force front-desk personnel . . . actively assisted guests in circumventing SUFI's system" by providing guests with numbers that would patch them to the operators. *Id.* (Ansola at 4/136-37, 4/140-42; White at 16/43, 16/133-36, 17/19-21; Ex. A106; R4F, vol. 8, tab 82B, at 2603.)

- The Air Force set up a push-button access to the operator through the AMC Terminal auto-attendant number and then took over a month to correct the situation after SUFI discovered it and complained. *SUFI ASBCA VIII*, 09-1 BCA at 168,251 (¶¶ 160-61).

With respect to the German Troops Housing (*SUFI CFC III*, 108 Fed. Cl. at 317):

- Without prior notice, the Air Force not only converted the lodgings SUFI serviced to a long-term barracks for German troops, but also failed to give them the PIN's they needed to use the SUFI phones. *SUFI ASBCA VIII*, 09-1 BCA at 168,269 (¶¶ 242-44).

With respect to the Lost Profits claim (*SUFI CFC III*, 108 Fed. Cl. at 318-20):

- The Board adopted a performance period that was inconsistent with its own findings and read the Performance Period clause out of the Contract. *SUFI ASBCA VIII*, 09-1 BCA at 168,286-87 (¶ G); *SUFI ASBCA IX*, 09-2 BCA ¶ 34,210 at 169,092-93 (2009).

With respect to the SIMS/LTS Interfaces claim (*SUFI CFC III*, 108 Fed. Cl. at 311-12):

- The Air Force repeatedly failed to assist SUFI in performing the SIMS interface work on a timely and professional basis, insisting that SUFI spend substantial amounts to accomplish "fixes" even though, internally, it admitted that the interface failures were its own responsibility. (Stephens at 2/41-76; 2/150-51, 10/74-75; Ex. B5; Ex. B6; Ex. B14; Ex. B17; Ex. A21 at S00050.)

- The ASBCA unreasonably reduced SUFI's damages by inserting irrelevant issues *sua sponte* with respect to the Tiger system, blatantly misreading the record, and arbitrarily eliminating proven extra work. *SUFI ASBCA VIII*, 09-1 BCA at 168,231-32; *SUFI CFC III*, 108 Fed. Cl. at 311-12.

With respect to the Change of Air Force Switches claim (*id.* at 314-15):

- The Air Force (and ASBCA) unreasonably refused to compensate SUFI for overcoming the technical problem with the automatic call distribution system for the Ramstein Reservations Center, even though SUFI's engineers successfully demonstrated that the cause of the problem was the government's replacement of its own switch and even though the Air Force put forward no other rationale for the sudden occurrence of the problem upon its changing the base switch. *SUFI ASBCA VIII* at 168,264 (¶ 215); *SUFI CFC III*, 108 Fed. Cl. at 315. (Congalton at 12/62-70; Ansola at 4/277-79.)

All of these incidents – and many more recounted for the various claims in SUFI's briefs and even in the Board's decision – demonstrate that the Air Force's behavior cannot be excused as simple "slip-ups" and "good faith differences of opinion" about what the Contract required. In instance after instance, Air Force officials intentionally acted in breach or with gross indifference to SUFI's rights under the Contract, in breach of their good faith duties. As a result,

the Air Force's position is not substantially justified, as a matter of law. *See Hubbard*, 480 F.3d at 1332.

B. SUFI Should Receive Full Rates in a § 2412(d) Recovery

Congress provided for enhancement of the capped rate when the case presents a "special factor." 28 U.S.C. § 2412(d)(2)(A). Congress gave some examples, but intentionally left the "special factor" category vague, open, and in the trial court's discretion, recognizing that each case is unique. *See id*.

This case presents several unusual and special factors that supports enhancement of the rate. Its counsel obtained exceptional relief, and the agency, acting both through COs and through the ASBCA as its ultimate decision maker, repeatedly denied SUFI appropriate relief. Another special factor here is the unique situation that SUFI was not able to retain needed expert assistance due to its limited means and, thus, that assistance was supplied by Crowell & Moring employees. Furthermore, other suitable counsel was not available at lower rates, government contracts is a specialty practice, and SUFI would not have been able to retain Crowell & Moring at the EAJA rates. There has also been an unusually long delay between the incurrence of the fees and the reimbursement here. In the unique circumstances of this case, these special factors, individually and in combination, dictate recovery at a full rate.

1. SUFI Should Receive an Enhanced Rate Due to the Exceptional Results Obtained

This is the rare case that qualifies for an enhanced rate "special factor" because counsel obtained exceptional success. *See Hensley*, 461 U.S. at 434 ("other considerations . . . may lead the [trial] court to adjust the fee upward . . ., including the important factor of the 'results

obtained'"), 437; *Hubbard*, 480 F.3d at 1332 (applying *Hensley* in EAJA case). Counsel achieved a number of "records" in this case:

- The largest verdict on record on a no-cost contract.
- The largest verdict on record against a NAFI.
- The only contractor ever to pursue three at least partially successful motions for reconsideration at the ASBCA, leading to a doubling of the Board's initial award.
- The first and only contractor successfully to prosecute a Wunderlich Act appeal following *Slattery v. United States*, 635 F.3d 1298 (Fed. Cir. 2011) (en banc), obtaining more than a ten-fold increase in the awarded damages based on the administrative record after remand.
- A ten-fold increase of damages by the ASBCA on remand from the Federal Circuit and this Court.
- The only contractor to negotiate interest on damages awarded against a NAFI, set at the Federal Reserve monthly rate.

Simply put, if this case does not meet the "exceptional success" standard for enhancement, this type of special factor is a dead letter. Indeed, this case compares favorably to other cases providing enhancements for exceptional success. *See*, *e.g.*, *Barnes v. Cincinnati*, 401 F.3d 729, 745-47 (6th Cir. 2005) (upholding district court's award of current market rates (per *Jenkins*) *and* 1.75x multiplier as enhancement for exceptional success) (citing cases); *Brotherton v. Cleveland*, 141 F. Supp. 2d 907, 913 (S.D. Ohio 2001) (awarding 150 percent multiplier); *Hollowell v. Gravett*, 723 F. Supp. 107, 110 (E.D. Ark. 1989) (awarding 75 percent quality enhancement); *Shakman v. Democratic Org.*, 677 F. Supp. 933, 945 (N.D. Ill. 1987) (awarding a one-third quality enhancement).

In the context of a 42 U.S.C. § 1988 fee petition, the Supreme Court in *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 554 (2010) provided greater specificity with respect to the "exceptional success" standard, noting that it must also be tied to superior attorney performance.

In that case, it called for "specific evidence" that a lodestar fee lower than the attorney's normal rate "would not have been 'adequate to attract competent counsel.'" *Id.* at 554-55 (quoting *Blum*, 465 U.S. at 897). That showing is obvious here. Section 2412(d) caps the rate at $125 (or about $174 as COLA-adjusted for this case). As will be discussed further below, the specialized expertise needed for SUFI's particular problems was not available at EAJA's capped rate. (Myers Aff't (Attach. B) ¶¶ 5-7; Claybrook Aff't (Attach. C) ¶¶ 6-7; Calhoon Decl. ¶ 5.) *Cf. Lumen View Tech. LLC v. Findthebest.com, Inc.*, 811 F.3d 479, 485 (Fed. Cir. 2016) (noting enhancement permissible under 35 U.S.C. § 285 when lodestar does not adequately measure attorney's true market value).

2. SUFI Should Receive an Enhanced Rate Under <u>§ 2412(d) Because of Special Tasks Performed</u>

SUFI, due to its small size and lack of continuing business after it canceled the Contract, could not afford to retain accounting consultants to assist with the presentation of its damages case. (Claybrook Aff't (Attach. C) ¶¶ 17, 27.) However, for the Board proceedings in Docket No. 55306, SUFI did require accounting and database analysis to prepare rebuttal testimony and exhibits, particularly regarding the government's defective DSN data for the illicit hallway and lobby phones. Typically, this work would have been performed by an accounting consultant. (Claybrook Aff't (Attach. C) ¶ 17); Calhoon Decl. (Attach. G) ¶¶ 6-10.) Fortunately, Crowell & Moring had in its employ individuals of sufficient expertise, particularly Ms. Tatiana King. She performed such analyses, prepared extensive reports and charts, and testified at the 55306 hearing. (55306 Exs. B208, 218-21[6]; (55306) King at 22/298-355; King Aff't, attached as Attachment D, ¶¶ 5-7 & Exs. 1 & 2; Claybrook Aff't (Attach. C) ¶ 17.) Due largely to her work,

---

6 These documents are voluminous and are available upon request.

the ASBCA found that the government data was full of gaps and incompetent evidence. *SUFI ASBCA VIII*, 09-1 BCA at 168,228 (¶ 109(b)). The Federal Circuit struck down the Board's use of the government data for similar reasons. *SUFI CAFC I*, 755 F.3d at 1316.

Ms. King, as well as other Crowell & Moring individuals assisting her and providing support during the Board's remand phase (by which time Ms. King had left Crowell & Moring's employ), despite providing this critical expertise, were not timekeepers. She and the others were technology support specialists at Crowell & Moring and were included in the firm's overhead expense. Thus, their expertise and hours – which Ms. King calculated to be 680 hours in the initial proceedings based on contemporaneous recordkeeping (King Aff't (Attach. D) ¶¶ 6-7 & Ex. 2), with about an additional 60 hours from other Crowell & Moring data experts in the remand proceedings (MacFarlane Aff't (Attach. E) ¶ 9 & Ex. 2; Apps Decl. (Attach. F) ¶ 9 & Ex. 2) – are only recovered in the rates of Crowell & Moring timekeepers. Unless a special factor allowance is made in this exceptional circumstance, her and her associates' critical work in the litigation will not be reimbursed at all. Mr. Calhoon of Baker Tilley estimates the value of that work if his firm had performed it to be over a quarter million dollars. (Calhoon Decl. (Attach. G) ¶ 11 & Ex. A.)

### 3. SUFI Should Receive an Enhanced Rate Under § 2412(d) Because of Extraordinary Delay

The courts have recognized an unusual delay in payment as a "special factor" under § 2412(d) permitting relief by enhancement of the rate or overall fee award. *See*, *e.g.*, *Okla. Aeronautics, Inc. v. United States*, 943 F.2d 1344, 1348-49 (D.C. Cir. 1991) (relying in § 2412(d) case on *Jenkins* and *Delaware Valley* to hold that enhancement for delay in payment is not interest and awarding special factor relief due to an eight-year delay); *Wilkett v. ICC*, 844 F.2d 867, 876 (D.C. Cir. 1988) (four-year delay); *Hirschey v. FERC,* 777 F.2d 1, 5 (D.C. Cir. 1985)

(two-year delay); *see also Jenkins*, 491 U.S. at 284; *Copeland*, 641 F.2d at 893 n.23. The delay here certainly has been unusual, as the majority of fees were earned about a decade ago. And as the D.C. Circuit held in *Wilkett*, 844 F.2d at 876, unusual delay still qualifies as a special factor under § 2412(d) after *Shaw*, in part because § 2412(d) expressly provides Congressional consent to adjust a fee award for special factors. *See also Delaware Valley*, 483 U.S. at 716 (adjustments for delay are not inconsistent with typical fee-shifting statutes).

In the context of 42 U.S.C. § 1988, the Supreme Court in *Perdue* quoted the *Jenkins* rule that enhancement for delay can be accommodated by "basing the award on current rates," 559 U.S. at 556 (quoting *Jenkins*, 491 U.S. at 282), but went on to hold that a further enhancement may be appropriate "in the face of unanticipated delay, particularly where the delay is unjustifiably caused by the defense." *Id.*; *cf. Lumen*, 811 F.3d at 485 (enhancement available under 35 U.S.C. § 285 for exceptional delay in payment). For reasons already recited, the delay in this case has been "unjustifiably caused" by the government. Thus, the Court should also provide an enhancement for extraordinary delay as a special factor if it awards under § 2412(d).

4. SUFI Should Receive an Enhanced Rate Under § 2412(d) <u>Because of the "Limited Availability of Qualified Attorneys"</u>

Section 2412(d)(2)(A) lists one example of a special factor justifying an enhanced rate "as the limited availability of qualified attorneys for the proceedings involved." Such a "specialized attorney" adjustment should be made here, if fees are awarded under § 2412(d).

The Supreme Court construed this "specialized counsel" adjustment factor provision in *Pierce*, as follows:

> [T]he exception for "limited availability of qualified attorneys for the proceedings involved" must refer to attorneys "qualified for the proceedings" in some specialized sense, rather than just in their general legal competence. We think it refers to attorneys having some distinctive knowledge or specialized skill needful for the

> litigation in question – as opposed to an extraordinary level of the general lawyerly knowledge and ability useful in all litigation. Examples of the former would be an identifiable practice specialty such as patent law, or knowledge of foreign law or language. Where such qualifications are necessary and can be obtained only at rates in excess of the $[125] cap, reimbursement above that limit is allowed.

487 U.S. at 572.

SUFI fully recognizes that this Court has consistently declined to find that "expertise in government contracts law per se satisfies the EAJA special factor requirement." *DGR Assocs.*, 97 Fed. Cl. at 220 (quoting *Cal. Marine Cleaning, Inc. v. United States*, 43 Fed. Cl. 724, 733 (1999)); *see also Impresa Construzioni Geom. Domenico Garufi v. United States*, 100 Fed. Cl. 750, 773 (2011); *Prowest Diversified, Inc. v. United States,* 40 Fed. Cl. 879, 889 (1998); *Esprit Corp. v. United States*, 15 Cl. Ct. 491, 494 (1988). Neither the Federal Circuit nor the Supreme Court has addressed the issue, however, and, with due respect, SUFI suggests that, for the circumstances of this particular case, the result should be different than in past cases.

First, the general proposition that government contracts attorneys do not bring the type of "distinctive knowledge or specialized skill needful" for government contracts litigation, when patent lawyers by definition do, *Pierce*, 487 U.S. at 572, is unsound. Government contracts litigation is not the same as general commercial litigation. It is a specialty practice, just like patent law is; it has special forums in which the cases are heard, and, in that particular, government contracts cases are more specialized than patent cases, which are heard at least in part at the trial level by courts of more general jurisdiction. There is no need to recite to this Court the various intricacies added to the field of government contracts by its multiple statutory and regulatory overlays. It cannot be gainsaid, however, that government contracts specialists are just as deserving of a "specialized" category than are specialists in other fields of law who have been so classified, at least in certain situations. *See, e.g.*, *Nadarajah v. Holder*, 569 F.3d

906, 911-15 (9th Cir. 2009) (immigration litigators awarded market rates); *Love v. Reilly*, 924 F.2d 1492, 1496 (9th Cir. 1991) (environmental law specialist); *Pirus v. Bowen*, 869 F.2d 536, 541-42 (9th Cir. 1989) (social security specialist); *Jazz Photo Corp. v. United States*, 597 F. Supp. 2d 1364, 1369 (Ct. Int'l Trade 2008) (customs law specialist awarded customary rate); *League of Wilderness Defenders v. Smith*, 491 F. Supp. 2d 980, 987-88 (D. Ore. 2007) (environmental law specialist awarded customary rate); *Loudner v. United States*, 379 F. Supp. 2d 1048, 1056 (D.S.D. 2005) (Indian law specialty recognized); *In re Tom Carter Enters., Inc.*, 159 B.R. 557, 562 (Bankr. C.D. Cal. 1993) (bankruptcy law specialist awarded customary rate).

Perhaps no better proof of the specialized knowledge required for government contracts is demonstrated than by the well publicized efforts of the academics and former board judges of the government contracts bar to have considered for appointment to the Federal Circuit a judge or judges with substantial government contracts expertise, as that bench is made up principally of attorneys who had experience in patent and intellectual property law prior to their appointment to the bench. Several retired board judges "with no judicial aspirations" formed an ad hoc "Government Contract Law Judges Committee" to address their concern over what they see as the "inherent weakness" that "none of the judges of that court have specialized in federal procurement law," which Judge Burg identifies as "an arcane area of law." Ruth C. Burg, *The Role of the Court of Appeals for the Federal Circuit in Government Contract Disputes: A Historic View from the Bench*, 42 Pub. Cont. L.J. 173, 182-83 (2012). That judges' committee has issued a mission statement that calls for the appointment of nominees to the Federal Circuit with "expertise in government contract law." *Id.* at 182. Whatever the merits of that endeavor, the point here is that the field of government contracts law is, indeed, specialized and does, indeed, meet the special factor requirement of § 2412(d)(2)(A) as elaborated by the Supreme

Court in *Pierce* that the attorneys involved have "some distinctive knowledge or specialized skill needful for the litigation in question." 487 U.S. at 572.

Second, decisions of this Court denying competence in government contracts law as a special factor under § 2412(d) do not set out an ironclad rule. They just reject a *per se* rule. *E.g.*, *DRS Assocs.*, 97 Fed. Cl. at 220. This leaves room for a specific showing in a particular case. For example, in *Nadarajah*, the Ninth Circuit rejected a *per se* rule for all immigration law specialists irrespective of the particular litigation involved, but allowed that specialty a special factor award of customary rates when it was "needful for litigation in question." 569 F.3d at 913-14 (collecting cases). Similarly here, no *per se* rule need be adopted for government contracts attorneys, but sufficient discretion exists to award market rates in particular instances in which a government contracts specialty or subspecialty was needful for the litigation. *Cf. BCPeabody Constr. Servs., Inc. v. United States*, 117 Fed. Cl. 408, 415 (2014) (denying enhancement because there "were no extraordinary factual or legal issues").

The facts here demonstrate that special competence was required for this particular matter. Mr. Myers, the Managing Director of SUFI, testified in related case No. 11-453C concerning the circumstances of SUFI retaining Crowell & Moring for this engagement. He first approached his regular, New York City counsel concerning the matter. He was told by his regular counsel that the matter involved special knowledge and expertise and that he should retain other counsel that specialized in government contracts, recommending Crowell & Moring. It is only because of Crowell & Moring's specialized expertise that it was retained by SUFI. (Myers Aff't (Attach. B) ¶¶ 5-7 & Ex. 1.)

And, of course, that specialized knowledge and expertise has been important to the prosecution of this matter. (Myers Aff't (Attach. B) ¶ 7; Claybrook Aff't (Attach. C) ¶ 6.)

Involved from the outset were the peculiar federal rules regarding federal contract terminations and breach law as applied to government actors – and in this instance, a NAFI actor, an unusual type of government instrumentality with its own specialized rules. The matter required presentation through the special administrative process involving the contracting officer, government auditors applying federal accounting rules, and the specialized forum of the ASBCA. The initial proceeding, for example, involved the unique practices and procedures involved with perfecting a contract interpretation claim and the Board's charter jurisdiction to provide declaratory relief. *See SUFI ASBCA I*, 04-1 BCA ¶ 32,606 (2004). In this Court and the Federal Circuit, the arcana of the Disputes clause and exhaustion of board processes have been central. Mr. Claybrook's specialized knowledge of government contracts claims and their damages calculation also allowed him to serve as SUFI's accounting expert for purposes of the litigation, with the assistance of other Crowell & Moring personnel. (Claybrook Aff't (Attach. C) ¶¶ 6-7, 17(a); Calhoon Aff't (Attach. G) ¶ 5; King Aff't (Attach. D) ¶¶ 5-7; MacFarlane Aff't (Attach. E) ¶¶ 5-7; Apps Decl. (Attach. F) ¶¶ 5-7.) This is not just "general lawyerly knowledge and ability useful in all litigation." *Pierce*, 487 U.S. at 572. It is "distinctive knowledge" and "specialized skill needful for the litigation in question." *Id*. It justifies a waiver of the statutory cap for a § 2412(d) recovery and application of Crowell & Moring's standard, current rates.

### C. At a Minimum, the Capped Rate Under § 2412(d) <u>Must Be Adjusted for the Increase in the Cost of Living</u>

Even if this Court determines that special factors do not permit use of the current, actual rates under § 2412(d) here, the statutory rate must be adjusted for the cost of living. 28 U.S.C. § 2412(d)(2)(A). This Court, as all others, has held this adjustment to be practically mandatory. *See*, *e.g.*, *DGR Assocs.*, 97 Fed. Cl. at 220; *United Partition Sys.*, 95 Fed. Cl. at 58 (citing *Payne*

*v. Sullivan*, 977 F.2d 900, 903 n.2 (4th Cir. 1992); *Baker v. Bowen*, 839 F.2d 1075, 1084 (5th Cir. 1988)).

This Court in *DGR Associates* and other cases has established the appropriate framework for adjusting the statutory cap of $125 per hour by increases in the cost of living since Congress established that figure. 97 Fed. Cl. at 220. SUFI follows the *DGR Associates* methodology in its attached supporting materials, using the midpoint of the period over which the services were rendered (February 2010 is the midpoint of November 2003 and May 2016). (Claybrook Aff't (Attach. C) ¶ 43 & Ex. 25.)

V. SUFI's Expenses Are Fully Supported and Are Not "Fractionable"

SUFI sets out its expenses in the attached materials, with supporting documentation. They are the type of expenses routinely incurred by attorneys in litigation, and they should be granted in full. Expenses allowed under EAJA are not limited to those recoverable as costs, but include all that are "reasonable and necessary to the litigation." *BCPeabody*, 117 Fed. Cl. at 417-18 (reimbursing travel expenses, copying charges, filing services, FedEx charges, and consultant costs); *see also Ulysses*, 117 Fed. Cl. at 786 (awarding under EAJA FedEx, taxi, transcript, and online research costs); *360Training.com, Inc. v. United States*, 111 Fed. Cl. 356, 364 (2013) (awarding under EAJA costs of "filing fees, travel, delivery services, research, telephone services [and] transcript production"); *Hopi Tribe v. United States*, 55 Fed. Cl. 81, 100 (2002) (noting that, under EAJA, the CFC "has awarded administrative expenses and costs such as the recovery of copying, delivery services, travel, research services, telephone, and postage costs, as well as other expenses routinely incurred by attorneys") (citation and quotation marks omitted).

Just as with the fees, the expenses are not segregable by successful and unsuccessful claims. As SUFI obtained excellent results and as the expenses would have been incurred whether or not the unsuccessful claims were brought, they should be awarded in full. *See Hensley*, 461 U.S. at 435; *United Partition Sys.*, 95 Fed. Cl. at 57.

If expenses are granted under § 2412(d), rather than § 2412(b), the expert expenses paid by SUFI to Mr. Calhoon for support of this application are capped by "the highest rate of compensation for expert witnesses paid by the United States." 28 U.S.C. § 2412(d)(2)(A)(i); *see Dalles Irrigation Dist. v. United States*, 91 Fed. Cl. 689, 708-09 (2010). The United States used an expert in the related litigation in No. 11-453C, paying Mr. David Cotton $352 per hour. SUFI suggests use of that as a capped rate, if § 2412(d) is applied. (Claybrook Aff't (Attach. C) ¶ 45 & Ex. 26.)

## VI. SUFI's Requested Damages <u>Are Appropriately Supported</u>

SUFI in the attached supporting materials itemizes its requested relief. It provides the same type of support relied upon by this Court in awarding attorneys' fees and expenses in related case No. 11-453C and relies on the Court's rulings in that decision. *SUFI CFC IV*, 113 Fed. Cl. 140 (2013), *aff'd in relevant part*, *SUFI CAFC II*, 785 F.3d 585 (Fed. Cir. 2015).

SUFI in the supporting materials relies on the Affidavit of Frederick W. Claybrook, Jr. (Attach. C), to set out the amounts due in fees and expenses incurred by Crowell & Moring and reimbursed by SUFI. SUFI principally relies on the Affidavit of Stephen E. Myers, Jr. (Attach. B), for itemization of expenses incurred directly by SUFI. SUFI also relies on materials presented to the Court in No. 11-453C, in particular PX 26 and 27 (*Chambers* ratings), 29-37 (rate surveys for D.C. firms), 39 and 40 (GAO grants of fees and expenses of Crowell &

Moring), 42 and 45-47 (agency grants of Claybrook fees), and 57 and DX 1 (expert report and deposition transcript selections of Peter Garvin), all of which SUFI incorporates by reference.

In summary, as shown in the supporting attachments, fees and expenses are presented separately for the following sessions of this litigation:

- ASBCA Docket No. 45403
- ASBCA Docket No. 55306, Initial Proceedings
- CFC Litigation, Initial Proceedings
- Federal Circuit Nos. 2013-5039, -5040
- ASBCA Docket No. 55306, Remand Proceedings
- CFC Litigation, Remand Proceedings
- Federal Circuit No. 2015-5151
- Petition Preparation

The following methodologies are presented for each of these sessions:

- Fees at Full, Current Rates
- Fees at Historical Rates
- Fees at the COLA-adjusted, Statutory Rate

Expenses are also accumulated, as follows:

- Expenses Paid by C&M and Reimbursed by SUFI
- Expenses Paid Directly by SUFI

## VII. Under the Partial Settlement Agreement, SUFI Is Entitled to Interest from the Date of This Petition Until Payment

Under the parties' Partial Settlement Agreement ("PSA"), "the Air Force agreed to pay SUFI interest on any amount recovered by a judgment." *SUFI CAFC II*, 785 F.3d at 592. Such

interest is at the monthly Federal Reserve prime rate. *SUFI CFC III*, 108 Fed. Cl. at 301; *SUFI ASBCA VIII*, 09-1 BCA at 168,224-25.

Interest under the PSA runs from the earlier of when the claim is filed or when damages are actually incurred, until payment. *See SUFI CAFC II*, 785 F.3d at 592 (quoting PSA). This EAJA claim for litigation fees was filed as of the filing of this petition. Thus, interest will run from that date until payment at the monthly Federal Reserve rate.

Conclusion

SUFI requests award of its attorneys' fees and expenses for this action and related administrative and appellate proceedings under the EAJA. Those fees should be awarded at the full, current rate. In the alternative, the fee award should be at the historical rates. At a minimum, the fee award should be at the COLA-adjusted, statutory rate, as enhanced for delay in payment and other special factors. SUFI also requests all fees and expenses incurred related to this motion. All fee awards should include interest under the Partial Settlement Agreement from the date of filing of this claim until payment; all expense reimbursements are due PSA interest from the date they were incurred.

Respectfully submitted,

s/ Brian Tully McLaughlin

Frederick W. Claybrook, Jr.
Brian Tully McLaughlin

Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
(202) 624-2500

Attorneys for SUFI Network Services, Inc.

June 17, 2016

17658492.1